UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| ANTHONY BAFFO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| -against- | § | Index No. 10-CV-01245 (LDW)(ETB) |
| | § | |
| | § | |
| NEW YORK INSTITUTE OF | § | |
| TECHNOLOGY; ROBERT RIZZUTO, in | § | |
| his official and individual capacities; and | § | |
| LEONARD AUBREY, in his official and | § | |
| individual capacities, | § | |
| | § | |
| Defendants. | § | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Douglas P. Catalano
Neil G. Sparber
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 318-3000
dcatalano@fulbright.com
nsparber@fulbright.com

Attorneys for Defendants

90517366.2

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ...................................................................................................... 9

POINT I      PLAINTIFF CANNOT TO PROVE A PRIMA FACIE CASE OF
DISABILITY DISCRIMINATION.......................................................... 9

     A.      Plaintiff Cannot Demonstrate a Causal Relationship Between His HIV
Status and His Termination.............................................................. 11

POINT II      PLAINTIFF CANNOT REBUT DEFENDANTS' LEGITIMATE NON-
DISCRIMINATORY REASON FOR HIS TERMINATION ........................... 16

POINT III      PLAINTIFF CANNOT MAINTAIN A CLAIM UNDER THE NEW
YORK CITY HUMAN RIGHTS LAW .................................................. 19

CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Allen v. Hebrew Academy of Nassau County,
    2000 U.S. Dist. LEXIS 19605 (E.D.N.Y. Oct. 17, 2000).................................................17

Amnesty Am. v. Town of W. Hartford,
    288 F.3d 467 (2d Cir. 2002)...........................................................................................9

Bonilla v. Boces,
    2010 U.S. Dist. LEXIS 91314 (W.D.N.Y. Sept. 2, 2010) ..................................................16

Brown v. Pension Bds.,
    488 F. Supp. 2d 395 (S.D.N.Y. 2007)...............................................................................11

Connell v. Consol. Edison Co. of N.Y., Inc.,
    109 F. Supp. 2d 202 (S.D.N.Y. 2000).............................................................................10

Greco v. County of Nassau,
    146 F. Supp. 2d 232 (E.D.N.Y. 2000) .........................................................................9, 10

Hester v. Rich,
    2004 U.S. Dist. LEXIS 16593 (S.D.N.Y. Aug. 19, 2004)..................................................17

Heyman v. Queens Village Comm. for Mental Health for Jam. Community Adolescent
    Program, Inc.,
    198 F.3d 68 (2d Cir. N.Y. 1999)...................................................................................10

James v. N.Y. Racing Ass'n,
    233 F.3d 149 (2d Cir. 2000)......................................................................................10, 16

Kinneary v. City of New York,
    601 F.3d 151 (2d Cir. 2010)............................................................................................11

Kolivas v. Credit Agricole,
    1996 U.S. Dist. LEXIS 17478 (S.D.N.Y. Nov. 26, 1996)...............................13, 14, 15, 16

McCowan v. HSBC Bank USA,
    689 F. Supp. 2d 390 (E.D.N.Y. 2010) ...........................................................................10

McDonald v. City of New York & N.Y. City Dep't of Transportation,
    2011 U.S. Dist. LEXIS 37307 (E.D.N.Y. Apr. 6, 2011) .....................................................9

McDonnell Douglas Corp. v. Green,
    411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).......................................................9

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

Ortiz v. Heir AM. Trading, LLC,
    2011 NY Slip Op 31414(U) (S. Ct. New York Co. May 24, 2011) ...........................19, 20

Patterson v. County of Oneida,
    375 F.3d 206 (2d Cir. 2004)................................................................................................10

Pierre v. North Shore Univ. Hosp.,
    2010 U.S. Dist. LEXIS 43963 (E.D.N.Y. Apr. 28, 2010) .............................................9, 11

Reese v. AIDS Institute, New York State Department of Health,
    1996 U.S. App. LEXIS 26082 (2d Cir. Oct. 3, 1996)........................................................17

Richardson v. New York State Dep't of Corr. Serv.,
    180 F.3d 426 (2d Cir. 1999)...............................................................................................16

Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab.,
    2009 U.S. Dist. LEXIS 84434 (E.D.N.Y. Sept. 14, 2009)................................................11

Wahlstrom v. Metro-North Commuter Railroad Company,
    89 F.Supp.2d 506 (S.D.N.Y. 2000) ...................................................................................19

Williams v. R.H. Donnelley, Corp.,
    368 F.3d 123 (2d Cir. 2004).................................................................................................9

Woolley v. Broadview Networks,
    2003 U.S. Dist. LEXIS 2716 (S.D.N.Y. Feb. 25, 2003)........................................14, 15, 16

**RULES AND STATUTES**

Federal Rule of Civil Procedure 56 ................................................................................................1

New York Executive Law ("NYSHRL") ........................................................................................1

This memorandum of law is submitted on behalf of defendants New York Institute of Technology ("NYIT"), Robert Rizzuto ("Rizzuto"), and Leonard Aubrey ("Aubrey") in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for an Order granting defendants' summary judgment on the grounds that there are no genuine issues of material fact which need to be tried.

