**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X
Anthony Baffo,                                      :
                                                    :
                              Plaintiff,            :      No. 10 Civ. 01245 (LDW) (ETB)
                                                    :
            v.                                      :
                                                    :
NEW YORK INSTITUTE OF TECHNOLOGY;                   :
ROBERT RIZZUTO, in his official and individual      :
capacities; and Leonard Aubrey; in his official and :
individual capacities,                              :
                                                    :
                              Defendants.           :
                                                    :
                                                    :

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

Thompson Wigdor LLP

Douglas H. Wigdor
Matthew D. Gorman
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Fax: (212) 257 6845
dwigdor@thompsonwigdor.com
mgorman@thompsonwigdor.com

*Counsel for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

    Mr. Baffo's Performance .......................................................................................... 3

    The Sales Associate and Dining Room Captain Positions ....................................... 3

    Mr. Baffo's Disability ............................................................................................... 5

    Mr. Baffo's Termination ........................................................................................... 6

ARGUMENT ..................................................................................................................... 9

    I.    SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO MR.
        BAFFO'S CLAIMS OF DISABILITY DISCRIMINATION ................................... 10

        A.  Mr. Baffo Has Established a Prima Facie Case of Disability Discrimination ...... 10

               1.    Both Temporal Proximity and Discriminatory Remarks by Rizzuto
                    Create an Inference of Discrimination ................................................... 11

               2.    Defendants' Argument That the Decision to Terminate Mr. Baffo Was
                    Made in August 2009 is Unsupported by The Record ........................... 13

        B.  Mr. Baffo Has Demonstrated That His Disability Was a Motivating Factor in His
           Termination ...................................................................................................... 17

               1.    Defendants' Proffered Reason for Mr. Baffo's Termination is   False .. 18

               2.    The Real Reason for Mr. Baffo's Termination is His Disability .......... 21

    II.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO MR. BAFFO'S CLAIM
        UNDER THE NYCHRL .................................................................................... 23

    III.    THE INDIVIDUAL DEFENDANTS AIDED AND ABETTED IN THE
        DISCRIMINATION AGAINST MR. BAFFO ................................................... 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Allen v. Hebrew Academy,*
No. 98-CV-673 (JBM), 2000 WL 1919478 (E.D.N.Y. Oct. 6, 2000) ........................................23

*Bickerstaff v. Vassar Coll.,*
196 F.3d 435 (2d Cir. 1999) ....................................................................................................10

*Brady v. Wal-Mart Stores, Inc.,*
531 F.3d 127 (2d Cir. 2008) ....................................................................................................10

*Brown v. The Pension Boards,*
488 F. Supp. 2d 395 (S.D.N.Y. 2007) .....................................................................................15

*Chertkova v. Connecticut Gen. Life Ins. Co.,*
92 F.3d 81 (2d Cir. 1996) ........................................................................................................13

*Cityspec, Inc. v. Smith,*
617 F. Supp. 2d 161 (E.D.N.Y. 2009) .......................................................................................9

*DeNardi v. DRA Imaging, P.C.,*
605 F. Supp. 2d 550 (S.D.N.Y. 2009) .....................................................................................17

*Feingold v. New York,*
366 F.3d 138 (2d Cir. 2004) ....................................................................................................24

*Flores v. Buy Buy Baby, Inc.,*
118 F. Supp. 2d 425 (S.D.N.Y. 2000) .....................................................................................12

*Gaffney v. Dep't of Info. Tech. & Telecommunications,*
536 F. Supp. 2d 445 (S.D.N.Y. 2008) ...............................................................................18. 20

*Gorzynski v. Jetblue Airways Corp.,*
596 F.3d 93 (2d Cir. 2010) ......................................................................................................17

*Graham v. Long Island R.R.,*
230 F.3d 34 (2d Cir.2000) .........................................................................................................9

*Grana v. Potter,*
No. 06-CV-1173 (JFB), 2009 WL 425913 (E.D.N.Y. Feb. 19, 2009) .........................................10

*Hester v. Rich,*
No. 03-CV-5714 (DC), 2004 WL 1872296 (S.D.N.Y. Aug. 19, 2004) ........................................22

*Kolivas v. Credit Agricole*,
No. 95-CIV-5662 (DLC), 1996 WL 684167 (S.D.N.Y. Nov. 26, 1996) ...............................15, 16

*Leibowitz v. Cornell University*,
584 F.3d 487 (2d Cir. 2009) ...................................................................................................17

*Loeffler v. Staten Island Univ. Hosp.*,
582 F.3d 268 (2d Cir. 2009) ...................................................................................................10

*Parker v. Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000) ...................................................................................................11

*Primmer v. CBS Studios, Inc.*,
667 F. Supp. 2d 248 (S.D.N.Y. 2009) ..............................................................12, 14, 18, 22

*Reese v. AIDS Inst. New York State Dept. of Health*,
112 F.3d 505 (2d Cir. 1996) ...................................................................................................22

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) .................................................................................................................17

*Velez v. McHugh*,
No. 09-CV-0925 (GAY), 2011 WL 778693 (S.D.N.Y. Mar. 2, 2011) ...........................9

*Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab.*,
No. 07-CV-1418 (JS) (ARL), 2009 WL 2984194 (E.D.N.Y. Sept. 14, 2009)...........15

*Walerstein v. RadioShack Corp.*,
No. 04-CV-1096 (SMG), 2007 WL 1041668 (E.D.N.Y. Mar. 30, 2007) ....................21

*Williams v. N.Y. City Hous. Auth.*,
61 A.D.3d 62 (1st Dep't 2009).................................................................................................23

*Woolley v. Broadview Networks*,
No. 01-CV-2526 (GEL), 2003 WL 554754 (S.D.N.Y. Feb. 26, 2003)........................16

*Zimmermann v. Assocs. First Capital Corp.*,
251 F.3d 376 (2d Cir.2001) ...................................................................................................11

**STATE CASES**

*Hoffman v. Parade Publis.*,
15 N.Y.3d 285 (2010)...............................................................................................................24

*Ortiz v. Heir AM. Trading, LLC*,
2011 NY Slip Op 31414(U) (N.Y. Sup. Ct. May 24, 2011).........................................24

## STATUTES AND OTHER AUTHORITIES

FED. R. CIV. P. 56(c) ................................................................................................9

42 U.S.C. §§ 12101 *et seq.* ...............................................................................10, 23

New York Executive Law §§ 290 *et seq* .............................................................10, 23

New York Administrative Code §§ 8-101 *et seq.* ................................................10, 23

Plaintiff Anthony Baffo ("Mr. Baffo"), by and through his counsel, respectfully submits this memorandum of law in support of his opposition to Defendants New York Institute of Technology ("NYIT"), Robert Rizzuto ("Rizzuto") and Leonard Aubrey's ("Aubrey") (together, the "Individual Defendants") (all together, "Defendants'") motion for summary judgment. As demonstrated more fully below, genuine issues of material fact exist which preclude awarding summary judgment to Defendants.

