# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

Anthony Baffo,

                Plaintiff,

v.

NEW YORK INSTITUTE OF TECHNOLOGY;
ROBERT RIZZUTO, in his official and individual
capacities; and Leonard Aubrey; in his official and
individual capacities,

                Defendants.

------------------------------------------------------------- X

No. 10 Civ. 01245 (LDW) (ETB)

**DECLARATION OF
ANTHONY BAFFO**

I, Anthony Baffo, pursuant to 28 U.S.C. §1746, declare and state as follows:

1. I am the Plaintiff in the above-captioned action. I am the former General Manager of the de Seversky Conference Center ("de Seversky"), a conference and dining facility on the Old Westbury campus of the New York Institute of Technology ("NYIT"). I have personal knowledge of the facts set forth herein and submit this declaration in opposition to Defendants' motion for summary judgment.

2. I began working at de Seversky in September 2006 and worked as General Manager for NYIT until I was fired in October 2009.

3. As the General Manager, I was responsible for overseeing the operations of de Seversky, including the dining room and kitchen, as well as the de Seversky sales department. I reported directly to Robert Rizzuto ("Rizzuto"), the Director of Dining Services.

1

4. During the entirety of my employment at NYIT, I shared an office with Rizzuto. Rizzuto and I spoke almost every day and would greet each other with a handshake at the beginning of the day, as well as a handshake when one was leaving the office.

5. In my position as General Manager, I routinely worked long hours and weekends.

6. My hard work was recognized by de Seversky patrons who frequently praised me for how well I ran their events. Rizzuto also recognized my aptitude for running events and often praised my work, doing so at least once or twice per month.

7. In approximately April 2009, I first discussed with Rizzuto the potential need to hire an additional sales associate at de Seversky.

8. Rizzuto and I decided that the additional sales associate was needed because of an increase in business at de Seversky and also to provide the sales manager, Eric Redlich ("Redlich"), with the opportunity to solicit new business outside de Seversky. With Redlich free to work on securing new business, the additional sales associate would handle the administrative functions of the sales department.

9. In approximately July 2009, I discussed with Rizzuto the need to fill the position of dining room captain.

10. Rizzuto and I concluded that a dining room captain was needed to take over some of my duties of running events in order to provide me with more time to oversee the entirety of de Seversky and focus on growing the business.

11. By approximately August 2009, Rizzuto and I had concluded that we should complete a Recruitment Authorization form ("RAs") for the sales associate and dining room captain positions.

12. At Rizzuto's instruction, I drafted RAs for both positions by the beginning of September 2009, as well as memoranda to Leonard Aubrey ("Aubrey"), the Chief Financial Officer ("CFO"), outlining the plan and the financial implications for the positions as I had previously discussed with Rizzuto. Before submitting the RAs and memoranda to Aubrey, I received approval from Rizzuto.

13. The RAs were the first step in the process of creating new positions at de Seversky. After Rizzuto approved the RAs, they would next be sent to NYIT's Chief Financial Officer for his approval, who would then forward the RAs to NYIT's President for final approval. Once approval was received from the President, the Human Resources department was free to begin recruiting to fill the position.

14. Before drafting the RAs, I sat down with Rizzuto and discussed the need for each position as a result of the increase in business at de Seversky.

15. In our conversations concerning the two new positions, Rizzuto expressed that I would remain as the General Manager of de Seversky and that the two positions would help me run the business because he had taken on additional responsibilities for food service operations on the Central Islip campus of NYIT and, as such, he would be spending less time at de Seversky.

16. In my conversations with Rizzuto, he only expressed that these positions were needed due to an increase in business at de Seversky, not as part of a reorganization that would result in the elimination of my position.

17. In the first week of September 2009, I met with Rizzuto to discuss my performance review. Due to what I believed were inaccuracies with the review, coupled with the

fact that the review given to me was the exact same as I received the previous year, I informed Rizzuto that I could not sign it and did not agree with its contents.

18. In the approximately six months prior to this review, I had no conversations with Rizzuto concerning unsatisfactory performance or that my performance needed to improve.

19. On September 29, 2009, I was notified by the New York Blood Center that blood I had previously donated had a reaction to a routine test and I would need to come in to their office to discuss these results.

20. On October 1, 2009, I had an appointment at the New York Blood Center where I was informed that blood I had donated tested positive for HIV.

21. After my appointment, at approximately 3:00 p.m., I called Rizzuto and left him a voicemail stating that I received some disturbing news and because it was quite upsetting I would not be able to make it back to work. I further informed Rizzuto that I would be in early the next morning to begin setting up an event that day at de Seversky.

22. On October 2, 2009, I arrived at de Seversky early in the morning and dropped my belongings off in my office, then spent approximately two hours setting up the event that day. After returning to my office, Rizzuto walked in while I was sitting at my desk and asked me how I was feeling.

23. I told Rizzuto that I was not doing so good and began to cry. I then informed Rizzuto that I had been diagnosed with HIV.

24. I left at approximately 11:00 a.m. that morning for a previously scheduled doctor's appointment and did not return to work as I was only scheduled until 2:00 p.m.

25. The following two days, I worked approximately fourteen hours each day. Rizzuto avoided seeing or speaking with me for the entirety of both days.

4

26. Prior to informing Rizzuto I was HIV-positive, rarely a day went by that I did not speak to Rizzuto in some manner.

27. On October 5, 2009, I left on a previously scheduled family vacation to Italy and returned to work on October 16, 2009.

28. When I returned to de Seversky on October 16, I again discussed my HIV diagnosis with Rizzuto.

29. During this conversation, I told Rizzuto that the trip was a good opportunity for my wife and I to come to terms with my HIV status and that we had decided to tell our families on October 20, 2009. I asked Rizzuto if I could take that day off for that purpose and further told Rizzuto that my first doctor's appointment at the North Shore University Hospital – Long Island Jewish Health System was scheduled for October 22, 2009.

30. On October 23, 2009, I spoke again with Rizzuto concerning my appointment the day before and informed him that I met with a social worker. I also told Rizzuto that my wife and I had informed my oldest son the night before and that he took it very well.

31. During this conversation, I was standing in front of Rizzuto's desk and he was seated behind it.

32. On October 26, 2009, my employment was terminated during a meeting with Rizzuto and Jablonsky.

33. Prior to this date, I was unaware of any meetings that took place concerning the reorganization between or among Rizzuto, Aubrey and Jablonsky.

34. During my employment at de Seversky, I witnessed Rizzuto express animosity towards individuals with disabilities.

35. In approximately June 2008, Rizzuto became upset with a food services employee who was spending time away from work to care for his wife with cancer. This employee subsequently took disability leave after having bypass surgery.

36. In a conversation with Rizzuto in our office, he told me that he was angry with himself and he should have let the employee go when he had the chance because now he had to pay for his disability and would not be able to replace him. Rizzuto further told me that he would never let this happen again.

37. Also in approximately June 2008, Rizzuto expressed that he was upset he had not let the food service employee go when he had the chance and he was now paying for it. This conversation occurred during a car ride with me, Rizzuto, Pilar Visconti and Caroline Fuchs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2011

_____
ANTHONY BAEPO