# Exhibit 2

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------

ANTHONY BAFFO,

       Plaintiff,

       vs.               No. 10-CV-012425(LDW)(ETB)

NEW YORK INSTITUTE OF TECHNOLOGY, ROBERT
RIZZUTO; in his official and individual
capacities; and LEONARD AUBREY, in his
official and individual capacities,

       Defendants.

------------------------------------------------


DEPOSITION OF ANTHONY BAFFO

New York, New York

Thursday, February 24th, 2011


Reported by:
Jeremy Frank, MPM
JOB NO. 21067

## Page 2

February 24th, 2011
10:12 a.m.

Deposition of ANTHONY BAFFO, held at the offices of Fulbright & Jaworski, LLP, 666 Fifth Avenue, New York, New York, pursuant to Notice, before Jeremy Frank, a Notary Public of the State of New York.

## Page 3

APPEARANCES:

Attorneys for Plaintiff
THOMPSON WIGDOR & GILLY, LLP
85 Fifth Avenue
New York, NY 10003
BY: GREGORY N. FILOSA, ESQ.
    gfilosa@twglaw.com

Attorneys for Defendants
FULBRIGHT & JAWORSKI, LLP
666 Fifth Avenue
New York, NY 10103
BY: NEIL G. SPARBER, ESQ.
    nsparber@fulbright.com
    SAMANTHA BELTRE, ESQ.
    sbeltre@fulbright.com

## Page 4

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

## Page 5

Baffo

ANTHONY BAFFO, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. SPARBER:

Q. State your name for the record.
A. Anthony Baffo.
Q. State your address for the record.
A. 171-07 33rd Avenue, Flushing, New York 11358.
Q. Good morning, Mr. Baffo.
A. Good morning.
Q. My name is Neil Sparber, I'm with the firm of Fulbright & Jaworski and we represent the defendants New York Institute of Technology, Robert Rizzuto, and forgive me if I say Phil Rizzuto, and Leonard Aubrey in an action commenced in the United States District Court of the Eastern District of New York by you.

And this morning I'm going to be asking you a series of questions, and if there is a question that you don't understand, just tell me and I'll try to rephrase the question.

```
                                    10
     Baffo
 1
 2   again depending on the event schedule.
 3       Q.  On those days on which you worked,
 4   what time would you normally get to work?
 5       A.  Again it varied, usually earlier
 6   before noon, and the weddings if they happened
 7   later on in the afternoon or at night I would
 8   generally stay through at least the time that
 9   the entrees were served which was in or around
10   10:00.
11       Q.  Those were days on which there
12   were events.
13           Is that correct?
14       A.  Correct.
15       Q.  What about the days where were
16   there no event?
17       A.  It was generally a 10 to 6
18   schedule, sometimes I would arrive earlier but
19   usually not later than 10.
20       Q.  And did you have an office in the
21   de Seversky Center?
22       A.  Yes.
23       Q.  And did Mr. Rizzuto also have an
24   office there?
25       A.  Yes.
```

```
                                    11
 1                   Baffo
 2       Q.  Where was your office in proximity
 3   to Mr. Rizzuto's?
 4       A.  We shared an office.
 5       Q.  You literally shared an office
 6   like you both had desks in the same office?
 7       A.  We literally shared an office,
 8   yes.
 9       Q.  Going quickly, in paragraph 20 it
10   talks about your dedication and your
11   commitment to service and that you frequently
12   received praise from the de Seversky patients
13   patrons.
14           Do you see that?
15       A.  Yes.
16       Q.  During the course of the
17   litigation, your counsel has produced a number
18   of letters and correspondence from customers
19   to you with regard to your service.
20           Is that what you're referring to
21   without going through each one in general with
22   respect to this allegation?
23       A.  In general, those specific letters
24   and correspondence as well as specific
25   dealings with the guests at the events, at the
```

```
                                    12
 1                   Baffo
 2   different events, there were e-mails and phone
 3   calls.
 4       Q.  Okay.
 5           Now, do you recall the first time
 6   that you met Mr. Rizzuto approximately?
 7       A.  Approximately it was in 1988 when
 8   I first met him when I was still in high
 9   school.  I started working as a waiter at the
10   de Seversky Center, that's when I met him, he
11   was the chef at that time.
12       Q.  He was the executive chef?
13       A.  Yes.
14       Q.  At the time you that you started
15   working for New York Institute of Technology
16   in September 2006, do you know what Mr.
17   Rizzuto's position was?
18       A.  He was, he had a dual role,
19   executive chef and general manager.
20       Q.  Okay.
21           And what was the position that you
22   were applying for?
23       A.  General manager.
24       Q.  And Mr. Rizzuto was the current
25   general manager?
```

```
                                    13
 1                   Baffo
 2       A.  Correct.
 3       Q.  Is it correct you started work
 4   there on or about September 25th, 26th, 2006?
 5       A.  Yes.
 6       Q.  Do you recall how you heard about
 7   the job opening?
 8       A.  I spoke directly to Robert
 9   regarding it in August 2006, at the very
10   beginning of August.
11       Q.  Do you recall whether he had
12   called you about it?
13       A.  I don't recall specifically if he
14   called me or we had a conversation and it came
15   up, I honestly don't recall.
16       Q.  All right.
17           If any event, you had met Mr.
18   Rizzuto back in 1988 when you were still in
19   high school?
20       A.  Yes.
21       Q.  And did you remain in contact with
22   him or did you at all between 1988 and when
23   you began working in September 2006?
24       A.  Yes.
25       Q.  How often would you speak with Mr.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

