# Exhibit 6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------x

ANTHONY BAFFO,

            Plaintiff,      Index No.

                            10 Civ 1245

   -against-       (LDW)(ETB)


NEW YORK INSTITUTE OF TECHNOLOGY;

ROBERT RIZZUTO, in his official and

individual capacities; and LEONARD

AUBREY, in his official and individual

capacities,

           Defendants.

------------------------------------x


          March 15, 2011

          10:00 a.m.


    Deposition of ERIC REDLICH, held at
the offices of Thompson Wigdor & Gilly LLP, 85
Fifth Avenue, New York, New York, pursuant to
Notice, before Lynne D. Metz, a Shorthand Reporter
and Notary Public of the State of New York.

Page 2

```
 1
 2    APPEARANCES:
 3
 4        THOMPSON WIGDOR & GILLY LLP
 5        Attorneys for Plaintiff
 6            85 Fifth Avenue
 7            New York, New York 10003
 8        BY:  GREGORY N. FILOSA, ESQ.,
 9             of Counsel
10
11        FULBRIGHT & JAWORSKI L.L.P.
12        Attorneys for Defendants
13            666 Fifth Avenue
14            New York, New York 10103
15        BY:  NEIL G. SPARBER, ESQ.,
16             of Counsel
17
18
19    ALSO PRESENT:
20        Anthony Baffo
21
22
23
24
25
```

Page 3

```
 1
 2        IT IS HEREBY STIPULATED, by and between the
 3    attorneys for the respective parties hereto, that:
 4    All rights provided by the C.P.L.R., and Part 221
 5    of the Uniform Rules for the Conduct of
 6    Depositions, including the right to object to any
 7    question, except as to form, or to move to strike
 8    any testimony at this examination is reserved; and
 9    in addition, the failure to object to any question
10    or to move to strike any testimony at this
11    examination shall not be a bar or waiver to make
12    such motion at, and is reserved to, the trial of
13    this action.
14
15    This deposition may be sworn to by the witness
16    being examined before a Notary Public other than
17    the Notary Public before whom this examination was
18    begun, but the failure to do so or to return the
19    original of this deposition to counsel, shall not
20    be deemed a waiver of the rights provided by Rule
21    3116 of the C.P.L.R. and shall be controlled
22    thereby.
23
24    The filing of the original of this deposition is
25    waived.
```

Page 4

```
 1
 2    ERIC REDLICH,
 3    called as a witness, having been first duly sworn
 4        by the Notary Public (Lynne D. Metz), was
 5        examined and testified as follows:
 6    EXAMINATION BY
 7    MR. FILOSA:
 8        Q.  Mr. Redlich, my name is Gregory
 9    Filosa. I am the attorney with Thompson Wigdor &
10    Gilly and we represent the plaintiff Anthony Baffo
11    in a lawsuit that he currently has pending in the
12    Eastern District of New York against his former
13    employer, New York Institute of Technology as well
14    as individual defendants Leonard Aubrey and Robert
15    Rizzuto.
16            We asked you to come down here today
17    just to answer a few questions about information
18    that you may have about Mr. Baffo's employment
19    with NYIT and the termination of his employment
20    there.
21            So I just want to go over a few ground
22    rules first that will govern the deposition so it
23    makes it easier on everyone involved and the court
24    reporter most importantly.  I am going to be
25    asking you a series of questions.  Your testimony
```

