# Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------x

ANTHONY BAFFO,

Plaintiff, Index No. 10 Civ 1245 (LDW)(ETB)

-against-

NEW YORK INSTITUTE OF TECHNOLOGY; ROBERT RIZZUTO, in his official and individual capacities; and LEONARD AUBREY, in his official and individual capacities,

Defendants.

-------------------------------------x

March 15, 2011
10:00 a.m.

Deposition of ERIC REDLICH, held at the offices of Thompson Wigdor & Gilly LLP, 85 Fifth Avenue, New York, New York, pursuant to Notice, before Lynne D. Metz, a Shorthand Reporter and Notary Public of the State of New York.

0105a82c-a34c-498a-92a3-887e93e17bc

APPEARANCES:

THOMPSON WIGDOR & GILLY LLP
Attorneys for Plaintiff
85 Fifth Avenue
New York, New York 10003
BY: GREGORY N. FILOSA, ESQ.,
of Counsel

FULBRIGHT & JAWORSKI L.L.P.
Attorneys for Defendants
666 Fifth Avenue
New York, New York 10103
BY: NEIL G. SPARBER, ESQ.,
of Counsel

ALSO PRESENT:
Anthony Baffo

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that: All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R. and shall be controlled thereby.

The filing of the original of this deposition is waived.

ERIC REDLICH,
called as a witness, having been first duly sworn by the Notary Public (Lynne D. Metz), was examined and testified as follows:
EXAMINATION BY
MR. FILOSA:

Q. Mr. Redlich, my name is Gregory Filosa. I am the attorney with Thompson Wigdor & Gilly and we represent the plaintiff Anthony Baffo in a lawsuit that he currently has pending in the Eastern District of New York against his former employer, New York Institute of Technology as well as individual defendants Leonard Aubrey and Robert Rizzuto.

We asked you to come down here today just to answer a few questions about information that you may have about Mr. Baffo's employment with NYIT and the termination of his employment there.

So I just want to go over a few ground rules first that will govern the deposition so it makes it easier on everyone involved and the court reporter most importantly. I am going to be asking you a series of questions. Your testimony

is under oath today. It is subject to the penalty of perjury.

Do you understand what that means?

A. Yes.

Q. Throughout the course of the day I will be asking you a number of questions. I ask you respond to those questions. Please answer verbally. That means if there is a question that calls for a yes or no or something substantive, please provide that. The court reporter can't record a nod of the head or shake of the head or an a-ha or uh-uh. Just so to make her life easier I will remind you to provide verbal answers to any of my questions.

Do you understand that?

A. Yes.

Q. If at any point during the course of the deposition I ask a question and you need me to repeat it or rephrase it I can do that, just please let me know. If you answer a question I will assume that you both heard the question and you understood the question.

Do you understand that?

A. Yes.

0105a82c-a34c-498a-92e3-887e93e17b

E. Redlich

description and you are agreeing with it every time it is put in front of you on a piece of paper, essentially you are agreeing you are not doing your job.

Q. Okay.

A. Very different than what I came from. You messed up your boss kind of yelled at you and read you the riot act and hopefully you didn't do it again.

Q. Would you characterize this as a progressive discipline policy?

A. Yes.

Q. With an emphasis on record keeping, putting things in writing?

A. Yes.

Q. During the period of time that you were employed as a sales manager, you reported to Mr. Baffo; correct?

A. Yes.

Q. What was your working relationship with Mr. Baffo?

A. It was good.

Q. Did you get along with him in a professional capacity?

E. Redlich

A. Yes.

Q. Did you have any trouble or -- strike that.

Did you have any difficulty in interacting with him in a professional capacity?

A. No.

Q. What about at social functions, did you interact with him socially?

A. No.

Q. Did you consider him to be a friend?

A. No.

Q. Did you ever interact outside the workplace?

A. No.

Q. What about with Mr. Rizzuto, what was your work relationship like with Mr. Rizzuto?

A. Professional.

Q. Did you have any difficulty or trouble interacting with him?

A. No.

Q. Did you ever interact during the period of time that you were employed as a sales manager, did you interact with him outside of the office?

E. Redlich

A. No.

Q. Since you have been -- strike that.

At any point, you are not in the sales manager position anymore; correct?