## PRELIMINARY STATEMENT

In this action, plaintiff Anthony Baffo alleges that his employment was terminated by NYIT because of his alleged disability, being HIV positive, in purported violation of the Americans with Disabilities Act ("ADA"), the New York Executive Law ("NYSHRL"), and the Administrative Code of the City of New York ("NYCHRL"). However, as set forth below, plaintiff's employment was terminated as a result of a reorganization of NYIT's de Seversky Center, at which plaintiff was employed as general manager, which reorganization included the elimination of plaintiff's position.

Plaintiff was first informed by the New York Blood Center in a letter, dated September 25, 2009, that the blood he had donated showed a reaction to routine tests. Plaintiff met with a representative of the New York Blood Center on October 1, 2009, at which meeting he was informed that testing indicated he was HIV positive. The diagnosis was confirmed with plaintiff after a second test was completed on or about October 7, 2009. It is undisputed that the decision to eliminate plaintiff's position was made by his supervisor, Robert Rizzuto, and NYIT's Chief Financial Officer, Leonard Aubrey, in or about August 2009, and that the process to reorganize the de Seversky Center and eliminate plaintiff's position was begun in August 2009, well before any of the parties, including plaintiff, became aware that plaintiff allegedly was HIV positive. Thus, no rational jury could determine that the termination of plaintiff was based upon plaintiff's alleged disability and summary judgment should be granted in defendants' favor.

## STATEMENT OF FACTS

Plaintiff Anthony Baffo began his employment with NYIT in September 2006 as the general manager of NYIT's de Seversky Conference Center (the "de Seversky Center"), a conference and dining facility located on NYIT's campus in Old Westbury, New York. (Compl. ¶¶ 14-15). As general manager, plaintiff reported directly to defendant Robert Rizzuto, NYIT's Director of Dining Services. (Compl. ¶ 17). Plaintiff's progression from a satisfactory employee, early in his employment at NYIT, to an employee whose job performance had become increasingly less satisfactory over time, is demonstrated by his formal job evaluations over the last two years of his employment, in which plaintiff's performance was rated unsatisfactory. (Exhibits 1 and 2; Exhibit 3 at 112-113).

Plaintiff's written performance evaluation for the period 2007-2008 noted, among other things, that plaintiff needed to learn how to become an effective leader through the use of vision and expectations. (Exhibit 1). Plaintiff was again rated unsatisfactory in his written performance evaluation for the period 2008-2009, which evaluation, among other things, noted plaintiff's continued lack of vision for future operations, his lack of leadership skills, and his lack of demanding accountability from his staff. (Exhibit 2; Exhibit 3 at 312-320). Mr. Rizzuto had several performance-related meetings with plaintiff to discuss the shortfalls and performance deficiencies in his work. (Exhibit 3 at 206-210). Mr. Rizzuto repeatedly offered plaintiff support and assistance, with a view to helping him succeed in the position. (Exhibit 3 at 206-210). Those efforts were not successful.

By early August 2009, Mr. Rizzuto decided that the general manager position should be eliminated. (Exhibit 3 at 164-170, 409-411). It was at that time that Mr. Rizzuto began developing his plan to reorganize the de Seversky Center by (i) eliminating the general manager's position and creating two new positions with the savings from the elimination of the

position; (ii) his own assumption of the bulk of the responsibilities of general manager; and (iii) delegating some of the responsibilities of the general manager to the catering sales manager, Eric Redlich. (Exhibit 3 at 174-177). Mr. Rizzuto spoke with defendant Leonard Aubrey, the Chief Financial Officer of NYIT, about the proposed reorganization throughout August and September 2009. (Exhibit 3 at 172-174; Exhibit 4 at 128, 207-208). Mr. Aubrey is responsible for ensuring that the de Seversky Center operates in the most cost-effective and profitable manner and sets goals for Mr. Rizzuto in connection therewith. (Exhibit 5 at 96-97).

During the summer of 2009, Mr. Aubrey and Mr. Rizzuto had periodic discussions concerning the financial performance of the de Seversky Center as well as their concerns over plaintiff's performance, his inability to show he was a strong manager, and the lack of improvement of his performance over time. (Exhibit 4 at 67-69, 115-116, 127-128, 154; Exhibit 3 at 172-174). Mr. Rizzuto specifically discussed the elimination of the general manager position with Mr. Aubrey as early as August 2009. (Exhibit 3 at 173; Exhibit 4 at 70; Exhibit 6). During the discussions between Mr. Rizzuto and Mr. Aubrey in August 2009, both Mr. Rizzuto and Mr. Aubrey determined that the general manager's position should be eliminated and that the management of the de Seversky Center should be instituted in a cost-effective manner. (Exhibit 3 at 206-208; Exhibit 4 at 69-70, 128, 207-208; Exhibit 7 at 68). The decision to eliminate the general manager position and terminated plaintiff was both performance and financially based. (Exhibit 4 at 71, 115-116, 127-128).