## PRELIMINARY STATEMENT

On October 1, 2009, Mr. Baffo received the life-altering news that blood he had previously donated tested positive for HIV. At that time, Mr. Baffo worked as General Manager of the de Seversky Conference Center on NYIT's Old Westbury campus, a position he had held since September 2006. The day after receiving his diagnosis, Mr. Baffo informed Rizzuto, his immediate supervisor and Director of Dining Services for NYIT, that he was HIV positive. Less than three weeks after being told of Mr. Baffo's HIV status, Rizzuto decided to terminate his employment for financial and economic reasons.

Defendants base almost the entirety of their moving papers on the untenable and unsupported allegation that the decision to terminate Mr. Baffo was made in August 2009. The record, however, reveals numerous genuine issues of material fact concerning the date that Defendants decided to terminate Mr. Baffo. This evidence includes multiple documents suggesting the speciousness of the allegation that the decision to terminate Mr. Baffo was made in August 2009. Additionally, Defendants can point to no documentary evidence which even intimates that Rizzuto or Aubrey considered terminating Mr. Baffo's employment before October 16, 2009. In terminating Mr. Baffo's employment mere weeks after learning of his disability, Rizzuto reinforced sentiment which he had previously expressed to Mr. Baffo

concerning employees with disabilities and his desire that they not work at NYIT.  Moreover, there is ample evidence in the record suggesting the utter falsity of Defendants' reasons for terminating Mr. Baffo's employment which, when combined with the exceedingly close temporal proximity between the disclosure of Mr. Baffo's disability and his termination, creates a genuine issue of material fact as to whether Mr. Baffo was terminated because of his disability.  Accordingly, summary judgment must be denied.

## STATEMENT OF FACTS

The de Seversky Conference Center ("de Seversky") is a conference and dining facility located on the campus of the New York Institute of Technology ("NYIT") in Old Westbury, New York.  (Ex. 1, ¶ 1).  On September 25, 2006, Mr. Baffo was hired by NYIT as General Manager of de Seversky.  (Ex. 2, p.12-13).  Prior to Mr. Baffo's hire, Rizzuto worked as General Manager and did so until Mr. Baffo began his employment with NYIT.  (Ex. 3, p.57-58, 65-66).  Based on his previous relationship with Mr. Baffo, and prior to taking the position as General Manager, Rizzuto sought Mr. Baffo's advice about serving in the position at a food service establishment and found it to be helpful.  (Ex. 3, p.90).

As General Manager, Mr. Baffo was responsible for overseeing the operations of de Seversky, including the dining room and kitchen, as well as the de Seversky sales department.  (Ex. 1, ¶ 3).  Mr. Baffo reported directly to Rizzuto, the Director of Dining Services for NYIT, with whom he shared an office.  (Ex. 2, p.11).  Due to this close proximity, Mr. Baffo and Rizzuto spoke almost every day and would greet each other with a handshake at the beginning of the day, as well as a handshake when one was leaving the office. (Ex. 1, ¶ 4).

**Mr. Baffo's Performance**

Throughout his employment with NYIT, Mr. Baffo was a hard-working employee and routinely worked long hours and weekends in order to fulfill his role as General Manager. (Ex. 1, ¶ 5). This work ethic was recognized by both de Seversky patrons, as well as Rizzuto, who frequently praised Mr. Baffo for his work, most notably with regards to events that Mr. Baffo was charged with running. (Ex. 1, ¶ 6). Indeed, for the first year of Mr. Baffo's employment, Rizzuto was satisfied with his performance. (Ex. 3, p.112; Ex. 4; Ex. 5). Mr. Baffo's reports also recognized his fine work performance and praised his ability to run events. (Ex. 6, p.64-66).

The de Seversky Center succeeded financially while Mr. Baffo was employed as General Manager. Revenue increased almost each year of his tenure and more than 50% from the beginning of his employment until his termination. (Ex. 7). Even up until his final days with NYIT, de Seversky was enjoying financial success as revenues in September and October 2009 exceeded the prior year's totals for those months by more than $200,000. (Ex. 8). Indeed, during the 2008 fiscal year when Mr. Baffo had control over the de Seversky budget, revenues increased by almost $300,000 and de Seversky enjoyed profits of approximately $150,000. (Ex. 7).

**The Sales Associate and Dining Room Captain Positions**

As revenues for the de Seversky Center continued to grow and the amount of business continued to increase, Mr. Baffo and Rizzuto began having discussions in approximately April, 2009 concerning hiring an additional sales associate due to this increase in business. (Ex. 1, ¶¶ 7-8). At that time, NYIT employed only one sales associate and Mr. Baffo and Rizzuto planned to use the additional sales associate to handle the administrative aspects of the sales department, thus allowing the sales manager, Eric Redlich, to focus on soliciting and securing new business.

(Ex. 1, ¶ 8; Ex. 9).  Additionally, another sales associate was needed to provide sales coverage at de Seversky seven days a week and to accommodate increased traffic and phone calls.  (Ex. 6, p.156).  During their discussions surrounding the need for this position, Rizzuto never mentioned to Mr. Baffo that he was planning to use the additional sales associate as part of a reorganization of de Seversky that would result in Mr. Baffo's termination.  (Ex. 1, ¶ 15-16).