```
                                    30
 1              Baffo
 2   substance of the conversation?
 3      A.   Yes.
 4      Q.   He specifically refused, I'm
 5   assuming the policy was to provide it over the
 6   phone to you?
 7      A.   Correct.
 8           MR. FILOSA: If I can interpose an
 9   objection there, that's fine though.
10           MR. SPARBER: We are doing the
11   regular stips, do they still do that
12   anymore?
13           MR. FILOSA: If you want to propose
14   certain stipulations, that's fine. I
15   don't generally as a practice agree to
16   quote/unquote regular stips. But we will
17   agree to waive and the requirement
18   that --
19           MR. SPARBER: Do we agree that all
20   objections are preserved to the time of
21   trial except to those with respect to
22   form or privilege?
23           MR. FILOSA: Correct.
24           MR. SPARBER: Okay.
25           Mr. Baffo, I'm going to show you a
```

```
                                    31
 1              Baffo
 2   copy of again a one-page document
 3   identified by Bates number D 00165 and
 4   ask the court reporter to mark this as
 5   Exhibit F, for identification.
 6           (Defendant's Exhibit F, e-mail
 7   chain, marked for identification, as of
 8   this date.)
 9      Q.   Mr. Baffo, this is a copy of an
10   e-mail, the first of which is dated September
11   29th, 2009 from you to Mr. Rizzuto in which
12   you say that you're going to the neurologist
13   now. His reply says, okay.
14           Do you see that?
15      A.   Yes.
16      Q.   Was this when you went to see Dr.
17   Mallin?
18      A.   Correct.
19      Q.   So this is something that you had
20   made an appointment for earlier in time?
21      A.   Correct.
22      Q.   Dr. Evanov had sent you to Dr.
23   Mallin?
24      A.   Correct.
25      Q.   I had seen some of the medical
```

```
                                    32
 1              Baffo
 2   records that you produced. This had to do
 3   with the weakness that you were feeling in
 4   your right hand?
 5      A.   It was a numbness, yes.
 6      Q.   Meaning, I'm differentiating this
 7   had nothing to do with your blood, this merely
 8   had to do with some other problem?
 9      A.   Correct.
10      Q.   That was where you went on the
11   29th?
12      A.   Correct.
13      Q.   All right.
14           In looking at the complaint in
15   paragraph 25, it states, on Thursday,
16   October 1st, you were notified by the New York
17   Blood Center that after having donated blood,
18   your blood tested positive for the HIV virus.
19           Do you see that?
20      A.   Yes.
21      Q.   That's what you had learned when
22   you went to the appointment with the New York
23   Blood Center on October 1st?
24      A.   Correct.
25      Q.   Do you recall did you come to work
```