Page 5

```
 1        E. Redlich
 2    is under oath today.  It is subject to the penalty
 3    of perjury.
 4        Do you understand what that means?
 5        A.  Yes.
 6        Q.  Throughout the course of the day I
 7    will be asking you a number of questions.  I ask
 8    you respond to those questions.  Please answer
 9    verbally.  That means if there is a question that
10    calls for a yes or no or something substantive,
11    please provide that.  The court reporter can't
12    record a nod of the head or shake of the head or
13    an a-ha or uh-uh.  Just so to make her life easier
14    I will remind you to provide verbal answers to any
15    of my questions.
16        Do you understand that?
17        A.  Yes.
18        Q.  If at any point during the course of
19    the deposition I ask a question and you need me to
20    repeat it or rephrase it I can do that, just
21    please let me know.  If you answer a question I
22    will assume that you both heard the question and
23    you understood the question.
24        Do you understand that?
25        A.  Yes.
```

```
                                    Page 62
1              E. Redlich
2    description and you are agreeing with it every
3    time it is put in front of you on a piece of
4    paper, essentially you are agreeing you are not
5    doing your job.
6        Q.    Okay.
7        A.    Very different than what I came from.
8    You messed up your boss kind of yelled at you and
9    read you the riot act and hopefully you didn't do
10   it again.
11       Q.    Would you characterize this as a
12   progressive discipline policy?
13       A.    Yes.
14       Q.    With an emphasis on record keeping,
15   putting things in writing?
16       A.    Yes.
17       Q.    During the period of time that you
18   were employed as a sales manager, you reported to
19   Mr. Baffo; correct?
20       A.    Yes.
21       Q.    What was your working relationship
22   with Mr. Baffo?
23       A.    It was good.
24       Q.    Did you get along with him in a
25   professional capacity?
```

```
                                    Page 63
1              E. Redlich
2        A.    Yes.
3        Q.    Did you have any trouble or -- strike
4    that.
5              Did you have any difficulty in
6    interacting with him in a professional capacity?
7        A.    No.
8        Q.    What about at social functions, did
9    you interact with him socially?
10       A.    No.
11       Q.    Did you consider him to be a friend?
12       A.    No.
13       Q.    Did you ever interact outside the
14   workplace?
15       A.    No.
16       Q.    What about with Mr. Rizzuto, what was
17   your work relationship like with Mr. Rizzuto?
18       A.    Professional.
19       Q.    Did you have any difficulty or trouble
20   interacting with him?
21       A.    No.
22       Q.    Did you ever interact during the
23   period of time that you were employed as a sales
24   manager, did you interact with him outside of the
25   office?
```

```
                                    Page 64
1              E. Redlich
2        A.    No.
3        Q.    Since you have been -- strike that.
4              At any point, you are not in the sales
5    manager position anymore; correct?
6        A.    I am still the sales manager.
7        Q.    What is your job title?
8        A.    I now have operations added to my
9    duties.
10       Q.    Has there been any change in your job
11   title?
12       A.    Sales and operations manager.
13       Q.    Since you have been employed in the
14   sales and operations manager position, have you,
15   do you interact with Mr. Rizzuto outside the
16   office?
17       A.    No.
18       Q.    During the period of time you worked
19   with Mr. Baffo, what was your opinion of his work
20   performance?
21       A.    Anthony's?
22       Q.    Yes.
23       A.    It was fine.
24       Q.    Did you have any concern for his work
25   performance or anything like that?
```

```
                                    Page 65
1              E. Redlich
2        A.    At times.
3        Q.    What concerns did you have?
4        A.    Coming to NYIT with more than 15 years
5    of catering experience, more than ten in sales I
6    would try and share what I felt to be very
7    beneficial practices to Anthony which I thought
8    and hoped would make his life easier that were not
9    taken into consideration.
10       Q.    Do you recall, do you have any
11   examples of advice you had offered that wasn't
12   taken into consideration?
13       A.    Not specifically. Everything is in
14   motion now; work plans, duties given to specific
15   employees whether it be a waiter or a bartender, a
16   maitre d', housekeeping, Anthony was a very hands
17   on guy and was putting in a tremendous amount of
18   hours and I just hoped a little bit of advice
19   would give him some quality of life.
20       Q.    And during the time period you worked
21   with Mr. Baffo did any other employees ever
22   complain to you about his management style or
23   about interactions with him?
24       A.    No.
25       Q.    Did anyone during the time period you
```

Page 66

E. Redlich

1 worked with Mr. Baffo, did anyone praise his
2 management style or write good comments about
3 working with him?
4    A.   Employees or clients?
5    Q.   Employees.
6    A.   No.
7    Q.   What about clients?
8    A.   Anthony started running events and he
9 was fantastic at it. He was a great maitre d'.
10 People loved the customer service that he provided
11 to them.
12    Q.   Did any clients complain about his
13 customer service or any interactions that they had
14 with him that you recall?
15    A.   No.
16    Q.   During the time period you worked with
17 Mr. Baffo did you have any conversations with Mr.
18 Rizzuto about Mr. Baffo's work performance?
19    A.   Could you repeat the question?
20    Q.   During the time period that you worked
21 with Mr. Baffo did you have any conversations with
22 Mr. Rizzuto about his opinion of Mr. Baffo's work
23 performance?
24    A.   No.

Page 67

E. Redlich

1    Q.   Did Mr. Rizzuto ever discuss with you
2 concerns that he had about Mr. Baffo's work
3 performance?
4    A.   Yes.
5    Q.   When was that?
6    A.   The summer of 2009.
7    Q.   What did he say; what concerns did he
8 express?
9    A.   That essentially the role of a general
10 manager was not being met.
11    Q.   What specifically did he say?
12    A.   That was pretty much it.
13    Q.   Did you agree with him?
14    A.   I just listened.
15    Q.   Did he say anything in response?
16    A.   What do you need me to do.
17    Q.   Did he ask you to do anything?
18    A.   No.
19    Q.   Did he say anything other than the
20 role of general manager is not being met?
21    A.   That's about it.
22    Q.   Did you have any opinion as to the
23 work relationship between Mr. Baffo and Mr.
24 Rizzuto -- strike that.

Page 68

E. Redlich

1    During the time period that you worked
2 with Mr. Baffo, how would you characterize his
3 relationship with Mr. Rizzuto?
4    A.   Good and bad like I would say any boss
5 and a peer. Good days and bad days, we all have
6 them.
7    Q.   Do you know whether or not Mr. Rizzuto
8 and Mr. Baffo had any interaction outside of the
9 office?
10    A.   Yes.
11    Q.   What was your understanding or what
12 were you aware of?
13    A.   I believe they had met each other at
14 NYIT and Robert possibly knew Anthony while he was
15 working at a restaurant and they were social.
16    Q.   Did you believe Mr. Baffo and Mr.
17 Rizzuto to be friends?
18    A.   Anthony said they were.
19    Q.   Did you ever -- did Mr. Rizzuto ever
20 say that?
21    A.   We didn't have conversations like
22 that.
23    Q.   Did you ever have any discussions with
24 any other employees of NYIT about Mr. Rizzuto's