A. I am still the sales manager.

Q. What is your job title?

A. I now have operations added to my duties.

Q. Has there been any change in your job title?

A. Sales and operations manager.

Q. Since you have been employed in the sales and operations manager position, have you, do you interact with Mr. Rizzuto outside the office?

A. No.

Q. During the period of time you worked with Mr. Baffo, what was your opinion of his work performance?

A. Anthony's?

Q. Yes.

A. It was fine.

Q. Did you have any concern for his work performance or anything like that?

E. Redlich

A. At times.

Q. What concerns did you have?

A. Coming to NYIT with more than 15 years of catering experience, more than ten in sales I would try and share what I felt to be very beneficial practices to Anthony which I thought and hoped would make his life easier that were not taken into consideration.

Q. Do you recall, do you have any examples of advice you had offered that wasn't taken into consideration?

A. Not specifically. Everything is in motion now; work plans, duties given to specific employees whether it be a waiter or a bartender, a maitre d', housekeeping, Anthony was a very hands on guy and was putting in a tremendous amount of hours and I just hoped a little bit of advice would give him some quality of life.

Q. And during the time period you worked with Mr. Baffo did any other employees ever complain to you about his management style or about interactions with him?

A. No.

Q. Did anyone during the time period you

0105a82c-a34c-498a-92e3-887e93e17be

Page 66

E. Redlich

worked with Mr. Baffo, did anyone praise his management style or write good comments about working with him?

A. Employees or clients?

Q. Employees.

A. No.

Q. What about clients?

A. Anthony started running events and he was fantastic at it. He was a great maitre d'. People loved the customer service that he provided to them.

Q. Did any clients complain about his customer service or any interactions that they had with him that you recall?

A. No.

Q. During the time period you worked with Mr. Baffo did you have any conversations with Mr. Rizzuto about Mr. Baffo's work performance?

A. Could you repeat the question?

Q. During the time period that you worked with Mr. Baffo did you have any conversations with Mr. Rizzuto about his opinion of Mr. Baffo's work performance?

A. No.

Page 67

E. Redlich

Q. Did Mr. Rizzuto ever discuss with you concerns that he had about Mr. Baffo's work performance?

A. Yes.

Q. When was that?

A. The summer of 2009.

Q. What did he say; what concerns did he express?

A. That essentially the role of a general manager was not being met.

Q. What specifically did he say?

A. That was pretty much it.

Q. Did you agree with him?

A. I just listened.

Q. Did he say anything in response?

A. What do you need me to do.

Q. Did he ask you to do anything?

A. No.

Q. Did he say anything other than the role of general manager is not being met?

A. That's about it.

Q. Did you have any opinion as to the work relationship between Mr. Baffo and Mr. Rizzuto -- strike that.

Page 68

E. Redlich

During the time period that you worked with Mr. Baffo, how would you characterize his relationship with Mr. Rizzuto?

A. Good and bad like I would say any boss and a peer. Good days and bad days, we all have them.

Q. Do you know whether or not Mr. Rizzuto and Mr. Baffo had any interaction outside of the office?

A. Yes.

Q. What was your understanding or what were you aware of?

A. I believe they had met each other at NYIT and Robert possibly knew Anthony while he was working at a restaurant and they were social.

Q. Did you believe Mr. Baffo and Mr. Rizzuto to be friends?

A. Anthony said they were.

Q. Did you ever -- did Mr. Rizzuto ever say that?

A. We didn't have conversations like that.

Q. Did you ever have any discussions with any other employees of NYIT about Mr. Rizzuto's

Page 69

E. Redlich

management style or supervision, both good or bad, complaints or praise?

A. Sure.

Q. What type of -- strike that.

Did anyone ever complain to you about Mr. Rizzuto's management style?

A. No.

Q. Did anyone ever praise his management style?

A. No.

Q. So what type of discussions then did you have with other NYIT employees about Mr. Rizzuto's management style or interactions with him?

A. That it was unique and one that I was not familiar with before.

Q. What do you mean by unique?

A. Through the memo management forms, trainings were regularly held by outside providers where he wasn't the one hosting them. He would always bring in professionals from the outside to provide us with leadership management styles. He was a firm believer in accountability.

Q. Did anyone ever complain to you about





0105a82c-a34c-498a-92e3-887e93e17be

Page 74

E. Redlich

assuming all the responsibilities of the general manager.