Mr. Rizzuto also discussed his plan to reorganize the de Seversky Center, and more specifically, his plan to eliminate the general manager position held by plaintiff, with Mr. Redlich beginning as early as August 2009. (Exhibit 3 at 164-168, Exhibit 8 at 73-75, 77-85, 104-105). Mr. Rizzuto had also voiced his dissatisfaction with plaintiff's performance as general

manager on a weekly basis to Mr. Redlich. (Exhibit 8 at 67, 74-75). Mr. Rizzuto discussed with Mr. Redlich the increased role Mr. Redlich would take on once the reorganization and elimination of the general manager position was implemented. (Exhibit 3 at 167-170; 309-310). During August 2009, Mr. Rizzuto also discussed his decision to reorganize the de Seversky Center and eliminate the general manager position with Pilar Visconti, NYIT's food service director, to get her input. (Exhibit 3 at 164-165).

On or about September 1, 2009, Mr. Rizzuto prepared a memorandum for Mr. Aubrey in connection with the planned reorganization and the recruitment for the two new positions, dining room captain and catering sales associate. (Exhibit 3 at 182-183, 195-198; Exhibit 8 at 79; Exhibits 9 and 10). In fact, on September 3, 2009, Mr. Rizzuto sent to Mr. Aubrey a cover letter in connection with the recruitment authorization for the new sales position in which he noted "as previously discussed, this is part of the reorganization of the management positions which will give Eric [Redlich] more support in the area of sales as he gets repositioned." (Exhibit 11). The memorandum also stated that Mr. Rizzuto's goal was to hire for the sales position as soon as possible "and to make the other change we spoke of effective October 1, 2009." (Exhibit 11) (emphasis added). On September 15, 2009, President Edward Guiliano approved the Request Authorization for the Dining Room Captain (Exhibit 12) and by September 25, 2009, the Request Authorization for the Catering Sales Associate had been approved. (Exhibit 13). These positions were later listed on Monster.com beginning on or about September 22 and 29, 2009, respectively. (Exhibits 14 and 15).[1]

---

[1]   These documents indicate that the decision to eliminate the general manager position was made prior to September 1, 2009 and that the process to effectuate the decision had begun by September 3, 2009.

While the exact positions that were created may have changed from the original plan (Exhibit 3 at 176-177; 494-496; Exhibit 7 at 228-229), Mr. Rizzuto testified that the goal of the reorganization, i.e., the elimination of the general manager position, was to have a more effective operation and greater leadership of the staff, areas in which plaintiff was lacking. (Exhibit 3 at 205-210). Mr. Rizzuto believed he could handle most of the general manger functions since he was essentially performing those functions already, with Mr. Redlich taking on some of the operations functions, and the added need in the dining room would be taken care of through the hiring of the new personnel. (Exhibit 3 at 159-176).

On September 18, 2009, plaintiff donated blood to the New York Blood Center. (Exhibit 16 at 23-25, Exhibit 17). Prior to donating blood, plaintiff had no knowledge that he may have been HIV positive. (Exhibit 16 at 25). On September 29, 2009, plaintiff received a letter, dated September 25, 2009, from the New York Blood Center which informed plaintiff that the blood he had donated showed a reaction to the routine tests performed on all donations by the New York Blood Center. (Exhibit 16 at 25-27). The following day, September 30, 2009, plaintiff called the New York Blood Center and made an appointment for October 1, 2009. (Exhibit 16 at 28-29). While plaintiff told Mr. Rizzuto that he had a doctor's appointment, he did not mention anything concerning his blood donation or the reason for his doctor's appointment. (Exhibit 16 at 33; Exhibit 3 at 219-221). On October 1, 2009, plaintiff was informed by the New York Blood Center that his blood donation had tested positive for the HIV virus (Exhibit 16 at 31-36), and that additional tests would be performed on a new blood sample to confirm the accuracy of the original test results. (Exhibit 16 at 37).

On October 2, 2009, plaintiff sent Mr. Rizzuto an email stating he had to go to the doctor. (Exhibit 18). This appointment had been previously scheduled and was completely unrelated to

plaintiff's possible HIV positive status.  (Exhibit 16 at 45-47).  Later in the day on October 2, 2009, Mr. Rizzuto emailed plaintiff asking whether plaintiff would be returning to work that day. (Exhibit 19).  At no time in these emails, or in other communications, did plaintiff mention either being tested for HIV or that he might be HIV positive.  (Exhibit 19).  In fact, in his email to plaintiff, Rizzuto expressed surprise that plaintiff might not return to work on October 2, 2009, and plaintiff replied that he would be in all weekend before leaving for vacation.  (Exhibit 19). Plaintiff left for vacation on October 3, 2009 and did not return to work until October 16, 2009. (Exhibit 16 at 52).  On October 7, 2009, while away on vacation, plaintiff learned that the additional test by the New York Blood Center had confirmed that he was, in fact, HIV positive. (Exhibit 16 at 38-39).  A formal letter from the New York Blood Center to plaintiff dated October 15, 2009 followed.  (Exhibit 16 at 39-40).