By August 2009, Mr. Baffo and Rizzuto had decided to begin recruiting for the sales associate position and to create a Recruitment Authorization ("RA"), the first step in the process of gaining approval to hire an employee in that position.  (Ex. 1, ¶ 11).  At approximately the same time, Mr. Baffo and Rizzuto started to discuss hiring a dining room captain; both due to an increase in business and in order to take over some of Mr. Baffo's duties in running events at de Seversky.  (Ex. 1, ¶¶ 10-11; Ex. 6, p.94-95).  With the hiring of a dining room captain, the plan was for Mr. Baffo to return to overseeing operations at de Seversky and focus on growing the business.  (Ex. 1, ¶ 10).  These two new positions were designed to support Mr. Baffo in operating de Seversky because Rizzuto had recently gained responsibility for food service operations at NYIT's Central Islip campus and was planning to spend less time at de Seversky. (Ex. 1, ¶ 15).

At Rizzuto's request, Mr. Baffo created RAs for both the sales associate and dining room captain positions. (Ex. 1, ¶ 12; Ex. 10).  On August 31, 2009, Mr. Baffo sent the sales associate RA to Rizzuto for his review.  (Ex. 11).  This RA stated that the additional position would provide the opportunity for the sales department to solicit new business outside of de Seversky, the same goal Mr. Baffo and Rizzuto had previously discussed.  (Id.).  After receiving Rizzuto's approval the following day, Mr. Baffo submitted the RA for the sales associate position to Aubrey, NYIT's Chief Financial Officer, along with a memorandum reflecting his conversations

with Rizzuto concerning the need for the position. (Ex. 12; Ex. 1, ¶ 12). Aubrey was required to approve all RAs and submit them to NYIT's President for final approval before the hiring process could begin for a given position. (Ex. 1, ¶ 13).

On September 3, 2009, Mr. Baffo sent the RA for the dining room captain position to Rizzuto. (Ex. 13). This RA also reflected previous discussions between Mr. Baffo and Rizzuto that the position was needed due to an increase in business at de Seversky. (Ex. 1 at ¶¶ 14, 16; Ex. 14). That same day, Mr. Baffo submitted the RA for the dining room captain position to Aubrey. (Ex. 15). The memorandum submitted to Aubrey stated that de Seversky was experiencing an increased level of business and that the monies for the position were already allocated in the budget for the 2010 fiscal year. (Id.). Mr. Baffo also attached a job description for the dining room captain position which stated that the position would work under the direction of the General Manager. (Ex. 16). Neither of the RAs referenced the elimination of Mr. Baffo's position (Ex. 9; Ex. 14).

After the positions were approved by NYIT President Edward Guiliano, an advertisement for the dining room captain position was posted on Monster.com on September 22, 2009 and the sales associate position was posted on September 29, 2009. (Ex. 17; Ex. 18). Both postings stated that the employee would be working under the direction of the General Manager. (Id.). Prior to the sales associate position being posted, Rizzuto reviewed and approved the advertisement. (Ex. 19).

**Mr. Baffo's Disability**

On September 29, 2009, Mr. Baffo was notified by the New York Blood Center that blood he had previously donated had a reaction to a routine test and he needed to come to their office. (Ex. 1, ¶ 19; Ex. 20). The following day, Mr. Baffo made an appointment at the Blood

Center for October 1, 2009 at 1:00 p.m. to discuss his test results.  (Ex. 1, ¶ 20). Mr. Baffo subsequently informed Rizzuto of his scheduled appointment because the doctor needed to see him immediately. (Ex. 2, p.33)

During his appointment on October 1, 2009, Mr. Baffo received the life-altering news that he had tested positive for HIV.  (Ex. 1, ¶ 20).  After receiving this news, at approximately 3:00 p.m., Mr. Baffo called and left a message for Rizzuto, telling him that he had just received some disturbing news and as it was quite upsetting, he would not be returning to work that evening. (Ex. 1, ¶ 21).  Mr. Baffo further informed Rizzuto that he would be in early the next morning to prepare for an event. (Id.)

On October 2, 2009, Mr. Baffo arrived at the de Seversky Center at approximately 7:30 a.m. (Ex. 21).  That morning, while Mr. Baffo was sitting at his desk, Rizzuto entered the office and asked Mr. Baffo how he was doing.  (Ex. 1, ¶ 22).  In response to Rizzuto, Mr. Baffo told him that he was not doing so well.  (Ex. 2, p.43).  Mr. Baffo eventually began to cry and told Rizzuto that he had tested positive for HIV.  (Ex. 2, p.43-44).

Mr. Baffo worked until approximately 11:00 a.m. that day at which time he left for a previously scheduled doctor's appointment.  (Ex. 1., ¶ 24; Ex. 22).  The following two days, Mr. Baffo worked approximately 14 hours each day during scheduled events.  (Ex. 1, ¶ 25).  On each of these days, Rizzuto avoided seeing or speaking with Mr. Baffo.  (Ex. 1, ¶ 25).  In fact, after Mr. Baffo informed Rizzuto he was HIV-positive, he avoided interacting with Mr. Baffo, came into their shared office less and acted in a cold manner towards Mr. Baffo.  (Ex. 2, p.57-64).

**Mr. Baffo's Termination**

On October 5, 2009, Mr. Baffo left for a previously planned vacation in Italy and returned to work on October 16, 2009.  (Ex. 1, ¶ 27).  The same day of Mr. Baffo's return,

Rizzuto made the decision to reorganize de Seversky and eliminate Mr. Baffo's position.  (Ex. 24; Ex. 25).  Although Rizzuto waited until this date to make the decision to eliminate Mr. Baffo's position, they could have made this change at any date prior by discussing the issue with Stephen Kloepfer, NYIT's General Counsel.  (Ex. 26, p.128-129).  In the October 16, 2009 memorandum to Aubrey, Rizzuto stated that he was predicting flat revenues for the upcoming fiscal year and that he would create three positions with the savings realized from eliminating Mr. Baffo's position.  (Ex. 24).  This memo was the only documentation provided to Aubrey regarding a reorganization; Rizzuto did not prepare a business plan, organizational chart, budget or any other documentation concerning the reorganization prior to this date.  (Ex. 27, p.106; Ex. 28, p.146-47).  Additionally, prior to October 16, 2009, there are no contemporaneous writings, emails or documents which reflect that Rizzuto or Aubrey decided to eliminate Mr. Baffo's position.  (Ex. 3, p. 17-21, 169-170, 172-174, 252-53; Ex. 29, p.423-24; Ex. 28, p.207; Ex. 6, p.76-77, 81, 112).