```
                                    33
 1              Baffo
 2   on the morning of October 1st?
 3      A.   Yes.
 4      Q.   Do you recall what approximately
 5   what time you got in?
 6      A.   I don't.
 7      Q.   Did you have any discussions with
 8   anybody about going to an appointment or
 9   anything else in the afternoon?
10      A.   I would have told Robert that I
11   was leaving for an appointment. I actually
12   told him that I was going to see my doctor. I
13   didn't bring the blood service into it at that
14   point, I just said that, "I got a call from my
15   doctor and he wants to see me right away, and
16   I had to go in at 1:00."
17      Q.   So you have would have had this
18   conversation with Mr. Rizzuto in the morning
19   that you were going to an appointment in the
20   afternoon?
21      A.   I believe so, it would have had to
22   be in the morning.
23      Q.   I'm not disputing that, I'm just
24   asking the question.
25      A.   I'm just thinking about it, that's
```

**Page 42**

Baffo

approximately one to two, and did you go back to work that day?

A. No.

Q. Did you have any conversations with Mr. Rizzuto after 2:00 on October 1st, conversations on October 1st after 2:00?

A. Yes.

I called him, I do not remember if I actually spoke to him or if I left a voicemail, but I know that I called his personal line.

Q. With the intent of either speaking with him or leaving a message that you were not returning on October 1st?

A. Correct.

Q. All right, that's October 1st.

Moving on to October 2nd, October 2nd is a Friday, do you recall?

A. Yes.

Q. Do you recall what time you got to work that day?

A. Approximately 8:00.

Q. Was Mr. Rizzuto at work also?

A. Yes.

**Page 43**

Baffo

Q. When you walked in was he in the office?

A. I don't recall specifically.

Q. In any event, did there come a time on the morning of October 2nd that you had a conversation with Mr. Rizzuto?

A. Yes.

Q. Did there come a time when you spoke to Mr. Rizzuto about having gone to the blood center the day before?

A. Yes.

Q. Can you recount for me as best you can the substance of that conversation.

A. Yes.

At some point I was sitting at my desk and he asked me how I was doing, I replied I was not so good. He asked if he could ask if it was, if the information the doctor had given me was that I had leukemia or some form of cancer, I replied no. He asked if it was MS, I replied no. About that point I started to cry and I told him that I in fact didn't go to my doctor but I went to the Long Island Blood Service and that I had tested

**Page 44**

Baffo

positive for HIV.

Q. Did Mr. Rizzuto say anything after that?

A. He seemed generally concerned, I got up and calmed myself down, and then we sat around our conference table and we just talked about it a little more, for probably about 15 minutes.

He asked if in fact my wife was going to be tested, I said yes, that actually I had to call my doctor, Dr. Evanov that day to get her in to be tested because we were still going to Italy, that we weren't going to tell our families until we got back, that was basically it.

MR. SPARBER: Mr. Baffo, I'm going to show you a copy of a document identified by Bates number D 07299 and ask you if you can identify this document, for identification.

(Defendant's Exhibit H, e-mail, marked for identification, as of this date.)

Q. Prior to asking you a question

**Page 45**

Baffo

about this document, for the record when you had that conversation with Mr. Rizzuto on the morning of October 2nd, was there anybody else present?

A. No.

Q. If you look at this document which is marked as Exhibit H, there is an e-mail from you to Mr. Rizzuto saying that, "I'm heading out for my test, will be back."

That e-mail was sent by you about 11:13 a.m?

A. Correct.

Q. You had had your conversation with Mr. Rizzuto prior to that time?

A. Correct.

Q. What was the nature of the test that you were headed out for?

A. I was scheduled for I think it is called an EEG that that was set up through Dr. Mallin's office to check the nerves in my shoulder and neck and stuff.

Q. All right.

This had been scheduled sometime earlier --

### Page 46

|   | Baffo |
|---|---|
| 1 | |
| 2 | A. Correct. |
| 3 | Q. -- than October 1st? |
| 4 | A. Correct. |
| 5 | Q. In your conversation with Mr. |
| 6 | Rizzuto earlier did you tell him that you were |
| 7 | in fact going to the doctor on the afternoon |
| 8 | of October 2nd? |
| 9 | A. I don't recall specifically. |
| 10 | Based on my statement, "I'm |
| 11 | heading out for my test," it is something he |
| 12 | must have known about because it is not like |
| 13 | I'm asking him, I'm stating that I'm going out |
| 14 | for my test, so I would say that we had a |
| 15 | conversation that I was going for a test. |
| 16 | Q. Do you recall telling Mr. Rizzuto |
| 17 | about the nature of the test? |
| 18 | A. No. |
| 19 | Q. Not whether it was related to your |
| 20 | blood disorder as opposed to some other |
| 21 | problem? |
| 22 | A. I don't recall if I spoke to him |
| 23 | about the nature of the test. I definitely |
| 24 | know it was not related to the blood disorder |
| 25 | or HIV because I didn't have anything |

### Page 47

Baffo
1
2 scheduled that day for the HIV.
3  Q. No, you knew what the nature of
4 the test was.
5   I was asking you whether or not
6 you had communicated the nature of the test to
7 Mr. Rizzuto, if you can recall?
8  A. I don't recall, no.
9  Q. In any event, you told him at
10 11:13 that you were heading out for your test,
11 you would be back later that day?
12  A. Correct.
13  Q. Do you recall what time your
14 appointment was with Dr. Evanov?
15   MR. FILOSA: Objection.
16   MR. SPARBER: What did I do wrong?
17   MR. FILOSA: It wasn't Dr. Evanov,
18 it was Dr. Mallin.
19   MR. SPARBER: Very good, I take
20 that back.
21  Q. Do you recall, I don't know if I
22 asked the question, the test was with Dr.
23 Mallin that day?
24  A. It was in Dr. Mallin's office and
25 it was for 12:00.

### Page 48

Baffo
1
2  Q. Did you see Dr. Evanov on the 2nd?
3  A. I did not, my wife did.
4  Q. Okay.
5   You did see Dr. Mallin that day?
6  A. Yes.
7  Q. Do you recall how long that
8 appointment was for?
9  A. It was long.
10   I actually wound up not returning
11 back to work because my original follow up
12 appointment was for 2:00 with Dr. Mallin. I
13 was going to do the EEG, Dr. Mallin's office
14 was about eight minutes from work so I could
15 shoot back and forth. I was already
16 previously scheduled to only work until 2:00
17 on that Friday and I was going to go for the
18 test, they said it only took a half hour, come
19 back and then go back to the doctor. But I