Page 69

E. Redlich

1 management style or supervision, both good or bad,
2 complaints or praise?
3    A.   Sure.
4    Q.   What type of -- strike that.
5    Did anyone ever complain to you about
6 Mr. Rizzuto's management style?
7    A.   No.
8    Q.   Did anyone ever praise his management
9 style?
10    A.   No.
11    Q.   So what type of discussions then did
12 you have with other NYIT employees about Mr.
13 Rizzuto's management style or interactions with
14 him?
15    A.   That it was unique and one that I was
16 not familiar with before.
17    Q.   What do you mean by unique?
18    A.   Through the memo management forms,
19 trainings were regularly held by outside providers
20 where he wasn't the one hosting them. He would
21 always bring in professionals from the outside to
22 provide us with leadership management styles. He
23 was a firm believer in accountability.
24    Q.   Did anyone ever complain to you about

Page 74

E. Redlich

1 assuming all the responsibilities of the general
2 manager.
3 Q. And when did you -- strike that.
4 How did you learn this?
5 A. Robert told me.
6 Q. Do you recall when he told you?
7 A. The summer of 2009.
8 Q. What did he tell you?
9 A. That he was considering eliminating
10 the position of general manager.
11 Q. Do you recall when in the summer this
12 was?
13 A. End of July beginning of August.
14 Q. And did you have a conversation with
15 Mr. Rizzuto about this?
16 A. It was brief.
17 Q. And was this a separate conversation
18 than the conversation you testified about earlier
19 today where you met with Mr. Rizzuto and he
20 expressed concerns about the role of the GM
21 position not being met?
22 A. After the first time that he had
23 brought it up it was almost a weekly frequency.
24 Q. Okay. And were these meetings that

Page 75

E. Redlich

1 you had with Mr. Rizzuto?
2 A. Yeah.
3 Q. Where would you meet with him?
4 A. In his office.
5 Q. Was this the same office that he
6 shared with Mr. Baffo?
7 A. Yes.
8 Q. Was Mr. Baffo present for these
9 meetings?
10 A. No.
11 Q. And do you recall when the meetings
12 took place?
13 A. I would say whenever he saw an
14 opportunity.
15 Q. But it was generally on a weekly
16 basis?
17 A. Yes.
18 Q. When did he first discuss his plan to
19 eliminate the general manager position?
20 A. Like I said, again the end of July,
21 beginning of August 2009.
22 Q. And was anyone else present for any of
23 these conversations?
24 A. No.

Page 76

E. Redlich

1 Q. And did he elaborate on why he was
2 eliminating the general manager position?
3 A. He didn't feel Anthony was doing the
4 job.
5 Q. Did he have, express any other
6 concerns?
7 A. Not at that time, no.
8 Q. Was it characterized to you as
9 eliminating the position or reorganization or
10 restructuring, did he ever use those words?
11 A. Reorganization, restructure,
12 eliminating the position all seemed very similar
13 pattern as to what we went through a year prior,
14 or less than a year prior.
15 Q. So you met with him on approximately a
16 weekly basis to discuss the reorganization or the
17 elimination of the general manager position?
18 A. From time to time, yeah.
19 Q. And do you have any documents or
20 e-mails referencing any of these conversations?
21 A. Only what I was shown earlier today.
22 I mean it was quite some time ago, so I don't
23 remember everything.
24 Q. But do you recall exchanging the

Page 77

E. Redlich

1 e-mails with Mr. Rizzuto about --
2 (Witness' phone rings.)
3 A. Excuse me.
4 (Pause.)
5 A. Yes.
6 Q. So you recall exchanging e-mails with
7 Mr. Rizzuto about the reorganization?
8 A. Specific reorganization yes. I know
9 we worked on a flow chart. That was about it.
10 Q. Do you recall when you worked on that
11 flow chart?
12 A. No.
13 Q. Was that around the same time you were
14 having these conversations?
15 A. They started in the summer and
16 continued through the Fall.
17 Q. What I am trying to understand though
18 is when you worked on this flow chart?
19 A. I don't recall.
20 Q. But you recall when your conversations
21 were with Mr. Rizzuto about the eliminating the
22 position; right?
23 A. He prepared me in the summer of 2009,
24 correct.

20 (Pages 74 to 77)

Page 78

E. Redlich

2  Q.  What do you mean he prepared you?
3  A.  That he was considering eliminating
4  the position of general manager.
5  Q.  Did he mention other than what you
6  talked about today that -- strike that.
7      Did he say why he was eliminating the
8  general manager position?
9  A.  Because the role was not being filled.
10 Q.  And did he say what he meant by that?
11 A.  Specifically I don't recall.
12 Q.  Do you understand what he meant that
13 the role was not being filled?
14 A.  Yes.
15 Q.  What was your understanding of what he
16 meant?
17 A.  That Anthony wasn't doing his job.
18 Q.  Did Mr. Rizzuto ever express any
19 concern about finances or the economics of
20 eliminating the general manager position?
21 A.  No. It didn't have any relation to
22 budget as far as I was led to believe.
23 Q.  It was purely related to performance?
24 A.  Correct.
25 Q.  And the flow chart that you worked on