Q. And when did you -- strike that.

How did you learn this?

A. Robert told me.

Q. Do you recall when he told you?

A. The summer of 2009.

Q. What did he tell you?

A. That he was considering eliminating the position of general manager.

Q. Do you recall when in the summer this was?

A. End of July beginning of August.

Q. And did you have a conversation with Mr. Rizzuto about this?

A. It was brief.

Q. And was this a separate conversation than the conversation you testified about earlier today where you met with Mr. Rizzuto and he expressed concerns about the role of the GM position not being met?

A. After the first time that he had brought it up it was almost a weekly frequency.

Q. Okay. And were these meetings that

Page 75

E. Redlich

you had with Mr. Rizzuto?

A. Yeah.

Q. Where would you meet with him?

A. In his office.

Q. Was this the same office that he shared with Mr. Baffo?

A. Yes.

Q. Was Mr. Baffo present for these meetings?

A. No.

Q. And do you recall when the meetings took place?

A. I would say whenever he saw an opportunity.

Q. But it was generally on a weekly basis?

A. Yes.

Q. When did he first discuss his plan to eliminate the general manager position?

A. Like I said, again the end of July, beginning of August 2009.

Q. And was anyone else present for any of these conversations?

A. No.

Page 76

E. Redlich

Q. And did he elaborate on why he was eliminating the general manager position?

A. He didn't feel Anthony was doing the job.

Q. Did he have, express any other concerns?

A. Not at that time, no.

Q. Was it characterized to you as eliminating the position or reorganization or restructuring, did he ever use those words?

A. Reorganization, restructure, eliminating the position all seemed very similar pattern as to what we went through a year prior, or less than a year prior.

Q. So you met with him on approximately a weekly basis to discuss the reorganization or the elimination of the general manager position?

A. From time to time, yeah.

Q. And do you have any documents or e-mails referencing any of these conversations?

A. Only what I was shown earlier today. I mean it was quite some time ago, so I don't remember everything.

Q. But do you recall exchanging the

Page 77

E. Redlich

e-mails with Mr. Rizzuto about --

(Witness' phone rings.)

A. Excuse me.

(Pause.)

A. Yes.

Q. So you recall exchanging e-mails with Mr. Rizzuto about the reorganization?

A. Specific reorganization yes. I know we worked on a flow chart. That was about it.

Q. Do you recall when you worked on that flow chart?

A. No.

Q. Was that around the same time you were having these conversations?

A. They started in the summer and continued through the Fall.

Q. What I am trying to understand though is when you worked on this flow chart?

A. I don't recall.

Q. But you recall when your conversations were with Mr. Rizzuto about the eliminating the position; right?

A. He prepared me in the summer of 2009, correct.

Page 78

E. Redlich

Q. What do you mean he prepared you?
A. That he was considering eliminating the position of general manager.
Q. Did he mention other than what you talked about today that -- strike that.
Did he say why he was eliminating the general manager position?
A. Because the role was not being filled.
Q. And did he say what he meant by that?
A. Specifically I don't recall.
Q. Do you understand what he meant that the role was not being filled?
A. Yes.
Q. What was your understanding of what he meant?
A. That Anthony wasn't doing his job.
Q. Did Mr. Rizzuto ever express any concern about finances or the economics of eliminating the general manager position?
A. No. It didn't have any relation to budget as far as I was led to believe.
Q. It was purely related to performance?
A. Correct.
Q. And the flow chart that you worked on

Page 79

E. Redlich

with Mr. Rizzuto, was that an organizational chart?
A. Correct.
Q. And do you recall did he provide you with a draft and ask for your -- strike that.
What type of interactions did you have with Mr. Rizzuto about the flow chart?
A. He asked me how office and operation would work or how I think it should work and I remember quickly sketching something out on a piece of paper.
Q. What did you do with that piece of paper?
A. I handed it to Robert.
Q. Do you know what he did with it?
A. Turned it into a document.
Q. Did he come back to you with a document that reflected what you had sketched out?
A. I recall seeing one, yes.
Q. Do you recall when that was?
A. Early Fall maybe.
Q. When you say early Fall, what do you mean?
A. October, end of September. Somewhere