While the decision to eliminate the general manager position had been made in August 2009, (Exhibit 4 at 86-88, 90; Exhibit 7 at 90-91; 193-194; Exhibit 3 at 164-170, 409-411; 447-448), on October 16, 2009 Mr. Aubrey signed a memorandum which authorized, from a budgetary perspective, the elimination of the position of general manager and the hiring to fill the newly created positions.  (Exhibit 20; Exhibit 4 at 86-90; 128, 131-132, 207-208; Exhibit 3 at 205-206).  That day, Mr. Rizzuto and Mr. Aubrey also met with Carol Jablonsky, NYIT's newly hired director of human resources, during which meeting Mr. Rizzuto and Mr. Aubrey spoke to her about the plan to reorganize the de Seversky Center.  (Exhibit 3 at 277-279; 283-284; Exhibit 7 at 63-73, 90-91, 112; Exhibit 4 at 129-130).  Mr. Rizzuto and Ms. Jablonsky met again on Monday, October 19, 2009, in order for Ms. Jablonsky to obtain the details of the planned action, and to prepare a memorandum outlining the changes with new organization charts.  (Exhibit 3 at 295; 322-323; Exhibit 7 at 86, 91-94, 99-101; 120-128).  Ms. Jablonsky reviewed these materials

provided by Mr. Rizzuto and provided revised materials to NYIT's General Counsel, Stephen Kloepfer, on October 20, 2009.  (Exhibit 7 at 101-106; 138-139; Exhibit 21).  Ms. Jablonksy received legal approval from Mr. Kloepfer with respect to the decision to eliminate of the general manager position as part of the reorganization, and she prepared the standard severance agreement NYIT presents to an employee whose position is being eliminated through a reorganization.  (Exhibit 7 at 134-144; 146-147; Exhibit 22).  Ms. Jablonksy made arrangements with Mr. Rizzuto to meet with Mr. Rizzuto and plaintiff on Friday morning, October 23, 2009, to inform plaintiff of the elimination of his position and to explain to him the post-separation benefits to which he would be entitled.  (Exhibit 7 at 152-154).  The proposed severance agreement provided, on the morning of October 23, 2009, that plaintiff would receive a payment of $6,444.00 and continuation of medical benefits through March 31, 2010. (Exhibit 7 at 150-152; Exhibit 22).

On October 22, 2009, plaintiff had his first appointment at North Shore University Hospital–Long Island Jewish to begin treatment for his HIV which included an intake appointment with a social worker. (Exhibit 23).   After arriving at work early on the morning of Friday, October 23, 2009, plaintiff asked to speak to Mr. Rizzuto, at which time plaintiff told Mr. Rizzuto for the first time that he had been diagnosed as having the HIV virus, and that he was going to start treatment soon.  (Exhibit 3 at 343-344, 346-348).  Mr. Rizzuto immediately informed Ms. Jablonsky of his conversation with plaintiff. (Exhibit 3 at 349-352; Exhibit 7 at 162-165, 172-176; Exhibit 24).   Ms. Jablonsky and Mr. Rizzuto decided that it would be insensitive to go forward with the meeting scheduled for 10:00 a.m. that morning, and the meeting was rescheduled to Monday, October 26, 2009.  (Exhibit 3 at 358, 407-410; Exhibit 7 at 197-198; 183-185,  193-195;  Exhibit 4 at 222-223; Exhibit 25).  NYIT decided to continue with

the planned reorganization, and to assist plaintiff during his employment transition period NYIT revised the separation agreement on the afternoon of October 23, 2009 to provide (a) an increased severance payment of $20,000, and (b) an extension of the period during which he would continue to participate in the NYIT medical plan, on the same terms as if he were a current employee. (Exhibit 7 at 168-169; 193-195; Exhibit 4 at 218-220; Exhibit 3 at 434-437; Exhibit 26). Thereafter, Ms. Jablonsky met with Mr. Rizzuto and plaintiff on Monday morning, October 26, 2009. (Exhibit 7 at 200-201; Exhibit 3 at 440-441). Mr. Rizzuto informed plaintiff about the reorganization, and plaintiff was presented with a proposed severance agreement. (Exhibit 3 at 440-441; Exhibit 7 at 200-206).

Plaintiff commenced this action alleging he was discriminated against based on his HIV status. Plaintiff contends that he informed defendant Mr. Rizzuto that he was HIV positive on October 2, 2009, not on October 23, 2009 as defendants allege, and that the decision to eliminate his position was not made until after he informed Mr. Rizzuto of the diagnosis. However, as set forth below, even assuming for purposes of this motion only that plaintiff informed Mr. Rizzuto that plaintiff was HIV positive on October 2, 2009, it is undisputed that defendants had determined that plaintiff's position would be eliminated during August 2009, and the process to effectuate the reorganization was substantially completed in September 2009, well before plaintiff was diagnosed as being HIV positive and before the date upon which plaintiff alleges that he informed Mr. Rizzuto of the diagnosis. Therefore, plaintiff cannot demonstrate that he was terminated because of his alleged disability, and the complaint should be dismissed in its entirety.

## ARGUMENT

Summary judgment is appropriate where the moving party demonstrates that there is "no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of

law." Pierre v. North Shore Univ. Hosp., 2010 U.S. Dist. LEXIS 43963, 8-10 (E.D.N.Y. Apr. 28, 2010) (citing Williams v. R.H. Donnelley, Corp., 368 F.3d 123 (2d Cir. 2004)).  The party opposing summary judgment cannot defeat a motion for summary judgment unless he "'designat[es] specific facts showing that there is a genuine issue for trial.'"  Id. ( quoting Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002)).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Id.  Even in the employment discrimination context, a plaintiff must still "provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  Pierce, 2010 U.S. Dist. LEXIS 43963, 8-10; McDonald v. City of New York & N.Y. City Dep't of Transportation, 2011 U.S. Dist. LEXIS 37307, 37-38 (E.D.N.Y. Apr. 6, 2011).