After Aubrey signed off on Rizzuto's decision to eliminate Mr. Baffo's position, both he and Rizzuto met with Carol Jablonsky ("Jablonsky"), the newly hired Director of Human Resources ("HR") for NYIT, on October 16, 2009.  (Ex. 30, p.63-64; Ex. 3, p.278).  Jablonsky's responsibility as HR Director was simply to act as a conduit to present the reorganization to the General Counsel and she fulfilled no role outside of that. (Ex. 30, p.106, 110-111, 137-38). During the course of their discussion with Jablonsky, Rizzuto and Aubrey outlined Rizzuto's plan to reorganize de Seversky.  (Ex. 30, p.68-82).  In explaining the reasons behind his decision to eliminate Mr. Baffo's position, Rizzuto only told Jablonsky that it was being done for financial reasons (Ex. 30, p.69-70); Mr. Baffo's performance was not mentioned during this meeting.  (Ex 30, p.70).  At the close of the meeting, Rizzuto and Jablonsky decided to meet

again on October 19, 2009 in order for Jablonsky to get further information concerning the reorganization. (Ex. 30, p.92).

Rizzuto and Jablonsky met on October 19, 2009, during which meeting Jablonsky asked Rizzuto to prepare a memorandum and a new organizational chart. (Ex. 30, p.92-94, 98, 100-101). Prior to this date, Rizzuto had not prepared a memorandum for Jablonsky or a new organizational chart. (Ex. 30, p.92-93). Subsequently, Rizzuto asked Mr. Baffo to email him the de Seversky organizational chart and Rizzuto proceeded to forward the chart to Jablonsky. (Ex. 31; Ex. 32). Additionally, Rizzuto drafted a memorandum for Jablonsky outlining the reorganization and sent it to her on October 20, 2009. (Ex. 33). That same afternoon, Rizzuto revised the memorandum, at Jablonsky's suggestion. (Ex. 34; Ex. 30, p.103). Rizzuto again did not mention Mr. Baffo's performance as one of the reasons for the reorganization. (Id.). Outside of the reasons delineated in this memorandum, however, Rizzuto did not provide Jablonsky with any reasons or explanations for the reorganization. (Ex. 30, p.106-112, 122, 137-138, 158-160).

On October 22, 2009, Mr. Baffo had an appointment at the North Shore University Hospital – Long Island Jewish Health System to begin treatment for HIV. (Ex. 1 at ¶¶ 29-30). After coming to work the following day, Mr. Baffo had a brief conversation with Rizzuto where he informed him of his appointment the previous day and let Rizzuto know that he had also met with a social worker. (Ex. 1, ¶ 30). Although Mr. Baffo had informed Rizzuto of his HIV status on October 2, 2009, Rizzuto claims that he notified Jablonsky the morning of October 23, 2009 that Mr. Baffo was HIV positive and met with her later that day. (Ex. 30, p.163-165; Ex. 29, p.384-385). Jablonsky then met with Kloepfer to convey the information concerning Mr. Baffo's HIV status. (Ex. 26, p.178-182).

On October 26, 2009, Mr. Baffo was called into a meeting with Rizzuto and Jablonsky. (Ex. 2, p.70).  Rizzuto proceeded to inform Mr. Baffo that he was being terminated and that due to economic pressure and uncertainty, he had decided to reorganize the de Seversky Center.  (Ex. 2, p.72, 84; Ex. 35).  At that time, Rizzuto's purported reorganization was not complete as NYIT had yet to hire either a sales associate or a dining room captain.  (Ex. 3, p.342; Ex. 29, p.413-416).  In fact, a dining room captain was not hired until November 18, 2009 and after recruiting for the position, Rizzuto declined to hire a sales associate and instead hired a bartender captain. (Ex. 6, p.158-161, Ex. 36; Ex. 3, p.309; Ex. 29, p.496-97).   Additionally, Redlich received a $5,000 annual raise following the termination of Mr. Baffo's employment.  (Ex. 6, p.97-98).  Mr. Baffo was the only employee terminated or negatively affected by the purported reorganization in October 2009.  (Ex. 23).

## **ARGUMENT**

Summary judgment is not appropriate unless the evidence in the record demonstrates that "there is no genuine issue as to any material fact."  FED.R.CIV.P. 56(c).  The party moving for summary judgment, drawing all inferences in favor of the non-moving party, has the burden of establishing that there is no genuine issue of material fact. *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009).  "The Court should not grant summary judgment if there is 'any evidence in the record that could reasonably support a jury's verdict for the non-moving party.'" *Id.*  In employment discrimination cases, it is well-settled that "[c]aution should be exercised in addressing summary judgment motions . . . where intent and state of mind are at issue because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'" *Velez v. McHugh*, No. 09-CV-0925 (GAY), 2011 WL 778693, at *2 (S.D.N.Y. Mar. 2, 2011) (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 38

(2d Cir.2000)); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("as discrimination will seldom manifest itself overtly, courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law") (internal quotation omitted).

I.  **SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO MR. BAFFO'S CLAIMS OF DISABILITY DISCRIMINATION**

Mr. Baffo was discriminated against because of his disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.. §§ 12101 *et seq.* ("ADA"), the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, New York Administrative Code §§ 8-101 *et seq.* ("NYCHRL"). As set forth below, Mr. Baffo has demonstrated that genuine issues of material fact exist which preclude summary judgment on his claims.

A.  **Mr. Baffo Has Established a Prima Facie Case of Disability Discrimination**

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that, "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).[1]  It is well established that at this stage the burden on plaintiff is de minimis. *See Grana v. Potter*, No. 06-CV-1173 (JFB), 2009 WL 425913, at *6 (E.D.N.Y. Feb. 19, 2009) ("The Second Circuit has

---

[1]      Disability discrimination claims under the NYSHRL and NYCHRL are analyzed under the same standard, however, claims under the NYCHRL must be reviewed "independently and more liberally from their federal and state counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).

characterized the evidence necessary for the plaintiff to satisfy this initial burden as 'minimal' and 'de minimis.'") (citing *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001)).  To satisfy the fourth prong of the prima facie test, the plaintiff's disability need only play "a motivating role" in the employer's decision to terminate his employment.  *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 337 (2d Cir. 2000).  Defendants assume that Plaintiff can meet the first three elements of the prima face case and only argue that Plaintiff cannot meet the final element and demonstrate a causal connection between his disability and his termination. (Def.'s br. 10-11).  This argument is entirely without merit, as demonstrated by the myriad of factual issues raised by Defendants' claim that the decision to terminate Mr. Baffo was made before he notified Rizzuto of his disability.  Further, Mr. Baffo can clearly meet the fourth prong by showing that his HIV status played a "motivating role" in the decision to terminate his employment.