20 wound up waiting in the waiting room for over
21 45 minutes and then the one appointment just
22 rolled into the next so I wound up not going
23 back to work.
24  Q. You were going to have a separate
25 appointment for the EEG and other tests so it

### Page 49

Baffo
1
2 would have entailed your normally going to his
3 office, back to work and back to his office?
4  A. Correct.
5   MR. SPARBER: Could you mark that
6 as Exhibit I, for identification.
7   (Defendant's Exhibit I, e-mail
8 chain, marked for identification, as of
9 this date.)
10  Q. Mr. Baffo, this is a copy of two
11 e-mails from October 2nd, 2009 that's
12 identified by Bates number AB 072. The first
13 of the string is an e-mail from Mr. Rizzuto to
14 you just basically stating that you're not
15 coming back.
16   Do you know if Mr. Rizzuto knew
17 you were only to work until 2:00 that day?
18  A. He had a copy of all of our
19 schedules, it wasn't a secret. I e-mailed the
20 de Seversky manager schedule to him, it was
21 two weeks out, and I don't know where it was
22 in this particular cycle. And the schedule
23 was posted on the bulletin board behind his
24 desk as well.
25  Q. I wasn't casting aspersions. It

### Page 50

Baffo

seems from the e-mail for whatever the reason he was seemed surprised that you weren't coming back.

Do you recall whether you spoke to him after you went to Dr. Mallin's office with respect to returning or not returning?

A. I don't recall.

Q. You were only scheduled to work until 2:00 so I would say it is a natural thing not to have to call because you knew you were only scheduled to work until 2:00?

A. Correct.

Q. So then you get this e-mail at 5:04 saying, "You're not coming back, I didn't know that, what's your schedule for the weekend?"

I assume this was your response, that's the e-mail on top of it?

A. Correct, it is.

Q. That you were going to be in all weekend, you were going to get payroll done prior to your going on vacation?

A. Correct.

Q. Also telling him you were only

### Page 51

Baffo

supposed to work until 2:00 that day?

A. Correct.

Q. Once you left on that Friday to go to Dr. Mallin, you did not return to the office?

A. Correct.

Q. And you did not speak to Mr. Rizzuto other than through these e-mails on that day?

A. Correct.

Q. Okay.

In fact, did you work on Saturday and Sunday?

A. Yes.

Q. You got the payroll done?

A. I did.

I got most of it done Sunday night and went back in on Monday morning to complete it and send it in.

Q. So you left the office to go see Dr. Mallin on Friday the 2nd, and did you see Mr. Rizzuto at all in person over the weekend?

A. I do not recall, I don't believe I did.

### Page 52

Baffo

Q. Do you recall having any other telephone conversations with him over the weekend?

A. No.

Q. Do you recall having any e-mail exchange with him over the weekend?

A. Yes.

I would send him periodic updates of the events usually after they happened and certainly at the end of the night.

Q. You returned to work on October 16th, 2009?

A. Correct.

Q. You left for vacation on the 5th to go to Italy?

A. Correct.

Q. From the time that you left the de Seversky Center to go to Dr. Mallin on Friday the 2nd, you didn't see Mr. Rizzuto again until you returned to work on the 16th?

A. Correct.

Q. Similarly, did you have any telephone conversations with him between leaving the office to go see Dr. Mallin and

### Page 53

Baffo

returning to work on the 16th?

A. We spoke on Monday morning.

Q. Okay.

A. Regarding the payroll getting done and when and where it was going to be sent on the phone.

Q. Whatever the conversation was, it was work-related?

A. Correct.

Q. To your recollection it did not relate at all to any health-related issues?

A. No.

Q. Did there ever come a time you told anybody else at New York Institute of Technology about having tested positive for HIV other than Mr. Rizzuto?

A. There was never anybody else at New York Institute of Technology who I told while I worked there.

Q. You might have told people after you ceased working there?

A. Yes.

Q. That would have been, you stopped working there I suppose on the morning of

## Page 54

Baffo

1 October 26th, 2009?
2 A. Correct.
3 Q. So any conversations you would
4 have had occurred after that meeting on the
5 26th?
6 A. Correct.
7 Q. Subsequently do you recall who did
8 you tell at New York Institute of Technology?
9 A. Yes.
10 Q. Who would that have been?
11 A. Karen Massetti (phonetic).
12 Q. Anybody else?
13 A. No.
14 Q. Who was Ms. Massetti?
15 A. She was a part-time receptionist
16 who worked Saturdays and Sundays.
17 Q. For you?
18 A. Correct.
19     She also, I know her through my
20 children's grammar school, she works there and
21 that's where the connection came for her for
22 the part-time job.
23     MR. FILOSA: Let me know when there
24 is a good time for a break.

## Page 55

Baffo

1     MR. SPARBER: Any time.
2     MR. FILOSA: We have been going
3 over an hour, just five.
4     MR. SPARBER: Time flies when
5 you're having fun, absolutely.
6     Off the record.
7     (Whereupon, an off-the-record
8 discussion was held.)
9     (Time noted: 11:28 a.m.)
10     (Time noted: 11:37 a.m.)
11     MR. SPARBER: We are going back on
12 the record.
13     Mark this as Exhibit J, for
14 identification.
15     (Defendant's Exhibit J, fax cover
16 sheets, marked for identification, as of
17 this date.)
18 Q. Mr. Baffo, I'm showing you a copy
19 of two pages identified by Bates numbers AB
20 039 and AB 040.
21     I ask you if you can identify
22 these pieces of paper.
23 A. Yes.
24 Q. Can you tell me what they are?

## Page 56

Baffo

1 A. This is the fax cover sheet that I
2 sent, it goes along with the confirmation from
3 the Long Island Blood Service that I faxed to
4 North Shore.
5 Q. It is just addressed to a person
6 by the name of Lauren.
7     Is she at North Shore?
8 A. I would think so, I don't know for
9 sure like I don't know anybody there
10 specifically by that name.
11 Q. All right.
12     In any event, you do recall that
13 this was the cover sheet with respect to the
14 letter dated October, the confirmation that
15 you had got on October 15th, the letter that's
16 been marked as Exhibit G?
17 A. Yes.
18 Q. That this was the cover sheet to
19 your fax of that letter?
20 A. Yes.
21 Q. To this woman Lauren?
22 A. Yes.
23 Q. Who may or may not have been at
24 LIJ.

## Page 57

Baffo

1     You faxed this to them on 10/19;
2 is that correct?
3 A. That's the date that's on the
4 sheet, yes.
5 Q. You don't have any reason to
6 believe the date was not the day on which you
7 sent it?
8 A. No.
9 Q. It would have been after your
10 return from your trip to Italy?
11 A. Correct.