Page 79

E. Redlich

2  with Mr. Rizzuto, was that an organizational
3  chart?
4  A.  Correct.
5  Q.  And do you recall did he provide you
6  with a draft and ask for your -- strike that.
7      What type of interactions did you have
8  with Mr. Rizzuto about the flow chart?
9  A.  He asked me how office and operation
10 would work or how I think it should work and I
11 remember quickly sketching something out on a
12 piece of paper.
13 Q.  What did you do with that piece of
14 paper?
15 A.  I handed it to Robert.
16 Q.  Do you know what he did with it?
17 A.  Turned it into a document.
18 Q.  Did he come back to you with a
19 document that reflected what you had sketched out?
20 A.  I recall seeing one, yes.
21 Q.  Do you recall when that was?
22 A.  Early Fall maybe.
23 Q.  When you say early Fall, what do you
24 mean?
25 A.  October, end of September. Somewhere

Page 80

E. Redlich

2  around there.
3  Q.  And when he ultimately showed you an
4  organizational chart that he put together on his
5  computer based on the one you sketched out; is
6  that correct?
7  A.  Similar.
8  Q.  How did he show it to you, did he
9  e-mail it to you?
10 A.  Yes.
11 Q.  Or provide it in hard copy?
12 A.  It was a form of e-mail.
13 Q.  When you were looking for documents
14 did you find a copy of the e-mail that Mr. Rizzuto
15 sent to you of the organizational chart?
16 A.  No. I had had some hard drive issues
17 where my system had been purged and I was given a
18 new tower from IT. It happened a number of times.
19 In my position I get flooded with e-mails and
20 documents so I didn't unfortunately have the level
21 of trace history.
22 Q.  What do you mean when you say "trace
23 history"?
24 A.  My e-mails were fairly fresh. I
25 didn't have stuff dating back to when I started my

Page 81

E. Redlich

2  employment.
3  Q.  But you recall Mr. Rizzuto sending you
4  a org chart via e-mail?
5  A.  Yeah, that's how I got it.
6  Q.  Did you provide him with any comments
7  on the organizational chart?
8  A.  I don't recall.
9  RQ    MR. FILOSA: At this point we call for
10       the production -- I don't believe an e-mail
11       with the flow chart has been produced. We
12       will followup in writing. I just want to
13       note for the record that we will call for
14       the production of that document or
15       documents.
16 Q.  Are there any other documents that you
17 are aware of that reflect or reference
18 conversations that you had with Mr. Rizzuto about
19 the elimination of Mr. Baffo's position?
20 A.  Just a few vague e-mails. Most of it
21 was dialogue and office meetings.
22 Q.  Do you recall these vague e-mails, do
23 you recall when they were sent?
24 A.  I would say their frequency increased
25 in October.

21 (Pages 78 to 81)

Page 94

```
 1           E. Redlich
 2   someone was hired would be funded?
 3        A.   No.
 4        Q.   And you had mentioned in talking about
 5   other positions that were being created or hired,
 6   a dining room manager, was it, position?
 7        A.   Dining room or maitre d'. I don't
 8   remember the specific title.
 9        Q.   What was your understanding of how
10   that position would play in the reorganization?
11        A.   That position I believe came about as
12   a reaction to sales and business increasing. So
13   it was a need, if you would call it. It wasn't a
14   replacement of another position.
15        Q.   And do you recall, so was someone
16   eventually hired for that position?
17        A.   Yes.
18        Q.   And your understanding was that that
19   was necessitated by sales and business increasing?
20        A.   Yes.
21        Q.   And do you know when that position was
22   filled?
23        A.   December 2009, January 2010.
24        Q.   So it was sometime after Mr. Baffo's
25   position was eliminated?
```

Page 95

```
 1           E. Redlich
 2        A.   That's correct.
 3        Q.   And it was your understanding that
 4   that was required because sales and business was
 5   increasing?
 6        A.   Correct.
 7        Q.   I am trying to get an understanding of
 8   what job duties you took on following the
 9   elimination of the GM position.
10           Do you recall what specifically you
11   handled following Mr. Baffo's termination that you
12   hadn't handled prior to that?
13        A.   The dining room staff would report
14   directly to me.
15        Q.   Anything else?
16        A.   No.
17        Q.   And other than taking over the
18   reporting for the dining room staff, who handled
19   Mr. Baffo's other job duties; was that all handled
20   by Mr. Rizzuto?
21        A.   That's correct.
22        Q.   Did anyone else take on any of the job
23   duties that Mr. Baffo had performed?
24        A.   Not that I am aware of.
25        Q.   How has it affected your job taking on
```

Page 96

```
 1           E. Redlich
 2   the reporting for dining room staff? Could you
 3   briefly summarize what that involves?
 4        A.   Review the work plans for the managers
 5   and the maitre d's, a central pull list, oversee
 6   the day-to-day aspects of running events and the
 7   business model for the house.
 8        Q.   When you say work plans, what do you
 9   mean?
10        A.   When there is a function there is a
11   good amount of planning beforehand that needs to
12   take place. Time lines, work plans for a waiter
13   whether it's set the tables, fold the napkins,
14   polish the silverware to bartenders from taking an
15   inventory, what are the necessary purchases that
16   need to be made, to what polls are essential for
17   the job based on population of male, female;
18   whether it is alcohol, beer, wine and soda.
19           Review the work plans and make sure
20   they are in line with industry standards by the
21   job. Putting in standard business practices that
22   just were not there.
23        Q.   When you say "work plans", you are
24   talking about-- strike that.
25           When you say "work plans" they refer
```