Page 80

E. Redlich

around there.
Q. And when he ultimately showed you an organizational chart that he put together on his computer based on the one you sketched out; is that correct?
A. Similar.
Q. How did he show it to you, did he e-mail it to you?
A. Yes.
Q. Or provide it in hard copy?
A. It was a form of e-mail.
Q. When you were looking for documents did you find a copy of the e-mail that Mr. Rizzuto sent to you of the organizational chart?
A. No. I had had some hard drive issues where my system had been purged and I was given a new tower from IT. It happened a number of times. In my position I get flooded with e-mails and documents so I didn't unfortunately have the level of trace history.
Q. What do you mean when you say "trace history"?
A. My e-mails were fairly fresh. I didn't have stuff dating back to when I started my

Page 81

E. Redlich

employment.
Q. But you recall Mr. Rizzuto sending you a org chart via e-mail?
A. Yeah, that's how I got it.
Q. Did you provide him with any comments on the organizational chart?
A. I don't recall.
RQ MR. FILOSA: At this point we call for the production -- I don't believe an e-mail with the flow chart has been produced. We will followup in writing. I just want to note for the record that we will call for the production of that document or documents.
Q. Are there any other documents that you are aware of that reflect or reference conversations that you had with Mr. Rizzuto about the elimination of Mr. Baffo's position?
A. Just a few vague e-mails. Most of it was dialogue and office meetings.
Q. Do you recall these vague e-mails, do you recall when they were sent?
A. I would say their frequency increased in October.

Page 94

E. Redlich
someone was hired would be funded?
A. No.
Q. And you had mentioned in talking about other positions that were being created or hired, a dining room manager, was it, position?
A. Dining room or maitre d'. I don't remember the specific title.
Q. What was your understanding of how that position would play in the reorganization?
A. That position I believe came about as a reaction to sales and business increasing. So it was a need, if you would call it. It wasn't a replacement of another position.
Q. And do you recall, so was someone eventually hired for that position?
A. Yes.
Q. And your understanding was that that was necessitated by sales and business increasing?
A. Yes.
Q. And do you know when that position was filled?
A. December 2009, January 2010.
Q. So it was sometime after Mr. Baffo's position was eliminated?

Page 95

E. Redlich
A. That's correct.
Q. And it was your understanding that that was required because sales and business was increasing?
A. Correct.
Q. I am trying to get an understanding of what job duties you took on following the elimination of the GM position.
Do you recall what specifically you handled following Mr. Baffo's termination that you hadn't handled prior to that?
A. The dining room staff would report directly to me.
Q. Anything else?
A. No.
Q. And other than taking over the reporting for the dining room staff, who handled Mr. Baffo's other job duties; was that all handled by Mr. Rizzuto?
A. That's correct.
Q. Did anyone else take on any of the job duties that Mr. Baffo had performed?
A. Not that I am aware of.
Q. How has it affected your job taking on

Page 96

E. Redlich
the reporting for dining room staff? Could you briefly summarize what that involves?
A. Review the work plans for the managers and the maitre d's, a central pull list, oversee the day-to-day aspects of running events and the business model for the house.
Q. When you say work plans, what do you mean?
A. When there is a function there is a good amount of planning beforehand that needs to take place. Time lines, work plans for a waiter whether it's set the tables, fold the napkins, polish the silverware to bartenders from taking an inventory, what are the necessary purchases that need to be made, to what polls are essential for the job based on population of male, female; whether it is alcohol, beer, wine and soda.
Review the work plans and make sure they are in line with industry standards by the job. Putting in standard business practices that just were not there.
Q. When you say "work plans", you are talking about-- strike that.
When you say "work plans" they refer

Page 97

E. Redlich
to a specific event; is that correct?
A. Correct.
Q. As opposed to an employee's work plan or anything like that?
A. That's an expectation. A daily work plan is when you come to work what you are supposed to do.
Q. But the work plans that you are referring to related to events and every event had a work plan and you had to work through that work plan to make sure that everything was in place for that event?
A. Correct.
Q. And as a result of the reorganization did you, was there any effect on your salary?
A. Minor.
Q. When you say "minor", what do you mean?
A. I received a modest raise.
Q. What is a modest raise?
A. I believe it was $5,000, maybe six.
Q. And you had been at that point making 50 to 55,000?
A. Yes.