## POINT I

## PLAINTIFF CANNOT TO PROVE A PRIMA FACIE CASE
## OF DISABILITY DISCRIMINATION

Courts analyze discrimination claims brought under the ADA through the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).[2] Greco v. County of Nassau, 146 F. Supp. 2d 232, 242 (E.D.N.Y. 2000) (citations omitted).  Thus, in opposing a motion for summary judgment, plaintiff has the burden to establish a prima facie case of discrimination.  Id.  See also Heyman v. Queens Village Comm. for Mental Health for Jam. Community Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999).  If a plaintiff is able to establish a prima facie case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the'" adverse employment action. McCowan v. HSBC Bank USA, 689 F. Supp. 2d 390, 408-409 (E.D.N.Y. 2010) (citing Patterson

---

[2] Plaintiff's disability discrimination claims under the New York state and city human rights laws are "governed by the same legal standards as federal ADA claims."  Cody v. County of Nassau, 345 Fed. Appx. 717, 719 (2d Cir. 2009) (citing Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 117 n. 1 (2d Cir. 2004).

v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004)).  If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  Id.  Plaintiff carries with him the ultimate burden to persuade the trier of fact that the defendant intentionally discriminated against him.  Id.  A plaintiff must do more, however, than "merely to show that she satisfies [the] minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false."  Id.  (citing James v. N.Y. Racing Ass'n, 233 F.3d 149, 153 (2d Cir. 2000)).  Rather, the "key inquiry is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination."  Id.  (citing Connell v. Consol. Edison Co. of N.Y., Inc., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  Kinneary v. City of New York, 601 F.3d 151, 155-156 (2d Cir. 2010); Pierre v. North Shore Univ. Hosp., 2010 U.S. Dist. LEXIS 43963, *8-10 (E.D.N.Y. Apr. 28, 2010).

### A.   Plaintiff Cannot Demonstrate a Causal Relationship Between His HIV Status and His Termination.

Plaintiff cannot demonstrate that his employment was terminated "because" he was HIV positive.  It is axiomatic that an employer cannot discriminate against an employee based on a disability of which the employer is unaware.  See, e.g., Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab., 2009 U.S. Dist. LEXIS 84434, 13-14 (E.D.N.Y. Sept. 14, 2009) (granting

summary judgment to employer where employer did not know about plaintiff's HIV-positive status at the time of her termination); Brown v. Pension Bds., 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) (granting summary judgment to defendant finding that the evidence indicated that defendant and its employees were unaware of plaintiff's HIV status and thus it "played no role in [defendant's] decision to terminate his employment.").

It is undisputed that the decision to reorganize the de Seversky Center was made by both Mr. Rizzuto and Mr. Aubrey in August 2009, which included the decision to eliminate the general manager position held by plaintiff, and that the implementation of the decision began in September 2009. This is supported by the following:

(i) The unrebutted testimony of Robert Rizzuto that he spoke about the decision to recognize the de Seversky Center and eliminate the position of general manager in July/August 2009 with Leonard Aubrey, the Chief Financial Officer of NYIT, Eric Redlich, the catering sales manager, and Pilar Visconti, NYIT's director of food service (Exhibit 3 at 164-177, 206-208, 309-310, 409-411, 447-448);

(ii) The unrebutted testimony of Leonard Aubrey that he spoke with Robert Rizzuto about the reorganization, and agreed with the decision to reorganize the de Seversky Center and eliminate the general manager position, in August 2009 (Exhibit 4 at 67-71, 86-88, 90, 115-116, 127-128, 207-208);

(iii) The unrebutted testimony of Eric Redlich that he spoke with Robert Rizzuto about the reorganization in July/August 2009 and that he specifically agreed to assume a number of the job responsibilities of the position of general manager in August 2009 (Exhibit 8 at 67, 73-75, 77-85, 104-105);

(iv) The memorandum from Robert Rizzuto to Leonard Aubrey, dated September 1, 2009, which attaches the Recruitment Authorization for the new catering sales position. The memorandum also confirms that the new sales position "is part of the reorganization of the management positions which will give Eric [Redlich] more support in the area of sales as he gets repositioned," that "[m]y goal is to bring  this person in as soon as possible and to make the other change we spoke of effective October 1, 2009" and that "[t]he request for this position is part of a reorganization of the management staff" (Exhibit 11);

(v)     The Recruitment Authorizations for the positions of Dining Room Caption and Catering Sales Associate, both of which are dated September 3, 2009, together with a memorandum, dated September 3, 2009, from Robert Rizzuto to Leonard Aubrey, enclosing the Recruitment Authorizations (Exhibits 9 and 10);

(vi)    The approval on September 15, 2009 by Edward Guiliano, President of NYIT, of the Request Authorization for the Dining Room Captain (Exhibit 12);

(vii)   An email, dated September 25, 2009, from Maureen Gaughran to Anthony Baffo, indicating that the Request Authorization for the Catering Sales Associate had been approved (Exhibit 13); and

(viii)  The postings on Monster.com for the positions of Dining Room Captain and Sales Catering Associate at the de Seversky Center which were posted on or about September 22, 2009 and September 29, 2009, respectively. (Exhibits 14 and 15).