    **1.**    **Both Temporal Proximity and Discriminatory Remarks by Rizzuto Create an Inference of Discrimination**

It is undisputed that Mr. Baffo was notified on October 1, 2009 that he had tested positive for HIV.  The next day, on October 2, after Mr. Baffo arrived at de Seversky early to set up for an event, he informed Rizzuto that he was HIV-positive.  Although Mr. Baffo left work early that day for a previously scheduled doctor's appointment, it is undisputed that Rizzuto's treatment of him changed from that point on.  In contrast to the cordial and friendly relationship the two had previously shared, Rizzuto became cold to Mr. Baffo and actively avoided him.  (Ex. 1, ¶¶ 25-26; Ex. 2, p.57-64).

Mr. Baffo left for vacation on October 5, 2009 and returned on October 16, 2009.  Upon his return, Rizzuto made the decision to terminate Mr. Baffo's employment and sent a memo to Aubrey stating the same.  (Ex. 24).  Prior to this date, there is no document showing that a

decision had been made to terminate Mr. Baffo, or that anyone at NYIT was even considering eliminating the General Manager position. (Ex. 3, p. 17-21, 169-170, 172-174, 252-53; Ex. 29, p.423-24; Ex. 28, p.207; Ex. 6, p.76-77, 81, 112). Additionally, Rizzuto had not prepared a memorandum, an organizational chart or any business plan that demonstrated he was seeking to eliminate Mr. Baffo's position before sending Aubrey the October 16, 2009 memorandum. (Ex. 27, p.106; Ex. 28, p.146-47). It was only after Rizzuto found out that Mr. Baffo had HIV that he began taking the necessary steps to terminate Mr. Baffo's employment, including detailing his plan for the alleged reorganization in two memoranda and preparing a new organizational chart. The two week lapse between Mr. Baffo notifying Rizzuto of his disability and Aubrey's approval of his termination, upon Rizzuto's recommendation, clearly creates an inference of discrimination concerning the reasons for eliminating his position. *See Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 260 (S.D.N.Y. 2009) ("The temporal proximity of an employee's disclosure of a disability and her termination helps support an inference of disability discrimination.") (internal citation omitted); *see also Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 430-31 (S.D.N.Y. 2000) (finding that plaintiff's termination, at most a month after informing her employer that she was pregnant, created an inference of discrimination based on the temporal proximity of the two events).

The inference of discrimination is strengthened by Rizzuto's prior statements to Mr. Baffo concerning his desire not to have any employees with disabilities working at de Seversky. Pointedly, in approximately June, 2008, Rizzuto told Mr. Baffo when a particular employee went out on disability leave that he wished he had fired that employee previously because now he could not replace him. (Ex. 1, ¶¶ 34-37). Rizzuto further vowed to Mr. Baffo that he would never let such a situation occur again. (Id., ¶ 36). This clear expression of discriminatory

animus towards individuals with disabilities is sufficient to create an inference that Mr. Baffo's disability was a motivating factor in Rizzuto's decision to terminate his employment. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) ("The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decision-makers that could be viewed as reflecting a discriminatory animus.").

### 2. Defendants' Argument That The Decision to Terminate Mr. Baffo Was Made in August 2009 is Unsupported by The Record

Defendants point to a litany of testimony which supposedly demonstrates that NYIT made decision to terminate Mr. Baffo's employment well before he notified Rizzuto that he had tested positive for HIV.  In the entirety of the cited testimony, however, not one person can pinpoint a date before October 2, 2009 at which a decision was made to terminate Mr. Baffo's employment.  Further, there are no documents, created by Rizzuto or any other NYIT employee, that reflect a desire to terminate Mr. Baffo's employment, or even suggest that any discussions occurred regarding this possibility prior to October 2, 2009.  Instead, Defendants rely on vague, conclusory and self-serving testimony that Rizzuto spoke with Redlich and Aubrey about reorganizing de Seversky and eliminating Mr. Baffo's position, however, all admit that there are no documents which reflect any of these alleged conversations.

Not only does the documentary evidence cited by Defendants fail to demonstrate that the decision to terminate Mr. Baffo's employment was made before he learned he was HIV-positive, it contradicts Defendants' position.  For instance, the September 3, 2009 memorandum concerning the dining room captain position prepared for Aubrey states that the position is needed to alleviate pressure on the General Manager and allow more opportunity for staff training and development.  (Ex. 15).  Additionally, the job postings created for the dining room captain and sales associate positions plainly state that the two positions will operate underneath

the General Manager. (Ex. 17; Ex. 18).  As these postings appeared on September 22, 2009 and September 29, 2009, and were approved by Rizzuto, it is clear that Rizzuto could not have decided to terminate Mr. Baffo in August 2009.

Defendants also point to a September 1, 2009 memorandum from Rizzuto to Aubrey as indicative that the decision to terminate Mr. Baffo was made in August 2009.   This memorandum, however, contained no mention of eliminating Mr. Baffo's position and instead spoke obliquely of a "reorganization of the management positions" in order to give more support to Redlich. (Ex. 37).  The reasoning provided by Rizzuto for hiring the additional sales associate is entirely reflective of conversations Rizzuto and Mr. Baffo had dating back to April 2009, well before Defendants claim that Mr. Baffo's termination was discussed. (Ex. 1, ¶ 7-8).  Further, the sales associate RA submitted to Aubrey is also entirely consistent with the conversations between Mr. Baffo and Rizzuto concerning the need to hire an additional sales associate in order to allow Redlich to solicit new business outside de Seversky. (Ex. 9).  The addition of these two additional positions is consistent with a "reorganization" of de Seversky as Redlich, Rizzuto and Mr. Baffo would be shifting responsibilities and focusing on new duties. (Ex. 1, ¶¶ 8, 10, 15).

Finally, Mr. Baffo and Rizzuto began discussing the hire of an additional sales associate in April 2009, months before Defendants claim Rizzuto and Aubrey decided to eliminate Mr. Baffo's position.  Defendants' attempt to create a justification for Mr. Baffo's termination after the fact is unavailing and the totality of the evidence creates a genuine issue of material fact as to when Defendants decided to terminate Mr. Baffo's employment. *See Primmer*, 667 F. Supp. 2d at 259-60 (finding that a genuine issue of material fact was created as to the date of plaintiff's termination where the record was "absolutely devoid of any contemporaneous writings . . . that

show any indication that any of [plaintiff]'s direct supervisors was dissatisfied with her performance prior to her aneurysm.").