12 Q. If you can look again at what is
13 in front of you as Exhibit A which is the
14 complaint, look at paragraph 28, the document
15 says you returned from vacation and reported
16 to work on October 16th, 2009.
17     You returned on October 16th?
18 A. That's correct.
19 Q. Upon your return, you noticed that
20 Mr. Rizzuto's treatment of you had changed.
21     Is that correct?
22 A. Correct.
23 Q. Among other things, it says that
24 Mr. Rizzuto avoided interacting with you

### Page 58

Baffo

directly and instead only exclusively communicated by e-mail.
    Do you see that?
A. Yes.
Q. So the two of you I think you had said shared an office.
    Is that right?
A. Yes.
Q. Did Mr. Rizzuto spend less time in the office when you were there?
A. Yes.
Q. Can you describe how much less time?
A. Not specifically.
Q. Prior to October 1st, 2009 how often would you interact with Mr. Rizzuto on a daily basis?
A. Several times throughout the day.
    His hours were generally from very early in the morning, 5:00 or 6:00 in the morning until about 5:00 or so. And he would come in and out of the office, make his rounds, come back, make his rounds. And there was just less of that, he seemed to be doing a

### Page 59

Baffo

lot more of his communication from him his PDA rather than from his actual desktop.
Q. I'm going to show my ignorance, what is a PDA? It is some kind of --
A. It's a phone.
Q. I'm sorry, I really am, what is a PDA, I really am totally --
A. A smart phone.
Q. -- not totally in the dark.
    When people use these PDA kind of things --
A. It's a smart phone.
Q. So Mr. Rizzuto his typical hours from very early in the morning, 5:00, 6:00 onwards, and I think you had said for an event you would come in at noonish and work at least through the entree of the event on those days where there were events?
A. Correct.
    I actually believe I said I would be in by noon, sometimes it was 9:00, sometimes it was 10:00.
Q. You said Mr. Rizzuto would make his rounds, what does that mean?

### Page 60

Baffo

A. He was at this point in time the Director of Dining Services, he was responsible for all the food service on the Old Westbury campus and the Manhattan campus as well.
Q. He was responsible not only for what was going on at the de Seversky Center but all the dining halls throughout the campuses?
A. Yes.
Q. Wherever there were other food services or dining services?
A. Yes.
Q. Wherever those buildings would have been, I see.
    But there definitely were times that both of you were in the office at the same time?
A. Yes.
Q. You can't really say as of now how often that would be on any given day prior to October 1st?
A. I can't, there is no specific time, it varied from day-to-day, but he was

### Page 61

Baffo

there, he was in the office, he was not -- he usually did a lot of work from his desk.
Q. At the time that you were also at your desk?
A. Yes.
Q. I'm just trying to quantify, I understand what you're saying that whatever the time was that he spent with you prior to October 1st diminished after October 1st, I think that's what you're saying.
A. That is correct.
Q. I'm just trying to quantify whether it was he spent an hour in common with you before and five minutes after or how much did it change or in what manner did it change?
A. To quantify it, what changed was he wasn't in the office, I would say maybe 40, 50 percent less time, we weren't having conversations like we had had. It was e-mails, it was a few voicemails, that's not to say that we never spoke during that week, we did, but it was less, I noticed it, it was it was less, he was almost avoiding me.
Q. Now when you say that week, that's

16 (Pages 58 to 61)

Page 62

Baffo

Q. the week from October 16th to the 23rd that you're referring to?
A. Correct.
Q. Because after you told him allegedly on the 2nd, you really were only there for a number of hours.
Is that right?
A. Correct.
Q. So that when you say that the time that he spent with you was less, we are talking about from the time you returned from October 16th until a week or 10 days later?
A. Correct.
Q. All right.
So one thing that you noticed was that whatever the time was that he spent with you prior to October 1st diminished?
A. Yes.
Q. That's one thing.
And I think you also said that the types of conversations that you did have also changed.
A. Yes.
Q. I don't want to put words in your

Page 63

Baffo

mouth, that's what I think you said.
A. I would say that's the gist of what I said.
Q. And the substance of the conversation changed?
A. There was no, he was my friend, I had known him for a long time, and that friendship it just wasn't there, it was cold and it was different, it was different.
Q. You attribute it being different from your having disclosed to him that you were HIV positive?
A. Yes.
Q. That's just a feeling that you had, you never had any conversations with him? I should ask you, did you have any conversations with him about how he was acting differently?
A. No, not on how he was acting differently.
Q. This is your perception of the way in which he was acting?
A. Yes.
Q. Other than the amount of time

Page 64

Baffo

changing and sort of the substance or the coldness changing, were there any other ways in which Mr. Rizzuto acted differently to you after October 2nd?
A. Things like at the end of the day when he would leave, he would if I was at my desk at that point he would usually get up, walk over and shake my hand and say, "Have a good night, see you tomorrow," that stopped.
I had mentioned earlier we would go out once or twice a week after work to have a couple of drinks or whatever, and there was none of that.
Q. You said you would go out after work once or twice a week?
A. Yes.
Q. Anything else that you noticed about how he acted differently to you?
A. Not that I recall, no.
Q. All right.
You didn't have a conversation with him about the way he was acting?
A. No.
Q. Just for the record, prior to

Page 65

Baffo

October 1st, 2009 is it your contention that New York Institute of Technology had discriminated against you in any manner?
A. I'm sorry, can you repeat that.
Q. Prior to October 1st, 2009, did New York Institute of Technology do anything with respect to you that you considered to be discriminatory?
A. No.
Q. So prior to October 1st everything was okay?
A. Yes.
Q. I'm just asking for the record here.
Other than what you just testified to about Mr. Rizzuto's conduct, did New York Institute of Technology or anybody working for New York Institute of Technology discriminate against you prior to October 26th on the date of your termination?
MR. FILOSA: Objection, calls for a legal conclusion. Go ahead, you can answer.
A. There was nobody, no person

**Page 70**