Page 97

```
 1           E. Redlich
 2   to a specific event; is that correct?
 3        A.   Correct.
 4        Q.   As opposed to an employee's work plan
 5   or anything like that?
 6        A.   That's an expectation. A daily work
 7   plan is when you come to work what you are
 8   supposed to do.
 9        Q.   But the work plans that you are
10   referring to related to events and every event had
11   a work plan and you had to work through that work
12   plan to make sure that everything was in place for
13   that event?
14        A.   Correct.
15        Q.   And as a result of the reorganization
16   did you, was there any effect on your salary?
17        A.   Minor.
18        Q.   When you say "minor", what do you
19   mean?
20        A.   I received a modest raise.
21        Q.   What is a modest raise?
22        A.   I believe it was $5,000, maybe six.
23        Q.   And you had been at that point making
24   50 to 55,000?
25        A.   Yes.
```

25 (Pages 94 to 97)

Page 98

E. Redlich

2  Q. So approximately a ten percent raise?
3  A. Approximately, yeah.
4  Q. What you would characterize as modest?
5  A. Based on the previous salaries that I
6  was receiving in the industry, yes.
7  MR. FILOSA: Let's take a break.
8  (Luncheon recess: 12:52 p.m.)

Page 99

E. Redlich
AFTERNOON SESSION.
(1:49 p.m.)
ERIC REDLICH,
  having been previously sworn, resumed the
  stand and testified further as follows:
EXAMINATION (Cont'd)
BY MR. FILOSA:
9  Q. Before the break Mr. Redlich, we had
10  talked about the modest salary increase that you
11  received as part of the reorganization you taking
12  on the sales and operations position.
13  Was there any other change in
14  compensation? Specifically you had referenced a
15  service charge distribution that you received as
16  part of the catering sales manager.
17  A. No. That remained the same.
18  Q. It remained at the one percent level?
19  A. Correct.
20  Q. Do you know if there is any change in
21  the service charge distribution as part of the
22  elimination of Mr. Baffo's employment?
23  A. Not that I am aware of.
24  Q. Are you aware of anyone else that
25  receives service charge distributions?

Page 100

E. Redlich

2  A. I know who the team members are that
3  are in the service charge distribution.
4  Q. And was there any change in the
5  percentage of team members -- strike that.
6  Was there any change in who received
7  service charge distribution as part of, following
8  Mr. Baffo's elimination?
9  A. No.
10  Q. Now Mr. Baffo's employment was
11  terminated as part of this reorganization;
12  correct?
13  A. Correct.
14  Q. Do you know when his employment ended?
15  A. End of October, beginning of November
16  2009.
17  Q. And did you have any discussions with
18  Mr. Rizzuto about the timing or about the timing
19  of Mr. Baffo's termination?
20  A. No.
21  Q. Did he tell you in advance that his
22  employment was being terminated?
23  A. Not specifically when, no, but I knew
24  that the position was going to be eliminated.
25  Q. And how did you know that, from those

Page 101

E. Redlich
2  conversations that you already testified to
3  earlier today?
4  A. That's correct.
5  Q. Do you recall prior to Mr. Baffo's
6  termination, do you recall any conversations with
7  Mr. Rizzuto in the week prior?
8  A. Possibly that he had been confirming
9  with human resources. However, it was that it was
10  going to happen. I am not really aware how the
11  school handles it.
12  I worked in many places before you
13  walk in, you are fired, get your stuff, go home.
14  Apparently things are held differently in the
15  academic community.
16  Q. How is it different in the academic
17  community?
18  A. I wasn't in the room so I couldn't
19  tell you. Normally it would be your supervisor
20  that would terminate you based on my past
21  experience.
22  Q. But you didn't have any advance notice
23  of specifically when Mr. Baffo's employment would
24  be terminated?
25  A. No.

26 (Pages 98 to 101)

Page 102

E. Redlich

Q. And you don't recall any meetings with Mr. Rizzuto with regard to the elimination of the general manager position?
A. Not specifically, no. He had mentioned one time he thought it was going to happen, it didn't happen. I was just there to do my job and continue about my business.
Q. And do you recall whether that conversation was that he talked about what he thought was going to happen and didn't happen, is that one conversation or two?
A. I don't recall how many it was, but I believe it was sometime in October.
Q. Do you recall what he said about the elimination of the position?
A. No new general manager would be hired.
Q. I am wondering about the timing of it, the elimination.
A. No. I don't recall.
MR. FILOSA: Please mark this as Redlich Exhibit 3.
(Redlich Exhibit 3, a one-page document Bates stamped D 04729, marked for identification, as of this date.)