0105a82c-a34c-498a-92e3-887e93e17be

Page 98

E. Redlich

Q. So approximately a ten percent raise?
A. Approximately, yeah.
Q. What you would characterize as modest?
A. Based on the previous salaries that I was receiving in the industry, yes.
MR. FILOSA: Let's take a break.
(Luncheon recess: 12:52 p.m.)

Page 99

E. Redlich

AFTERNOON SESSION.
(1:49 p.m.)

ERIC REDLICH,
having been previously sworn, resumed the stand and testified further as follows:
EXAMINATION (Cont'd)
BY MR. FILOSA:
Q. Before the break Mr. Redlich, we had talked about the modest salary increase that you received as part of the reorganization you taking on the sales and operations position.
Was there any other change in compensation? Specifically you had referenced a service charge distribution that you received as part of the catering sales manager.
A. No. That remained the same.
Q. It remained at the one percent level?
A. Correct.
Q. Do you know if there is any change in the service charge distribution as part of the elimination of Mr. Baffo's employment?
A. Not that I am aware of.
Q. Are you aware of anyone else that receives service charge distributions?

Page 100

E. Redlich

A. I know who the team members are that are in the service charge distribution.
Q. And was there any change in the percentage of team members -- strike that.
Was there any change in who received service charge distribution as part of, following Mr. Baffo's elimination?
A. No.
Q. Now Mr. Baffo's employment was terminated as part of this reorganization; correct?
A. Correct.
Q. Do you know when his employment ended?
A. End of October, beginning of November 2009.
Q. And did you have any discussions with Mr. Rizzuto about the timing or about the timing of Mr. Baffo's termination?
A. No.
Q. Did he tell you in advance that his employment was being terminated?
A. Not specifically when, no, but I knew that the position was going to be eliminated.
Q. And how did you know that, from those

Page 101

E. Redlich

conversations that you already testified to earlier today?
A. That's correct.
Q. Do you recall prior to Mr. Baffo's termination, do you recall any conversations with Mr. Rizzuto in the week prior?
A. Possibly that he had been confirming with human resources. However, it was that it was going to happen. I am not really aware how the school handles it.
I worked in many places before you walk in, you are fired, get your stuff, go home. Apparently things are held differently in the academic community.
Q. How is it different in the academic community?
A. I wasn't in the room so I couldn't tell you. Normally it would be your supervisor that would terminate you based on my past experience.
Q. But you didn't have any advance notice of specifically when Mr. Baffo's employment would be terminated?
A. No.

0105a82c-a34c-498a-92e3-887e93e17be

E. Redlich

Q. And you don't recall any meetings with Mr. Rizzuto with regard to the elimination of the general manager position?

A. Not specifically, no. He had mentioned one time he thought it was going to happen, it didn't happen. I was just there to do my job and continue about my business.

Q. And do you recall whether that conversation was that he talked about what he thought was going to happen and didn't happen, is that one conversation or two?

A. I don't recall how many it was, but I believe it was sometime in October.

Q. Do you recall what he said about the elimination of the position?

A. No new general manager would be hired.

Q. I am wondering about the timing of it, the elimination.

A. No. I don't recall.

MR. FILOSA: Please mark this as Redlich Exhibit 3.

(Redlich Exhibit 3, a one-page document Bates stamped D 04729, marked for identification, as of this date.)

E. Redlich

Q. You have been shown a document that's been marked as Redlich Exhibit 3. It is a one-page document Bates stamped D 04729. Please take a look at it and let me know when you are ready.

A. Okay. Now I recall, yes.

Q. This is an e-mail communication from you to Mr. Rizzuto; correct?

A. Yes.

Q. Dated October 19, 2009; correct?

A. Correct.

Q. And in it you say: "Are we still thinking about having a meeting about SFH to reflect on the areas we would like to improve not that Anthony is back."

A. Typo. Should be now that Anthony is back.

Q. That was the first question.

The second is what does SFH refer to?

A. St. Francis Hospital.

Q. And what is this e-mail a reference to?

A. An employee appreciation barbecue that I hosted in September.

E. Redlich

Q. Why did you send this e-mail to Mr. Rizzuto?

A. We usually have a postmortem meeting on most events to get better, reflect on areas that needed improvement. That's how things got better, talked about them.