Plaintiff cannot rebut any of the testimony or documentary evidence set forth above. There were numerous discussions between and among Robert Rizzuto, Leonard Aubrey, Eric Redlich and Pilar Visconti concerning the decision to reorganize the de Seversky Center and eliminate the position of general manager in July/August 2009.   The documentary evidence demonstrates that Robert Rizzuto prepared a memorandum in connection with the Recruitment Authorizations for the new positions, Dining Room Captain and Sales Catering Associate, on September 1, 2009 and submitted it to Leonard Aubrey on September 3, 2009.  The Recruitment Authorization for the Dining Room Contain was approved by President Guiliano on September 15, 2009 and the Recruitment Authorization for the Sales Catering Associate was approved prior to September 25, 2009.  The actual positions were posted on Monster.com on September 22, 2009 and September 29, 2009.  Yet plaintiff did not learn that he was HIV positive until October 1, 2009 and allegedly informed Mr. Rizzuto of his diagnosis on October 2, 2009.

Mr. Aubrey's formal approval from a budgetary perspective of the elimination of the general manager position in his capacity of NYIT's Chief Financial Officer in the October 16,

2009 memorandum is immaterial inasmuch as the decision had already been made in August and September 2009 that plaintiff would be terminated.  In <u>Kolivas v. Credit Agricole</u>, 1996 U.S. Dist. LEXIS 17478 (S.D.N.Y. Nov. 26, 1996), <u>aff'd</u> 1997 U.S. App. LEXIS 27163 (2d Cir. Oct. 7, 1997), the plaintiff alleged that she was terminated because of an alleged disability in violation of the ADA, the New York State Human Rights Law, and the New York City Administrative Code.  Throughout the plaintiff's employment, he had been advised about shortcomings in his performance.  <u>Id.</u> at *2.  After receiving a performance evaluation on February 7, 1995, plaintiff complained to his supervisor, and then to the president of the Company, during which time the president concluded that the extreme manner in which plaintiff  reaction to his performance evaluation was inappropriate.  <u>Id.</u> at *3.  At the conclusion of that meeting, the president first considered terminating plaintiff's employment due to his "outrageous" criticisms of his supervisor related to his evaluation.  <u>Id.</u>  On Friday, February 10, 1995, after another conversation with plaintiff, his supervisor concluded that she wanted plaintiff to be terminated and communicated that "<u>desire</u>" with human resources.  <u>Id.</u> at *4, 10-11 (emphasis added).  On Monday, February 13, 1995, plaintiff told human resources that he was being treated for depression and taking medication.  <u>Id.</u> at *5-6.  That same day, the local human resources personnel informed the director of human resources that the supervisor had recommended plaintiff' termination and the director agreed.  <u>Id.</u> at *6.  On February 14, 2010, the president <u>approved</u> the termination and plaintiff was fired that day.  <u>Id.</u>  (emphasis added).

The Court found it dispositive that prior to learning of plaintiff's depression, plaintiff's supervisor had already decided to fire plaintiff and communicated that desire to human resources on February 10, 1995.  <u>Id.</u> at *10-11.  Moreover, the president had "already begun to consider" terminating plaintiff based on his conversation earlier in that week.  Thus, the Court held:

> Thus, prior to learning that [plaintiff] was depressed . . . [his supervisor] had already begun the process to fire plaintiff and the person who had to approve that decision had already reached an independent conclusion that that might be the appropriate course of action.   This alone is sufficient to support a grant of summary judgment for the failure to establish a causal connection between the decision to terminate [plaintiff] and knowledge of any disabling condition.

Id.  Notably, the Court noted that "it was irrelevant that [the president] did not officially approve [the supervisor's] decision to terminate plaintiff" until after plaintiff disclosed his depression because the supervisor already determined that she wanted to terminate plaintiff and she "merely had to seek approval." Id. at *14 (emphasis added).

Similarly, in Woolley v. Broadview Networks, 2003 U.S. Dist. LEXIS 2716, 23-24 (S.D.N.Y. Feb. 25, 2003), the plaintiff was terminated on September 18, 2000 after having informed his employer that he was suffering from an alleged disability, insomnia, on September 7, 2000.  The Court, however, held that the plaintiff could not meet the causation element of the prima facie case of disability discrimination because by August 3, 2000, the plaintiff's supervisor had already communicated with the managing director of human resources his request that the plaintiff cease working in his current position and either be transferred to a different position, and, if no other position was available, be fired.   Id. at *7, 24.   Thus, because plaintiff's supervisor had already concluded that plaintiff could not continue in his current position prior to receipt of any knowledge of plaintiff's insomnia, plaintiff could not carry his burden to prove that he was terminated because of his alleged disability.  Id. at *24.  The Court granted summary judgment to the defendant and dismissed plaintiff's ADA discrimination claims.  Id.

The facts of this case are substantially identical to those in Kolivas and Woolley.  It is undisputed that by August 2009 Mr. Rizzuto concluded that he wanted to reorganize the de Seversky Center and eliminate plaintiff's position, and that he communicated that desire to Mr.