Defendants' case-law supporting their position is distinguishable. In *Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab.*, the plaintiff admitted that she never told anyone at defendant that she had HIV and that she didn't know if there was anyone at defendant who would have known of her condition, thus making it impossible for her to prove she was terminated because she was HIV-positive. No. 07-CV-1418 (JS) (ARL), 2009 WL 2984194, at *1 (E.D.N.Y. Sept. 14, 2009) *aff'd in part*, 395 F. App'x. 795 (2d Cir. 2010); *see also Brown v. The Pension Boards*, 488 F. Supp. 2d at 406 (S.D.N.Y. 2007) (granting summary judgment to defendant when there was no evidence that defendant knew of plaintiff's HIV status before terminating his employment). As the only evidence demonstrating when Defendants made the decision to terminate Mr. Baffo's employment shows that the decision was made two weeks after Mr. Baffo notified Rizzuto of his HIV status, these cases do not advance Defendants' position.

Defendants' reliance on *Kolivas v. Credit Agricole* is similarly misplaced. No. 95-CV-5662 (DLC), 1996 WL 684167 (S.D.N.Y. Nov. 26, 1996). There, plaintiff was terminated after engaging in verbal disputes with two supervisors over his performance review. *Id.* at *1-2. After his second verbal altercation with his supervisor within three days, his supervisor notified an employee in HR that she concluded plaintiff would need to be terminated. *Id.* at *2. Three days later, plaintiff notified defendant that he was being treated for depression but was notified of his termination the following day. *Id.* Unlike the instant matter, there was evidence in *Kolivas* that the decision to terminate plaintiff was communicated to someone prior to defendant learning that plaintiff was disabled. Further, there was only a four day gap between when defendant decided to terminate plaintiff and when plaintiff was notified of this decision. Here,

there is no evidence that Rizzuto communicated to anyone at NYIT that he had decided to eliminate Mr. Baffo's position before learning he was HIV-positive. Additionally, although Defendants' claim that the decision to terminate Mr. Baffo was made in August, they took no steps to implement that decision until Rizzuto sent Aubrey the October 16 memo. Due to these distinctions, Defendants cannot rely on *Kolivas* to support their claims.

The circumstances in *Woolley v. Broadview Networks* are even more dissimilar to the instant matter. No. 01-CV-2526 (GEL), 2003 WL 554754 (S.D.N.Y. Feb. 26, 2003). There, one of plaintiff's supervisors wrote an email specifically requesting that plaintiff be transferred back to his previous division or fired. *Id.* at *2. The court found that plaintiff could not make out a prima facie case under the ADA because the record established clearly that the decision to terminate his employment was made before he informed defendant of his disability. *Id.* at *8. Here, Defendants have produced no email or other documentation to demonstrate that the decision to terminate Mr. Baffo's employment was made prior to the date Mr. Baffo informed Rizzuto he was HIV-positive and instead rely on conclusory, self-serving testimony. This lack of documentary evidence, along with numerous inconsistencies within Defendants' contention that the decision to terminate Mr. Baffo was made in August 2009, clearly creates an issue of fact as to when the decision was made.

From the foregoing, it is clear that there is at least an issue of fact concerning the causal connection between Defendants learning of Mr. Baffo's disability and his termination. Primarily, Defendants can point to no document prior to October 16, 2009 where Mr. Baffo's termination is discussed. Further, although Rizzuto claims that he was contemplating terminating Mr. Baffo since August 2009, he failed to take any steps to effectuate this alleged plan until two weeks after Mr. Baffo told him he was HIV-positive. While Defendants point to

the recruitment of a sales associate and a dining room captain as indicative of plans to terminate Mr. Baffo, the documents prepared to recruit for these positions actually demonstrate that Rizzuto planned to keep Mr. Baffo at NYIT. Finally, although Rizzuto used the term "reorganization" in a memorandum to Aubrey dated September 1, 2009, the changes he described are fully consistent with conversations he had with Mr. Baffo starting in April 2009. Accordingly, summary judgment on this basis should be denied.

**B.      Mr. Baffo Has Demonstrated That His Disability Was a Motivating Factor in His Termination**

Because Mr. Baffo has met his initial burden, Defendants must articulate a legitimate, non-discriminatory reason for Mr. Baffo's termination. *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). Defendants claim that Mr. Baffo was terminated because of "the reorganization and the need to eliminate his position." (D. Br., p.16). Now, the burden shifts back to Mr. Baffo to establish an issue of fact as to whether Defendants' reason for terminating his employment is false and "it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *DeNardi v. DRA Imaging, P.C.*, 605 F. Supp. 2d 550, 555 (S.D.N.Y. 2009). In order to meet this burden, Mr. Baffo may rely on the facts used to establish the fourth prong of his prima facie case, as well as evidence demonstrating that the reason for his termination is false. *Leibowitz v. Cornell University*, 584 F.3d 487, 503 (2d Cir. 2009); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

### 1.  Defendants' Proffered Reason for Mr. Baffo's Termination is False

A plaintiff in an employment discrimination matter may show pretext through "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally . . . infer that the employer did not act for the asserted non-discriminatory reasons." *Primmer*, 667 F. Supp. 2d at 261 (S.D.N.Y. 2009).   Defendants maintain that Mr. Baffo was terminated as part of a reorganization of de Seversky.   Issues of fact remain, however, as to whether this is the true reason for terminating Mr. Baffo.   *See Gaffney v. Dep't of Info. Tech. & Telecommunications*, 536 F. Supp. 2d 445, 457-58 (S.D.N.Y. 2008) ("Whether particular terminations and hires were done in accordance with a legitimate, lawful intent to reorganize . . . is a question of fact for the jury.").