```
1              Baffo
2         MR. SPARBER:  I would like to talk
3    a little bit about the events of
4    October 26th.
5         Q.   Do you recall reporting to work at
6    your usual time?  What time did you report to
7    work on October 26th if you can recall?
8         A.   Approximately 9:00.
9         Q.   As far as you knew it was business
10   as usual on the 26th?
11        A.   Yes.
12        Q.   Okay.
13             It says in paragraph 30 that
14   shortly after you reported to work you were
15   called into a meeting with Mr. Rizzuto and Ms.
16   Jablonsky.
17             Is that right, this is in
18   paragraph 30.
19        A.   That is correct.
20        Q.   For the record, whose Ms.
21   Jablonsky?
22        A.   She was introduced to me as the
23   new director of HR.
24        Q.   That's the first time you ever met
25   her?
```

**Page 71**

```
1              Baffo
2         A.   Yes.
3         Q.   Who asked you to go to the
4    meeting?
5         A.   Robert.
6         Q.   Where were you at the time?
7         A.   At my desk.
8         Q.   Do you recall what he said to you
9    in sum and substance?
10        A.   Not specifically, he said, "Can
11   you come into the conference room," that was
12   it.
13        Q.   There was a conference room at the
14   de Seversky Center?
15        A.   Yes.
16             The conference room that I'm
17   referring to is on the second floor, it is
18   adjoined to our office, it is where we met
19   with clients and whatnot.
20        Q.   You went to the conference room
21   and Ms. Jablonsky was there?
22        A.   Yes.
23        Q.   Do you recall who spoke next?
24        A.   She introduced herself as Carol
25   Jablonsky, the Director of Human Resources.  I
```

**Page 72**