Page 103

E. Redlich

Q. You have been shown a document that's been marked as Redlich Exhibit 3. It is a one-page document Bates stamped D 04729. Please take a look at it and let me know when you are ready.
A. Okay. Now I recall, yes.
Q. This is an e-mail communication from you to Mr. Rizzuto; correct?
A. Yes.
Q. Dated October 19, 2009; correct?
A. Correct.
Q. And in it you say: "Are we still thinking about having a meeting about SFH to reflect on the areas we would like to improve not that Anthony is back."
A. Typo. Should be now that Anthony is back.
Q. That was the first question. The second is what does SFH refer to?
A. St. Francis Hospital.
Q. And what is this e-mail a reference to?
A. An employee appreciation barbecue that I hosted in September.

Page 104

E. Redlich

Q. Why did you send this e-mail to Mr. Rizzuto?
A. We usually have a postmortem meeting on most events to get better, reflect on areas that needed improvement. That's how things got better, talked about them.
Q. And that's why you were scheduling for that event; correct?
A. Correct. I recall that Anthony had taken a long overdue honeymoon and now that he was back we should have spoken about it.
Q. And prior to this had you had any discussions with Mr. Rizzuto about -- strike that.
Prior to or around the same time as this e-mail, had you had any discussions with Mr. Rizzuto about the timing of the elimination of the general manager position?
A. No.
Q. So you didn't know whether or not they had planned to eliminate the general manager position on Friday of this week?
A. No. Not that I am aware of.
Q. And prior to this e-mail, had you already discussed the elimination of the general

Page 105

E. Redlich

manager position with Mr. Rizzuto?
A. Yes.
Q. When did you discuss it with him?
A. Those conversations started in the summer of 2009.
Q. And did you have any conversation with him about the specific timing of the elimination prior to this e-mail, at least that you recall?
A. No.
Q. Did you have any concern about scheduling this postmortem, as you described it, before the elimination of the general manager position?
A. I wasn't aware if the termination was definite. I have been in business a long time. Some people will lose their jobs, some people don't. Anthony was the lead point on the position on the job. I felt he should be there for the postmortem.
Q. At this point in time you didn't know whether or not Mr. Rizzuto was going to go forward with eliminating the general manager position?
A. Nothing definite.
Q. At some point after you sent this

27 (Pages 102 to 105)

Page 110

E. Redlich

the action plan to them?
A. An attachment or a hard copy.
Q. Do you recall specifically what you did in this instance?
A. No.
Q. And in the context of setting these goals, did you include within the goals anything related to performing the general manager job duties that you had discussed with Mr. Rizzuto?
A. No.
Q. Why not?
A. Because I wasn't assuming the responsibilities or duties of the general manager.
Q. Well, you were taking on duties, operational duties that had been performed by Mr. Baffo prior to the elimination; correct?
A. Similar and different. Anthony was running jobs. He was essentially, sorry to say, a glorified maitre d' and my position was a little bit more unique where I was going to manage those positions and supervise which was something I had been customized to do at many properties. Sales and operations were always tied together.
Q. So how is what you were doing

Page 111

E. Redlich

different with respect to these employees than what Mr. Baffo had done during the time period he was in the general manager position?
A. The duties that Anthony was performing were not, in my opinion or anyone else's, general manager duties.
Q. You viewed them as glorified maitre d' duties?
A. He allowed himself to get absorbed into the operation as opposed to focusing on the day-to-day business operation.
Q. How do you distinguish between getting absorbed into the operation as opposed to the day-to-day business operation which is what you just said?
A. Well, my experience as a manager, a director leads by advising in a much less hands on capacity. I think Anthony enjoyed running jobs, that's why he did it and allowed himself to slip away from the day-to-day managerial positions. That's what I think his downfall was.
Q. And did you ever discuss that with Mr. Rizzuto?
A. No.

Page 112

E. Redlich

Q. Did Mr. Rizzuto ever discuss that with you, ever express a similar concern or opinion?
A. Specific examples, no. The fact that he was not meeting the requirements of a general manager, yes. Somebody is going to get terminated, I ask why, he is not doing the job.
Q. Could there be any other reason?
A. Not that I am aware of.
Q. Could there be any other reason is the question? I am not asking if you were aware of any other reason. Could there be any other reason that somebody is being terminated other than they are not doing a job?
A. I am sure there could be.
Q. And during this time period that Mr. Baffo was the general manager he was also your supervisor; correct?
A. Yes.
Q. And you consulted with him on a daily basis?
A. Yes.
Q. Did you feel that consistent with his role of general manager supervising you?
A. Yes.

Page 113

E. Redlich

Q. So was he doing his job in that respect in your opinion?
A. Yes.
Q. And you continued throughout the course of your employment -- strike that.
    Throughout the period of time that you worked with Mr. Baffo, you continued to report to him and continued to seek out his advice with respect to the day-today performance of your job duties; correct?
A. Not advice. I had to get approval on anything that I wanted to do. Again, there was a chain of command and how they operate and no one really operates on their own without permission from the supervisor.
Q. But you continued throughout the course of your employment during the time period that Mr. Baffo was the GM, you continued to seek his approval on things that required his approval; correct?
A. That's correct.
    MR. FILOSA: Please mark this as Redlich Exhibit 5.
    (Redlich Exhibit 5, a one-page