Q. And that's why you were scheduling for that event; correct?

A. Correct. I recall that Anthony had taken a long overdue honeymoon and now that he was back we should have spoken about it.

Q. And prior to this had you had any discussions with Mr. Rizzuto about -- strike that.

Prior to or around the same time as this e-mail, had you had any discussions with Mr. Rizzuto about the timing of the elimination of the general manager position?

A. No.

Q. So you didn't know whether or not they had planned to eliminate the general manager position on Friday of this week?

A. No. Not that I am aware of.

Q. And prior to this e-mail, had you already discussed the elimination of the general

E. Redlich

manager position with Mr. Rizzuto?

A. Yes.

Q. When did you discuss it with him?

A. Those conversations started in the summer of 2009.

Q. And did you have any conversation with him about the specific timing of the elimination prior to this e-mail, at least that you recall?

A. No.

Q. Did you have any concern about scheduling this postmortem, as you described it, before the elimination of the general manager position?

A. I wasn't aware if the termination was definite. I have been in business a long time. Some people will lose their jobs, some people don't. Anthony was the lead point on the position on the job. I felt he should be there for the postmortem.

Q. At this point in time you didn't know whether or not Mr. Rizzuto was going to go forward with eliminating the general manager position?

A. Nothing definite.

Q. At some point after you sent this

0105a82c-a34c-498a-92e3-887e93e17be

E. Redlich

the action plan to them?

A. An attachment or a hard copy.

Q. Do you recall specifically what you did in this instance?

A. No.

Q. And in the context of setting these goals, did you include within the goals anything related to performing the general manager job duties that you had discussed with Mr. Rizzuto?

A. No.

Q. Why not?

A. Because I wasn't assuming the responsibilities or duties of the general manager.

Q. Well, you were taking on duties, operational duties that had been performed by Mr. Baffo prior to the elimination; correct?

A. Similar and different. Anthony was running jobs. He was essentially, sorry to say, a glorified maitre d' and my position was a little bit more unique where I was going to manage those positions and supervise which was something I had been customized to do at many properties. Sales and operations were always tied together.

Q. So how is what you were doing

E. Redlich

different with respect to these employees than what Mr. Baffo had done during the time period he was in the general manager position?

A. The duties that Anthony was performing were not, in my opinion or anyone else's, general manager duties.

Q. You viewed them as glorified maitre d' duties?

A. He allowed himself to get absorbed into the operation as opposed to focusing on the day-to-day business operation.

Q. How do you distinguish between getting absorbed into the operation as opposed to the day-to-day business operation which is what you just said?

A. Well, my experience as a manager, a director leads by advising in a much less hands on capacity. I think Anthony enjoyed running jobs, that's why he did it and allowed himself to slip away from the day-to-day managerial positions. That's what I think his downfall was.

Q. And did you ever discuss that with Mr. Rizzuto?

A. No.

E. Redlich

Q. Did Mr. Rizzuto ever discuss that with you, ever express a similar concern or opinion?

A. Specific examples, no. The fact that he was not meeting the requirements of a general manager, yes. Somebody is going to get terminated, I ask why, he is not doing the job.

Q. Could there be any other reason?

A. Not that I am aware of.

Q. Could there be any other reason is the question? I am not asking if you were aware of any other reason. Could there be any other reason that somebody is being terminated other than they are not doing a job?

A. I am sure there could be.

Q. And during this time period that Mr. Baffo was the general manager he was also your supervisor; correct?

A. Yes.

Q. And you consulted with him on a daily basis?

A. Yes.

Q. Did you feel that consistent with his role of general manager supervising you?

A. Yes.

E. Redlich

Q. So was he doing his job in that respect in your opinion?

A. Yes.

Q. And you continued throughout the course of your employment -- strike that.

Throughout the period of time that you worked with Mr. Baffo, you continued to report to him and continued to seek out his advice with respect to the day-today performance of your job duties; correct?

A. Not advice. I had to get approval on anything that I wanted to do. Again, there was a chain of command and how they operate and no one really operates on their own without permission from the supervisor.

Q. But you continued throughout the course of your employment during the time period that Mr. Baffo was the GM, you continued to seek his approval on things that required his approval; correct?

A. That's correct.

MR. FILOSA: Please mark this as Redlich Exhibit 5.