Aubrey at that time. By August/September 2009, as a result of multiple conversations on the issue, Mr. Aubrey and Mr. Rizzuto reached a decision that the position would, in fact, be eliminated. Mr. Rizzuto took steps to prepare for the reorganization by moving forward with the recruitment for the two newly created positions. The Recruitment Authorization for the Dining Room Captain and Catering Sales Associate positions were approved on September 15, 2009 and prior to September 25, 2009, respectively. The positions were posted on Monster.com on September 22 and 29, 20009. Thus, both plaintiff's immediate supervisor, Mr. Rizzuto, and Mr. Rizzuto's supervisor, Mr. Aubrey, determined that plaintiff's position would be eliminated, and the process of implementing the decision was begun, prior to October 2, 2009, the date on which plaintiff alleges he informed defendants of his HIV status. The October 16, 2009 memorandum signed by Mr. Aubrey was simply the final step of a process that began in August/September 2009.

Therefore, as in Kolivas and Woolley, prior to plaintiff learning that was HIV positive on October 1, 2009, Mr. Rizzuto communicated his desire to eliminate plaintiff's position to Mr. Aubrey, Mr. Aubrey and Mr. Rizzuto agreed that plaintiff's position would be eliminated, and they had begun the process to implement that decision. It is not relevant that by October 16, 2009, Mr. Rizzuto and Mr. Aubrey sought to get final approval from Mr. Kloepfer on the decision they made in August/September. See Kolivas v. Credit Agricole, 1996 U.S. Dist. LEXIS 17478, at *10-11, 14; Woolley v. Broadview Networks, 2003 U.S. Dist. LEXIS 2716 at *23-24. Plaintiff cannot demonstrate that he was terminated "because of" his HIV status, a requisite element of a prima facie case and, as a result, summary judgment should be granted in favor of the defendants.

## POINT II

## PLAINTIFF CANNOT REBUT DEFENDANTS' LEGITIMATE NON-DISCRIMINATORY REASON FOR HIS TERMINATION

For the same reasons that plaintiff cannot demonstrate a causal relationship between his being HIV positive and his termination to establish a prima face case, plaintiff's claims should also be dismissed because he has failed to establish that defendants' articulated legitimate non-discriminatory reason for his termination, the reorganization and the need to eliminate his position, was a pretext for actual discrimination. To demonstrate pretext, "a plaintiff must show both that the proffered reason is false and that discrimination was the real reason." Bonilla v. Boces, 2010 U.S. Dist. LEXIS 91314, 22-23 (W.D.N.Y. Sept. 2, 2010) (citation omitted). Thus, a defendant is entitled to summary judgment unless plaintiff can present "sufficient potential proof for a reasonable jury to find the proffered legitimate reason [is] merely a pretext for impermissible [discrimination]." Id. (granting summary judgment to defendant) (citing Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999)); James v. NY Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).

Plaintiff relies exclusively on his testimony that he informed Mr. Rizzuto that he was HIV positive on October 2, 2009 and that defendants made the decision to terminate his employment on October 16, 2009, the date on which Mr. Aubrey signed the formal memorandum. Plaintiff's reliance on the timing of his disclosure, even if it were true, is insufficient evidence to defeat a motion for summary judgment. In Hester v. Rich, 2004 U.S. Dist. LEXIS 16593 (S.D.N.Y. Aug. 19, 2004), the Court noted that the only evidence of discrimination presented by the plaintiff was that he was HIV positive and that he was fired shortly after he revealed his HIV status. The Court held that despite plaintiff's evidence of the timing of plaintiff's dismissal, which followed his disclosure of being HIV positive, the defendants produced evidence which, among others things, supported the employer's position

that it had been considering terminating the plaintiff prior to his disclosure.  The Court held that no reasonable jury could find that HIV was a motivating factor in the employer's decision to terminate plaintiff, and defendants were granted summary judgment.  See also Allen v. Hebrew Academy of Nassau County, 2000 U.S. Dist. LEXIS 19605 (E.D.N.Y. Oct. 17, 2000) (granting summary judgment to defendants rejecting plaintiff's conclusory allegations, without any proof, that because he was terminated after the defendant learned he was HIV positive and was replaced by a person who was not HIV positive, he was fired because of his HIV status); Reese v. AIDS Institute, New York State Department of Health, 1996 U.S. App. LEXIS 26082 (2d Cir. Oct. 3, 1996) (affirming summary judgment in favor of defendant because plaintiff failed to offer "concrete evidence" that he was discriminated against because he was HIV positive; plaintiff's allegations that his supervisors knew he was HIV positive before terminating him was insufficient and he offered no proof that the employer terminated him because of his HIV status.).  Thus, as in the cases cited above, plaintiff's allegations that he informed Mr. Rizzuto on October 2, 2009 that he was HIV positive and that the decision to terminate him was purportedly made after this disclosure is insufficient to defeat a motion to for summary judgment.