Most notably, Defendants' rationale for terminating Mr. Baffo's employment has changed drastically since October 2009 when Rizzuto justified his decision in memoranda to Aubrey and Jablonsky, as well as in Mr. Baffo's termination meeting.   In fact, there are stark inconsistencies and discrepancies between the explanations given for Mr. Baffo's termination in October 2009 and those explanations given during deposition.   In his October 16, 2009 memorandum to Aubrey, Rizzuto stated that his prediction of "flat revenues" for the upcoming year justified terminating Mr. Baffo.  (Ex. 24).  In his revised memo to Jablonsky on October 20, 2009, Rizzuto again provided a financial justification for Mr. Baffo's terminating, stating that he was recommending the reorganization because of "continued uncertainty regarding the economy" and that de Seversky would "continue to feel pressure through fiscal 2010."  (Ex. 34). To further reiterate the financial reasons behind Mr. Baffo's termination, the narrative prepared

prior to Mr. Baffo's termination meeting stated "we have been under a lot of economic pressure lately and we need to look at ways to make this operation more cost effective."  (Ex. 35).

The reasons documented by Rizzuto around the time of Mr. Baffo's termination are contradicted directly by the later deposition testimony of Rizzuto, Aubrey and Redlich who stated that either the only, or the most important, reason for Mr. Baffo's termination was his performance and that financial concerns did not come into play.  (Ex. 28, p.115-116, 140-41, 205-06, Ex. 26, p.139, Ex. 6, p.78).  Further, at no point during his conversations with Jablonsky in October 2009 did Rizzuto state that Mr. Baffo's performance was the reason for his termination and he provided Jablonsky with only financial justifications.  (Ex. 30, p.220-222, 246).  Rizzuto also fails to mention Mr. Baffo's performance in any of the written documents explaining the reasons for the reorganization.  Additionally, Rizzuto has even admitted that part of his performance-based justification for Mr. Baffo's termination is false.  In his affidavit submitted to the New York State Division of Human Rights, Rizzuto stated that Mr. Baffo's performance was deficient because de Seversky lost $600,000 during the time period when Mr. Baffo had control over the budget; however he later admitted that this assertion is utterly false. (Ex. 3, p.124-134; Ex. 29, p.379; Ex. 37 at ¶ 7).

Finally, there is evidence that even Rizzuto's financial justifications for the reorganization are false because, as he and Aubrey admitted, the reorganization would be budget neutral and would actually increase expenses.  (Ex. 3, p.269-270, 306-07; Ex. 27, p.97-98).  In fact, at the time of his termination, Mr. Baffo's salary was approximately $74,000, however, the positions that Rizzuto was planning to hire were budgeted for at least $73,000 in annual salary. (Ex. 2, p.87; Ex. 9; Ex. 14).  Further, Redlich received a $5,000 raise in connection with the elimination of Mr. Baffo's position.  (Ex. 6, p.97-98).  Thus, the proposals made by Rizzuto in

order to implement the alleged reorganization do not lend any support to his financial justifications for terminating Mr. Baffo.

The record further reveals that a large component of Rizzuto's "reorganization," the hire of a sales associate and dining room captain, was contemplated independently of, and prior to, any decision or discussion of terminating Mr. Baffo.  In explaining his reorganization, Rizzuto opined that he could create three positions with the savings generated from eliminating Mr. Baffo's position (Ex. 24).   However, the undisputed facts demonstrate that Rizzuto and Mr. Baffo were contemplating hiring for these positions well before Rizzuto states he decided to eliminate Mr. Baffo's position.  (Ex. 1, ¶¶ 7, 9).  In addition, RAs for both positions state that the monies for the positions were allocated in the 2010 fiscal year budget.  (Ex. 9; Ex. 14).  At the time the 2010 fiscal year budget was prepared, the salary for the General Manager position was still allocated in that year's budget (Ex. 3, p.181-182) thus, Rizzuto's after the fact rationale for recruiting these positions is entirely incompatible with the expressed rationale when recruitment was first contemplated.  Finally, both the RA for the dining room captain position and Rizzuto's discussions with Mr. Baffo reveal that the two new positions were being recruited because the volume of business at de Seversky was increasing.  This is entirely contradictory to Rizzuto's stated reason that these positions were being recruited as part of a reorganization that would result in the termination of Mr. Baffo's position.

Defendants' shifting and incompatible explanations for Mr. Baffo's termination, along with facts demonstrating that the sales associate and dining room captain positions were not recruited in order to replace Mr. Baffo, create an issue of fact as to Defendants' reason for Mr. Baffo's termination.  *See Gaffney*, 536 F. Supp. 2d 445 (finding that where defendant asserted that plaintiff was terminated due to budgetary cutbacks and there was a question of fact as to

whether salaries were actually reduced, plaintiff had demonstrated evidence that defendant's motive was pretext for discrimination); *see also Walerstein v. RadioShack Corp.*, No. 04-CV-1096 (SMG), 2007 WL 1041668, at *7 (E.D.N.Y. Mar. 30, 2007) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

### 2.   The Real Reason for Mr. Baffo's Termination is His Disability

In addition to the myriad inconsistencies in Defendants' non-discriminatory reason for terminating Mr. Baffo, the record contains numerous examples of circumstantial evidence which demonstrate that Mr. Baffo's disability was at least a motivating factor in the decision to terminate his employment.  Primarily, during Mr. Baffo's employment, Rizzuto displayed his discriminatory animus towards individuals with disabilities.   In approximately June 2008, Rizzuto expressed frustration to Mr. Baffo concerning an employee who was taking time away from work to care for his sick wife. (Ex. 1, ¶ 35).  Later, when that employee had bypass surgery, Rizzuto opined to Mr. Baffo that he regretted not terminating him prior to the employee taking disability leave. (Ex. 1, ¶ 35-36).  Specifically, Rizzuto told Mr. Baffo that he should have terminated the employee before he took disability leave because now he had to make disability payments and would not be able to replace the employee.  (Ex. 1, ¶ 36).  Rizzuto vowed to Mr. Baffo that he would not make the same mistake twice.  (Id.).  In Mr. Baffo's case, Rizzuto kept his promise and terminated him less than three weeks after being informed he was HIV-positive.

Moreover, there is an exceedingly close temporal proximity between Mr. Baffo's termination and when he notified Rizzuto he was HIV-positive.  Mr. Baffo informed Rizzuto that he was HIV-positive on October 2, 2009.  The undisputed evidence shows that on October 16, 2009, Aubrey signed a memorandum approving Rizzuto's decision to eliminate Mr. Baffo's

position.  This is the first time anyone at NYIT discussed Mr. Baffo's potential termination in writing and the first time Rizzuto documented his alleged reorganization plan.  Prior to this date, Rizzuto did not prepare a memorandum, business plan, revised organizational chart or take any other steps to implement his reorganization.  As demonstrated *supra*, these facts establish an inference of discrimination that can be used to rebut Defendants' proffered reason for Mr. Baffo's termination. *See Primmer* at 260.