```
1              Baffo
2    introduced myself and I welcomed her, and she
3    said how beautiful the building was.  I said,
4    "When we are finished with our meeting I would
5    be happy to give you a tour of the place and
6    show you how beautiful it actually is."
7         Q.   Do you recall approximately what
8    time this was?
9         A.   Shortly after 10:00 or --
10        Q.   Did Mr. Rizzuto do most of the
11   talking at this meeting?
12        A.   He started the conversation, he
13   spoke first.
14        Q.   Do you recall as best you can what
15   he said to you?
16        A.   He said, "Due to economic
17   uncertainty and not knowing financially what
18   was going to happen in the future, that they
19   decided to reorganize the de Seversky Center,
20   and as a result the general manager position
21   was being eliminated."
22        Q.   Okay.
23             At that point did you say
24   anything?  I'm just trying to figure out who
25   said what, he said this, did Jablonsky then
```

**Page 73**

```
1              Baffo
2    say anything?
3         A.   She at that point jumped in and
4    explained the packet that they gave me which
5    was a separation agreement.  She directed me
6    to review it with my lawyer, they spoke to me
7    about what the severance package was, and the
8    medical benefits and that I would be contacted
9    by Maureen Gaughran --
10        Q.   G-A-U-G-H-R-A-N.
11        A.   -- regarding Cobra and all of that
12   stuff and did I have any questions, and I
13   didn't.  I think I asked something regarding
14   medical benefits but I don't recall exactly
15   what.  I asked if I could, I knew that they
16   would be shutting down my computer, and I
17   actually had photos on there that I asked if I
18   could copy to my CD.
19        Q.   You knew that they would be
20   shutting down your computer because that is
21   their policy with respect to terminations?
22        A.   Yes.
23        Q.   You had been involved in other
24   terminations from the other side of the coin?
25        A.   Yes.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

```
                                                    82
 1              Baffo
 2    contract.
 3       Q.   So are you aware of any other
 4    person that had been terminated at New York
 5    Institute of Technology that did receive a
 6    separation agreement?
 7       A.   At New York Institute of
 8    Technology, no.
 9       Q.   Okay.
10            So as far as your personal
11    knowledge is that you were unaware of any
12    other person that had been tendered a
13    separation agreement for being let go, for
14    being terminated?
15       A.   Yes, I do not know of anybody else
16    at New York Institute of Technology.
17       Q.   So is it your objection really
18    that you were being asked to sign a release in
19    exchange for money, is that what your
20    objection was, if you can call it an
21    objection.
22       A.   I don't understand that, I'm
23    sorry, can you repeat that.
24       Q.   I'm just trying to sort this out.
25            I think that your counsel will
```

```
                                                    83
 1              Baffo
 2    take the deposition of New York Institute of
 3    Technology, but I think it is their position
 4    that they were doing a nice thing in offering
 5    you the additional monies and the additional
 6    medical continuation, but you're welcome to
 7    disagree, you seemingly disagree as to my
 8    statement.
 9            MR. FILOSA:  Object to your
10       statement.
11            MR. SPARBER:  That's fine.
12       A.   I disagree.
13            I believe that I was let go
14    because I was HIV positive and they did not
15    want me there as a result of that.
16       Q.   You never considered the fact that
17    because you had disclosed that you were HIV
18    positive, they were trying to do a nice thing
19    for you?
20       A.   Well, the fact that I was HIV
21    positive, they, I'm sorry, are you asking if
22    they felt bad for me?
23       Q.   No, because I don't think that you
24    would know whether they felt bad for you.
25       A.   I didn't.
```

```
                                                    84
 1              Baffo
 2            I never took it as they felt bad
 3    or they were trying to do something nice or,
 4    from the moment that Robert said what he said
 5    about they were reorganizing based on the
 6    economic uncertainty, it made absolutely no
 7    sense to me.
 8       Q.   Did you ever ask him what he meant
 9    by economic uncertainty?
10       A.   I didn't ask him what he meant.
11       Q.   Let me ask you what did you think
12    economic uncertainty meant?
13       A.   He did not, I can't say what he
14    was thinking, for me economic uncertainty
15    would have been the future economy, but we
16    were doing very well, we had bookings, we had
17    inquiries coming in, we were up sales from
18    previous years, we were up bookings from
19    previous years going into 2010.
20       Q.   I guess I'm asking did you take
21    economic uncertainty to mean economic
22    uncertainty with respect to the de Seversky
23    Center?
24       A.   Yes.
25       Q.   Did you take economic uncertainty
```

```
                                                    85
 1              Baffo
 2    to be with respect to New York Institute of
 3    Technology as a whole?
 4       A.   No, not at that time, no.
 5       Q.   Did you take think economic
 6    uncertainty could have been with respect to
 7    just the committee as a whole?
 8       A.   That definitely had to do with it,
 9    sure.
10       Q.   Now, in the second paragraph on
11    page AB 465, you say you were not aware of any
12    restructuring, but you were aware that from an
13    economic point our revenue and profits were
14    substantially higher than both previous years.
15       A.   I see that.
16       Q.   What else, it says, in the current
17    budget, I'm not sure what that means.  In any
18    event, let's talk about the years for a
19    minute.
20            It is a fiscal year for the de
21    Seversky Center, correct?