Page 134

```
 1         E. Redlich
 2    A.   Yes.
 3    Q.   And the first sentence says: "Okay,
 4  FYI the thing I spoke to you about did not happen
 5  right away or today at all."
 6         Do you have any understanding as to
 7  what he was referring to?
 8    A.   Yes.
 9    Q.   What was it?
10    A.   Anthony's termination.
11    Q.   Had he spoken to you about the timing
12  of the termination prior to this e-mail?
13    A.   It may have been the day prior. I
14  wasn't given an advance notice. Remember, there
15  was a frequency we had been talking about off and
16  on when he decided to speak to me about it for a
17  few months and then when apparently things came to
18  a head around this time he had been making
19  arrangements to follow through with what he
20  intended to do.
21    Q.   And he spoke to you the day prior?
22    A.   I am assuming. Again, I wasn't given
23  a lot of notice on specifics.
24    Q.   And when he did give you notice, what
25  did Mr. Rizzuto tell you?
```

Page 135

```
 1         E. Redlich
 2    A.   Probably something along the lines
 3  that Anthony will be terminated today.
 4    Q.   Or tomorrow or the next day?
 5    A.   Sometime maybe this week.
 6    Q.   And did he say anything else?
 7    A.   No.
 8    Q.   Did you say anything when he told you
 9  that?
10    A.   I responded to his e-mail.
11    Q.   I am talking about during the
12  conversation when he told you that Mr. Baffo's
13  employment was going to be terminated that week or
14  the next few days.
15    A.   No.
16    Q.   Were you surprised it was happening at
17  that time?
18    A.   No.
19    Q.   Now do you recall where you were when
20  Mr. Rizzuto told you about the timing of the
21  termination?
22    A.   Probably in my office.
23    Q.   Do you know if anyone else was
24  present?
25    A.   No.
```

Page 136

```
 1         E. Redlich
 2    Q.   Now looking at the second paragraph it
 3  says: "I would like to schedule time and day/days
 4  that you and I can sit and I can get updates from
 5  you and answer any questions you may have instead
 6  of you having to run after me and pin me down. I
 7  think it will help you and be more effective for
 8  both of us."
 9         Do you see that?
10    A.   Yes.
11    Q.   So prior to this e-mail, you hadn't
12  had a sit down with Mr. Rizzuto to discuss the
13  full effect of the reorganization or elimination
14  of the position?
15    A.   That's correct. He had led me to
16  believe that he was taking on the responsibilities
17  of the general manager and would delegate work out
18  as he sees fit.
19    Q.   Prior to that did you ever sit down
20  with Mr. Rizzuto and have a discussion about
21  questions you may have and also provide him with
22  updates as he references in this e-mail?
23    A.   After this?
24    Q.   Yes.
25    A.   Yes.
```

Page 137

```
 1         E. Redlich
 2    Q.   Did it seem odd to you that you didn't
 3  have this meeting with him until after the
 4  decision was made or after the position was
 5  eliminated?
 6    A.   No. I really don't take things like
 7  this as to be shocking information with the amount
 8  of experience I have in business. I didn't think
 9  many things were really going to change in my
10  world.
11    Q.   What do you mean by that?
12    A.   I knew I wasn't going to be the
13  general manager. He made that very clear. He was
14  not replacing that position and that he felt
15  better by assuming the responsibilities.
16    Q.   But you were going to take on
17  additional duties with respect to operations;
18  right?
19    A.   That's correct.
20    Q.   And you were given additional pay?
21    A.   That was not explored initially.
22    Q.   When you talked about the
23  reorganization with Mr. Rizzuto, he didn't
24  reference any increase in your salary?
25    A.   No, not right away.
```

Page 154

E. Redlich
1  
2  general manager's salary was going to make the
3  world happen for us. We used -- if that was the
4  case they wouldn't have replaced other positions
5  which they did and built more positions onto the
6  operation.
7  Q. So if they were concerned about
8  increasing profit and cutting the budget they
9  wouldn't have hired these two positions; is that
10 your understanding?
11 A. That's my understanding, correct.
12 Q. Do you know what other positions were
13 ultimately hired?
14 A. A dining room manager. I am not aware
15 of what the exact title is. It maybe a steward or
16 bar manager.
17     MR. FILOSA: Please mark this as
18     Redlich Exhibit 10.
19     (Redlich Exhibit 10, a three-page
20     document Bates stamped D 02155 through 2157,
21     marked for identification, as of this date.)
22 Q. You have been shown a document that's
23 been marked Redlich Exhibit 10. It is a
24 three-page document Bates stamped D 02155 through
25 2157. Please review it and let me know when you

Page 155

E. Redlich
1  
2  are ready.
3  A. I am ready.
4  Q. Have you ever seen this before?
5  A. It's possible.
6  Q. Do you recognize what it is?
7  A. It's an RA for a sales position.
8  Q. And an RA is that a recruitment
9  authorization?
10 A. That's correct.
11 Q. And this one is dated September 1,
12 2009?
13 A. Yes.
14 Q. And the position listed on the left is
15 catering sales associate?
16 A. Yes.
17 Q. And on September 1, 2009 you were the
18 catering sales manager?
19 A. Yes.
20 Q. And was this a new position that was
21 being hired?
22 A. Yes.
23 Q. And was this position -- strike that.
24     Do you know why this position was
25 being hired or posted?