(Redlich Exhibit 5, a one-page

0105a82c-a34c-498a-92e3-887e93e17be

Page 134

E. Redlich

   A. Yes.
   Q. And the first sentence says: "Okay, FYI the thing I spoke to you about did not happen right away or today at all."
      Do you have any understanding as to what he was referring to?
   A. Yes.
   Q. What was it?
   A. Anthony's termination.
   Q. Had he spoken to you about the timing of the termination prior to this e-mail?
   A. It may have been the day prior. I wasn't given an advance notice. Remember, there was a frequency we had been talking about off and on when he decided to speak to me about it for a few months and then when apparently things came to a head around this time he had been making arrangements to follow through with what he intended to do.
   Q. And he spoke to you the day prior?
   A. I am assuming. Again, I wasn't given a lot of notice on specifics.
   Q. And when he did give you notice, what did Mr. Rizzuto tell you?

Page 135

E. Redlich

   A. Probably something along the lines that Anthony will be terminated today.
   Q. Or tomorrow or the next day?
   A. Sometime maybe this week.
   Q. And did he say anything else?
   A. No.
   Q. Did you say anything when he told you that?
   A. I responded to his e-mail.
   Q. I am talking about during the conversation when he told you that Mr. Baffo's employment was going to be terminated that week or the next few days.
   A. No.
   Q. Were you surprised it was happening at that time?
   A. No.
   Q. Now do you recall where you were when Mr. Rizzuto told you about the timing of the termination?
   A. Probably in my office.
   Q. Do you know if anyone else was present?
   A. No.

Page 136

E. Redlich

   Q. Now looking at the second paragraph it says: "I would like to schedule time and day/days that you and I can sit and I can get updates from you and answer any questions you may have instead of you having to run after me and pin me down. I think it will help you and be more effective for both of us."
      Do you see that?
   A. Yes.
   Q. So prior to this e-mail, you hadn't had a sit down with Mr. Rizzuto to discuss the full effect of the reorganization or elimination of the position?
   A. That's correct. He had led me to believe that he was taking on the responsibilities of the general manager and would delegate work out as he sees fit.
   Q. Prior to that did you ever sit down with Mr. Rizzuto and have a discussion about questions you may have and also provide him with updates as he references in this e-mail?
   A. After this?
   Q. Yes.
   A. Yes.

Page 137

E. Redlich

   Q. Did it seem odd to you that you didn't have this meeting with him until after the decision was made or after the position was eliminated?
   A. No. I really don't take things like this as to be shocking information with the amount of experience I have in business. I didn't think many things were really going to change in my world.
   Q. What do you mean by that?
   A. I knew I wasn't going to be the general manager. He made that very clear. He was not replacing that position and that he felt better by assuming the responsibilities.
   Q. But you were going to take on additional duties with respect to operations; right?
   A. That's correct.
   Q. And you were given additional pay?
   A. That was not explored initially.
   Q. When you talked about the reorganization with Mr. Rizzuto, he didn't reference any increase in your salary?
   A. No, not right away.

E. Redlich

general manager's salary was going to make the world happen for us. We used -- if that was the case they wouldn't have replaced other positions which they did and built more positions onto the operation.

Q. So if they were concerned about increasing profit and cutting the budget they wouldn't have hired these two positions; is that your understanding?

A. That's my understanding, correct.

Q. Do you know what other positions were ultimately hired?

A. A dining room manager. I am not aware of what the exact title is. It maybe a steward or bar manager.

MR. FILOSA: Please mark this as Redlich Exhibit 10.

(Redlich Exhibit 10, a three-page document Bates stamped D 02155 through 2157, marked for identification, as of this date.)

Q. You have been shown a document that's been marked Redlich Exhibit 10. It is a three-page document Bates stamped D 02155 through 2157. Please review it and let me know when you

E. Redlich

are ready.

A. I am ready.

Q. Have you ever seen this before?

A. It's possible.

Q. Do you recognize what it is?

A. It's an RA for a sales position.

Q. And an RA is that a recruitment authorization?

A. That's correct.

Q. And this one is dated September 1, 2009?

A. Yes.

Q. And the position listed on the left is catering sales associate?

A. Yes.

Q. And on September 1, 2009 you were the catering sales manager?

A. Yes.

Q. And was this a new position that was being hired?

A. Yes.

Q. And was this position -- strike that.

Do you know why this position was being hired or posted?