Plaintiff can point to no other evidence of alleged discrimination.  Instead, plaintiff relies on pure speculation.  For example, plaintiff contends that hand-sanitizers were installed in the de Seversky Center because the defendants purportedly became aware of his HIV status (Exhibit 16 at 66-68).  Plaintiff's brazen contention is not credible and is contradicted by the evidence demonstrating conclusively that hand-sanitizers were installed campus-wide in response to the H1N1 influenza pandemic.  (Exhibit 4 at 231-232; Exhibit 27).  Another example of plaintiff's lack of evidence, and reliance on unsupported conjecture, is his testimony that the memorandum from Robert Rizzuto to Leonard Aubrey, dated October 16, 2009, in which Mr. Aubrey gave

budgetary approval to the new hiring, was allegedly "backdated." (Exhibit 16 at 125-126). At his deposition, plaintiff was asked for the facts on which his contention was based and he testified that "I don't know, it just doesn't make sense . . . " (Exhibit 16 at 127-130).

It is also undisputed that the performance evaluations of plaintiff for the years 2008 and 2009, dated September 24, 2008 and September 19, 2009 (Exhibits 1 and 2), were completed prior to plaintiff being diagnosed as HIV positive on October 1, 2009.  Plaintiff was rated unsatisfactory in both evaluations and counseled in connection therewith, having nothing to do with plaintiff's alleged disability.  Moreover, it is undisputed that NYIT raised the benefits offered to plaintiff in the separation agreement presented to him.  On the morning of October 23, 2009, the separation agreements provided for a severance payment of $6,444., and medical benefits through March 31, 2010. (Exhibit 25).  The separation agreement was revised on the afternoon of October 23, 2009 to provide for a severance payment in the amount of $20,000 and medical benefits through August 31, 2010. (Exhibit 29).  What other reason would there be for the increased severance benefits on the afternoon of October 23, 2009 other than being informed by plaintiff on the morning of October 23, 2009 that he was HIV positive?  This is consistent with the deposition testimony of Robert Rizzuto, Leonard Aubrey, Carol Jablonsky and Stephen Kloepfer and contrary to the testimony of plaintiff that he first told Mr. Rizzuto about the diagnosis on October 2, 2009.  Indeed, if, as alleged by plaintiff that NYIT had, in fact, become aware of the diagnosis on October 2, 2009, it is clear that, consistent with NYIT's reaction on October 23, 2009, NYIT would have chosen to supplement his severance package in preparing the initial version of that agreement, which did not include the additional $20,000 and increased medical benefits later inserted into the agreement by NYIT after learning of his condition.

Thus, plaintiff has failed to carry his burden to offer proof that defendants' legitimate non-discriminatory reason for his termination was false and he has offered no proof that the actual reason was based on his HIV positive status.   As a result, defendants are entitled to summary judgment dismissing plaintiff's claims of discrimination.

## POINT III

### PLAINTIFF CANNOT MAINTAIN A CLAIM UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

Where the alleges acts which form the basis of a discrimination claim do not occur within the bounds of New York City, the New York City Human Rights Law do not apply to that claim. See Ortiz v. Heir AM. Trading, LLC,  2011 NY Slip Op 31414(U) (S. Ct. New York Co. May 24, 2011).  Unless the impact of the discriminatory decision is felt in New York City, neither the plaintiff's residence nor defendant's business location within the City of New York is sufficient to confer jurisdiction over a discrimination claim by the New York City Human Rights Law.  Id. (citing Wahlstrom v. Metro-North Commuter Railroad Company, 89 F.Supp.2d 506 (S.D.N.Y. 2000) and noting that the Court in Wahlstrom "without giving consideration to either the residency of the plaintiff, or the location of defendant's principal place of business, held that 'the NYCHRL only applies when the actual impact of the discriminatory conduct or decision is felt within the five boroughs, even if a discriminatory decision is made by an employer's New York City Office.'").  In Ortiz, the plaintiff was a resident of New York City and his employer had its headquarters in New York City.  Id. at *2.  However, plaintiff was employed at the employer's New Jersey location.  Id.  The Court held that because the impact of the alleged discriminatory conduct occurred outside New York City, plaintiff could not maintain a claim under the New York City Human Rights Law.  Id. at *3-4.

All of the alleged acts of discrimination in this action purportedly took place at NYIT's campus in Old Westbury, New York, which is outside New York City.  Plaintiff was employed at the de Seversky Center in Old Westbury, the individual defendants Robert Rizzuto and Leonard Aubrey are employed in Old Westbury, the decision to eliminate the general manager position was made in Old Westbury, and plaintiff was informed of his termination in Old Westbury.  Plaintiff's residing in Queens County (Compl. ¶ 5) is insufficient for plaintiff to invoke the protection of the New York City Human Rights Law.  See Ortiz, 2011 NY Slip Op 31414(U) (S. Ct. New York Co. May 24, 2011).  As a result, plaintiff's claim for discrimination based on disability under the New York City Human Rights Law should be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully submit that defendants' motion for summary be granted and the complaint be dismissed in its entirety.

Dated: New York, New York
   August 18, 2011

         FULBRIGHT & JAWORSKI L.L.P.

         By: _Neil G. Sparber_
         Douglas P. Catalano
         Neil G. Sparber
         666 Fifth Avenue
         New York, New York  10103
         (212) 318-3000
         dcatalano@fulbright.com
         nsparber@fulbright.com
         Attorneys for Defendants