Contrary to Defendants' suggestion, Mr. Baffo provides more evidence than just the timing of his termination.  In addition to the copious evidence above concerning the falsity of Defendants' rationale for Mr. Baffo's termination, there is undisputed evidence in the record demonstrating that Rizzuto's treatment of Mr. Baffo changed drastically upon learning he was HIV-positive.  Whereas previously the two had shook hands at the beginning and end of every shift together, Rizzuto stopped the practice altogether and worked actively to avoid Mr. Baffo. In fact, during the two days following Mr. Baffo's notification of his disability, Rizzuto ignored Mr. Baffo completely.  Until his termination, Rizzuto acted in a cold manner towards Mr. Baffo and came into their shared office far less than he normally did.  The totality of the evidence, including facts demonstrating the falsity of Defendants' reason for Mr. Baffo's termination, clearly creates an issue of fact as to whether Mr. Baffo's disability was a motivating factor in Defendants' decision to terminate his employment.

The case-law cited by Defendants is inapposite to the present matter. *See Hester v. Rich*, No. 03-CV-5714 (DC), 2004 WL 1872296, at *10 (S.D.N.Y. Aug. 19, 2004) (granting summary judgment for defendant where defendant had recommended in writing that plaintiff be fired a week before he learned he was HIV-positive and defendant replaced plaintiff with another HIV-positive individual); *Reese v. AIDS Inst. New York State Dept. of Health*, 112 F.3d 505 (2d Cir.

1996) (affirming summary judgment for defendant where defendant presented evidence it fired plaintiff because he was engaged in outside employment with a competing entity and plaintiff admitted same).   Reliance on *Allen v. Hebrew Academy*, No 98-CV-673 (JBM), 2000 WL 1919478 (E.D.N.Y. Oct. 6, 2000), is similarly misplaced because Mr. Baffo has put forth far more than "conclusory allegations of discrimination" and has supported his claim with both circumstantial evidence that Mr. Baffo's disability was at least a motivating factor in his termination, as well as evidence of the falsity of Defendants' non-discriminatory reason. Defendants' claim that Mr. Baffo is relying on pure speculation is specious and ignores the close temporal proximity between Mr. Baffo's termination and disclosure of his disability, the discriminatory animus toward individuals with disabilities displayed by Rizzuto and the litany of inconsistencies, falsehoods and contradictions in the record concerning Defendants' reason for Mr. Baffo's termination.   For all these reasons, Defendants' motion for summary judgment on Mr. Baffo's claim for disability discrimination under the ADA, NYSHRL and NYCHRL must be denied.

## II.   **SUMMARY JUDGMENT SHOULD BE DENIED AS TO MR. BAFFO'S CLAIM UNDER THE NYCHRL**

Claims under the NYCHRL should receive an "independent analysis . . . targeted to understanding and fulfilling what the statute characterizes as the City HRL's 'uniquely broad and remedial' purposes." *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66-69 (1st Dep't 2009). Here, Defendants argue that the NYCHRL should not apply because Mr. Baffo worked outside New York City.   Defendants fail to cite the correct standard for judging the territorial applicability of NYCHRL claims and ignore the prevailing case-law which clearly demonstrates that Mr. Baffo falls within the ambit of the law's protections.   The New York Court of Appeals has stated definitively that the NYCHRL applies "to those who inhabit or are 'persons in' the

City of New York." *Hoffman v. Parade Publis.*, 15 N.Y.3d 285, 289 (2010). The Court of Appeals went on to note that the impact requirement, propounded here by Defendants, "is appropriate where a nonresident plaintiff invokes the protection of the City Human Rights Law." *Id.* at 290. As Defendants admit, Mr. Baffo resides in Queens County (Def.'s br. 20) and therefore is clearly an "inhabitant" of the City of New York; thus, the impact test would not apply to his claims. Mr. Baffo's residency alone is sufficient to bring him within the protections of the NYCHRL. *See Hoffman* at 289. Because *Hoffman*, as a decision from New York's highest court, is clearly controlling precedent, the only authority cited by Defendants, *Ortiz v. Heir AM. Trading, LLC*, 2011 NY Slip Op 31414(U) (N.Y. Sup. Ct. May 24, 2011), must be disregarded as contrary to controlling authority and erroneously decided.

## III. THE INDIVIDUAL DEFENDANTS AIDED AND ABETTED IN THE DISCRIMINATION AGAINST MR. BAFFO

Although Defendants ignore completely Mr. Baffo's claims against the Individual Defendants, an issue of fact exists as to individual liability for Rizzuto and Aubrey. Under the NYCHRL, an individual who "actually participates in the conduct giving rise to a discrimination claim" may be held liable in their individual capacity. *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004). It is undisputed that Rizzuto was the decision-maker behind Mr. Baffo's termination and submitted a memorandum to Aubrey on October 16, 2009 seeking his approval, which Aubrey subsequently provided. Rizzuto drafted this memorandum only two weeks after Mr. Baffo informed him that he was HIV-positive and had not previously prepared any documentation stating he desired to eliminate Mr. Baffo's position. Subsequent to Rizzuto's memorandum, Aubrey and Rizzuto worked to effectuate Mr. Baffo's termination and implement Rizzuto's alleged reorganization. Finally, Rizzuto met with Mr. Baffo, along with Jablonsky, to notify Mr. Baffo that he was being terminated and explain the reasoning behind his decision.

Thus, due to the fact that Rizzuto decided to terminate Mr. Baffo's employment, and Aubrey approved his decision, an issue of fact exists as to their individual liability.

## **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that Defendants' motion for summary judgment be denied.

Dated: September 22, 2011
      New York, New York

                                    Respectfully submitted,

                                    **THOMPSON WIGDOR LLP**

By: _____
                                  Douglas H. Wigdor
                                  Matthew D. Gorman

                                    85 Fifth Avenue
                                    New York, New York 10003
                                    Tel: (212) 257-6800
                                    Fax: (212) 257-6845

                                    *Counsel for Plaintiff*