22       A.   Yes.
23       Q.   That fiscal year runs from
24    September 1st to August 31st of any given
25    year?
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

## Page 110

Baffo

1. identified by Bates numbers AB 032 and AB 033.
2. Q. Can you identify this document for me, sir?
3. A. Yes, this is the PDP for fiscal year 2008.
4. Q. Similarly, is that your signature on the second page under employee signature?
5. A. Yes.
6. Q. Do you recognize the signature of the director as being Mr. Rizzuto's?
7. A. Yes.
8. Q. And you signed it on or about 9/24/08?
9. A. Yes.
10. Q. As with the past ones, did you prepare any portion of this report?
11. A. This one, no, I didn't.
12. Q. So where it says major accomplishments, that was done by Mr. Rizzuto?
13. A. Yes.
14. Q. Key goals for the coming year, that was also done by Mr. Rizzuto?
15. A. Yes.
16. Q. The last section filled out,

## Page 111

Baffo

recommendations for professional development, Mr. Rizzuto also filled that out?

A. Yes.

Q. I notice that for this particular PDP he gave you an unsatisfactory.

A. Yes.

Q. Did the time come that you met with Mr. Rizzuto to discuss this PDP?

A. Yes, we did.

Q. Was that on or about September 24th, '08?

A. Yes.

Q. Do you recall any part of the discussion that you had with Mr. Rizzuto about this exhibit?

A. Yes.

Q. Could you describe what you recall of being the substance of that conversation?

A. Yes.
   We had in most of the previous year written expectations and standard operating procedures for every position in the building. And the PDPs were done and completed based on that, based on those

## Page 112

Baffo

expectations of job descriptions what the performance was.

Q. I'm sorry, are you referring to the other positions at de Seversky other than general manager?

A. Yes.

Q. Okay.

A. And we actually had great discussion about what and how those expectations needed to reflect in the PDPs for all the staff, the general manager included. And it was said to me by Robert that it is all or nothing, you either meet all the expectations or you don't, there was very little gray area. And so most of the PDPs for that year received either unsatisfactory or needs improvement.
   And because I was the general manager and responsible for everybody and everything, I received unsatisfactory because we did not achieve all of the goals. We did not achieve all of the expectations across the board for myself or for the center as well.

Q. So just to make sure I understand

## Page 113

Baffo

you, the unsatisfactory rating as described to you was really because of the performance of the other people at the de Seversky Center rather than just strictly saying unsatisfactory with respect to your performance as general manager?

MR. FILOSA: Objection, misstates his testimony.
   You can answer.

A. Let me clarify that.

Q. Go ahead, I don't mean to be misleading.

A. I'm not saying that I received an unsatisfactory because of what somebody else did.

Q. Okay.

A. I received an unsatisfactory because as a general manager I didn't make sure that everybody did everything that they were supposed to do at every moment throughout the year. And because how could I get a needs improvement or a fully proficient rating if 90 or so percent of my staff received a needs improvement or an unsatisfactory and received

**Page 114**

Baffo

no increase, no annual increase as a result of it, that doesn't make sense, I agree with that, which is why this is signed because if it is all or nothing, if that's what our standard is, if that's what Robert was setting up, then you know, my performance was unsatisfactory, okay.

Q. Do you know whether certain of the people that you supervised received increases in compensation in this year?

A. Some did. I don't recall who, I believe it was two or three and it was half a percent, three quarters of a percent, maybe one percent for each of those individuals.

Q. How many people in general do you supervise?

MR. FILOSA: Objection, past tense.

Q. How many people did you supervise in this given year?

A. Including the part-time wait staff, approximately 60, 50 to 60.

Q. All or nothing being that unless all 60 of them in essence got increases, that

**Page 115**

Baffo

would be an unsatisfactory to you?

A. In essence, yes, not all 60 people got a PDP.

Q. I see.

A. It was only the full-time employees. Well, that's not, it was only the waiters did not get PDPs, it was the salaried staff, basically some of those people were part-time also; that was probably 20 people, 15 to 20 people.

Q. Do you recall whether you received an increase in compensation?

A. I did not.

Q. Do you know whether Mr. Rizzuto received an increase in compensation?

A. I don't know.

Q. All right.

MR. SPARBER: Mark this as Exhibit Q, for identification.

(Defendant's Exhibit Q, professional development program, marked for identification, as of this date.)

THE WITNESS: I'm sorry, can I just take a minute?

**Page 116**

Baffo

MR. SPARBER: Absolutely. Off the record.

(Whereupon, an off-the-record discussion was held.)

(Time noted: 1:22 p.m.)

(Time noted: 1:25 p.m.)

(Whereupon Ms. Beltre reentered the room.)

MR. SPARBER: Let's go back on the record.

Q. Mr. Baffo, last but not least, I have shown you a document that's been identified by Bates numbers AB 034 through AB 036.

I ask you if you can identify this document.

A. It is the PDP for fiscal year 2009.

Q. Okay.

I take it that's your signature on the last page?

A. Yes.

Q. You dated it on or about September 19th, '09?

**Page 117**

Baffo

A. Yes.

Q. You recognized the supervisor's signature as being that of Mr. Rizzuto?

A. Yes.

Q. Now, as with the past did you prepare any portion of what's been marked as Exhibit Q?

A. Not initially, there are my statements on this document, but I did not prepare the original document.

Q. So are you suggesting that there was sort of an interim document before this one?

A. Yes.

Q. I just don't have a copy of it, do you?

A. I do not have a copy of it.

Q. Okay.

A. It is actually a carbon copy of the, it is not a carbon copy, the key goals section is exactly the 2008 PDP.

Q. Let me just take a look.

It just seems that in the prior year one is considerably shorter, but that