Page 156

E. Redlich
1  
2  A. I believe the original reason was to
3  assist in a seven day sales coverage at de
4  Seversky which two people were doing at the time
5  and to also accommodate an increased traffic where
6  the phone was ringing more.
7  Q. And did you have any discussions with
8  Mr. Baffo or Mr. Rizzuto about the recruitment
9  authorization for this position?
10 A. I am assuming so. I didn't have any
11 influence on the salary requirements or the
12 percentage. I have never seen this letter.
13 Q. When you say this letter, you are
14 referring to page 3?
15 A. Yes.
16 Q. And looking at page 1 in the box, the
17 last box, the second sentence: "Additional sales
18 associate will also provide the opportunity for
19 the sales department to solicit new business
20 outside the mansion without taking away valuable
21 meeting time with existing clients."
22     Do you know was there any discussion
23 about that at the time of this recruitment
24 authorization?
25 A. I don't remember.

Page 157

E. Redlich
1  
2  Q. Any goal of being able to be, to
3  solicit outside of the office more?
4  A. Yeah, that was a goal that they wanted
5  me to attempt.
6  Q. Were you able to do that?
7  A. No.
8  Q. Why not?
9  A. The position was never filled.
10 Q. And you took on the operational
11 responsibilities as well?
12 A. That's correct.
13 Q. That would require you to be in the
14 house more?
15 A. That's correct.
16 Q. As opposed to soliciting outside of
17 the office?
18 A. That's correct.
19 Q. And this position was never filled?
20 A. Yes.
21     MR. FILOSA: Mark this as Redlich
22     Exhibit 11.
23     (Redlich Exhibit 11, a three-page
24     document Bates stamped D 02128 through 2130,
25     marked for identification, as of this date.)

40 (Pages 154 to 157)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

## Page 158

```
 1              E. Redlich
 2      Q.  You have been shown a document that's
 3  been marked as Redlich Exhibit 11. It is a
 4  three-page document Bates stamped D 02128 through
 5  2130. Please review it and let me know when you
 6  are ready.
 7      A.  I am ready.
 8      Q.  This is also a recruitment
 9  authorization?
10      A.  Yes.
11      Q.  And the title for this is Dining Room
12  Captain?
13      A.  Yes.
14      Q.  Is this the position that you were
15  referring to earlier? I think you referred to it
16  as dining room manager.
17      A.  Yes.
18      Q.  So the position that was being
19  recruited for as part of the reorganization --
20  strike that.
21          So this was the position that you were
22  referring to earlier that would be filled?
23      A.  Yes.
24      Q.  And this is dated September 3, 2009?
25      A.  Yes.
```

## Page 159

```
 1              E. Redlich
 2      Q.  And do you know if this position was
 3  ever filled?
 4      A.  Yes, it was.
 5      Q.  And this position reports in to you;
 6  right?
 7      A.  Yes.
 8      Q.  On the operational side?
 9      A.  Yes.
10      Q.  And do you know who filled this
11  position; who was hired for this position?
12      A.  This position was filled by Roger
13  Echurie.
14      Q.  And Mr. Echurie, did you know him
15  prior to him coming on as dining room captain?
16      A.  Yes, I did.
17      Q.  Had you worked with him prior?
18      A.  Yes, I did.
19      Q.  Where did you work with him?
20      A.  At the Whitsons Culinary Group.
21      Q.  Did you recommend him for the
22  position?
23      A.  He applied ironically enough not
24  knowing I was there. Was gainfully employed at
25  the time.
```

## Page 160

```
 1              E. Redlich
 2      Q.  And he was ultimately hired?
 3      A.  Yes, he was.
 4      Q.  So the dining room captain position
 5  was filled; correct?
 6      A.  Yes.
 7      Q.  Do you know whether or not the funds
 8  that were saved from the elimination of general
 9  manager position was used to hire any other
10  positions?
11      A.  Yes. I believe there was a steward
12  position or bar manager position created. I don't
13  recall the exact title.
14      Q.  Is it bartender captain?
15      A.  Okay.
16      Q.  Could that be it?
17      A.  Yes.
18      Q.  Have you ever heard of that job title
19  before?
20      A.  Close enough, yes.
21      Q.  Does NYIT employ someone in the
22  position of bartender captain?
23      A.  Yes.
24      Q.  Do you know who fills that position?
25      A.  Marshall Spence.
```

## Page 161

```
 1              E. Redlich
 2      Q.  Do you know when he was hired?
 3      A.  He was a part-time employee for many
 4  years and was offered a full time position based
 5  on his merit and dedication to his job.
 6      Q.  Do you know what the salary is for the
 7  bartender captain position?
 8      A.  I believe he was hired at $14 per hour
 9  non-salary which meant that he would be entitled
10  to overtime if he did more than 40 hours per week.
11      Q.  And that's in the bartender captain
12  position; is that correct?
13      A.  That's correct.
14      Q.  I am going to show you again what has
15  been marked as Redlich Exhibit 2. If I could
16  direct your attention to page 8 under the heading
17  Response to Interrogatory Number 8.
18      A.  Okay.
19      Q.  Reading it says: "Following the
20  reorganization of the de Seversky Center in
21  October 2009, job responsibilities previously
22  performed by plaintiff, which is a reference to
23  Mr. Baffo, were assumed by Mr. Rizzuto and Mr.
24  Redlich."
25          Do you see that?
```