E. Redlich

A. I believe the original reason was to assist in a seven day sales coverage at de Seversky which two people were doing at the time and to also accommodate an increased traffic where the phone was ringing more.

Q. And did you have any discussions with Mr. Baffo or Mr. Rizzuto about the recruitment authorization for this position?

A. I am assuming so. I didn't have any influence on the salary requirements or the percentage. I have never seen this letter.

Q. When you say this letter, you are referring to page 3?

A. Yes.

Q. And looking at page 1 in the box, the last box, the second sentence: "Additional sales associate will also provide the opportunity for the sales department to solicit new business outside the mansion without taking away valuable meeting time with existing clients."

Do you know was there any discussion about that at the time of this recruitment authorization?

A. I don't remember.

E. Redlich

Q. Any goal of being able to be, to solicit outside of the office more?

A. Yeah, that was a goal that they wanted me to attempt.

Q. Were you able to do that?

A. No.

Q. Why not?

A. The position was never filled.

Q. And you took on the operational responsibilities as well?

A. That's correct.

Q. That would require you to be in the house more?

A. That's correct.

Q. As opposed to soliciting outside of the office?

A. That's correct.

Q. And this position was never filled?

A. Yes.

MR. FILOSA: Mark this as Redlich Exhibit 11.

(Redlich Exhibit 11, a three-page document Bates stamped D 02128 through 2130, marked for identification, as of this date.)

0105a82c-a34c-498a-92e3-887e93e17be

Page 158

E. Redlich
Q. You have been shown a document that's been marked as Redlich Exhibit 11. It is a three-page document Bates stamped D 02128 through 2130. Please review it and let me know when you are ready.
A. I am ready.
Q. This is also a recruitment authorization?
A. Yes.
Q. And the title for this is Dining Room Captain?
A. Yes.
Q. Is this the position that you were referring to earlier? I think you referred to it as dining room manager.
A. Yes.
Q. So the position that was being recruited for as part of the reorganization -- strike that.
So this was the position that you were referring to earlier that would be filled?
A. Yes.
Q. And this is dated September 3, 2009?
A. Yes.

Page 159

E. Redlich
Q. And do you know if this position was ever filled?
A. Yes, it was.
Q. And this position reports in to you; right?
A. Yes.
Q. On the operational side?
A. Yes.
Q. And do you know who filled this position; who was hired for this position?
A. This position was filled by Roger Echurie.
Q. And Mr. Echurie, did you know him prior to him coming on as dining room captain?
A. Yes, I did.
Q. Had you worked with him prior?
A. Yes, I did.
Q. Where did you work with him?
A. At the Whitsons Culinary Group.
Q. Did you recommend him for the position?
A. He applied ironically enough not knowing I was there. Was gainfully employed at the time.

Page 160

E. Redlich
Q. And he was ultimately hired?
A. Yes, he was.
Q. So the dining room captain position was filled; correct?
A. Yes.
Q. Do you know whether or not the funds that were saved from the elimination of general manager position was used to hire any other positions?
A. Yes. I believe there was a steward position or bar manager position created. I don't recall the exact title.
Q. Is it bartender captain?
A. Okay.
Q. Could that be it?
A. Yes.
Q. Have you ever heard of that job title before?
A. Close enough, yes.
Q. Does NYIT employ someone in the position of bartender captain?
A. Yes.
Q. Do you know who fills that position?
A. Marshall Spence.

Page 161

E. Redlich
Q. Do you know when he was hired?
A. He was a part-time employee for many years and was offered a full time position based on his merit and dedication to his job.
Q. Do you know what the salary is for the bartender captain position?
A. I believe he was hired at $14 per hour non-salary which meant that he would be entitled to overtime if he did more than 40 hours per week.
Q. And that's in the bartender captain position; is that correct?
A. That's correct.
Q. I am going to show you again what has been marked as Redlich Exhibit 2. If I could direct your attention to page 8 under the heading Response to Interrogatory Number 8.
A. Okay.
Q. Reading it says: "Following the reorganization of the de Seversky Center in October 2009, job responsibilities previously performed by plaintiff, which is a reference to Mr. Baffo, were assumed by Mr. Rizzuto and Mr. Redlich."
Do you see that?