# Exhibit 26

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    EASTERN DISTRICT OF NEW YORK
 4    INDEX NO. 10 Civ 1245 (LDW)(ETB)
 5    -------------------x
 6    ANTHONY BAFFO,
 7              Plaintiff,
 8         -against-
 9    NEW YORK INSTITUTE OF TECHNOLOGY, ROBERT
      RIZZUTO, in his official and individual
10    capacities, and LEONARD AUBREY, in his
      official and individual capacities,
11
                 Defendants.
12
13    -------------------x
14
15         85 Fifth Avenue
           New York, New York
16
           June 22, 2011
17         10:10 a.m.
18
19
20         DEPOSITION of STEPHEN KLOEPFER, a
21    Non-Party Witness in the above-entitled
22    action, held at the above time and place,
23    taken before Jennifer Brennan, a Notary
24    Public of the State of New York, pursuant
25    to Subpoena.
```

## Page 2

```
 1
 2  APPEARANCES:
 3  THOMPSON WIGDOR & GILLY, LLP
       Attorneys for Plaintiff
 4     85 Fifth Avenue
       Fifth Floor
 5     New York, New York 10003
 6  BY:  MATTHEW D. GORMAN, ESQ.
         BASIL SITARAS, ESQ.
 7       NICOLETTE VAIRO, INTERN
 8
    FULBRIGHT & JAWORSKI, LLP
 9     Attorneys for Defendants
       666 Fifth Avenue
10     New York, New York 10103
11  BY:  NEIL G. SPARBER, ESQ.
12
              *  *  *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2         STIPULATIONS
 3     IT IS HEREBY STIPULATED AND AGREED, by
 4  and among counsel for the respective
 5  parties hereto, that the filing, sealing
 6  and certification of the within
 7  deposition shall be and the same are
 8  hereby waived;
 9     IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to form of
11  the question, shall be reserved to the
12  time of the trial;
13     IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be signed
15  before any Notary Public with the same
16  force and effect as if signed and sworn
17  to before the Court.
18          *  *  *
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2  S T E P H E N   K L O E P F E R, the
 3  Witness herein, having first been duly
 4  sworn by the Notary Public, was examined
 5  and testified as follows:
 6  EXAMINATION BY
 7  MR. GORMAN:
 8     Q    Good morning, my name is Matt
 9  Gorman, from the law firm Thompson Wigdor
10  and Gilly.  With me is my colleague,
11  Basil Sitaras.  And as you know, we
12  represent the plaintiff, Anthony Baffo,
13  in this case against New York Institute
14  of Technology, as well as Robert Rizzuto
15  and Len Aubrey.
16          I asked you here this morning
17  to answer a couple of questions regarding
18  his claims.  And first I want to go
19  through a couple general instructions.  I
20  assume you're familiar with these, but I
21  want to go through them anyway.
22          You realize that today you are
23  testifying under oath?
24     A    I do.
25     Q    If you could just wait, I
```

## Page 5

```
 1             S. Kloepfer
 2  understand that many times you're going
 3  to know exactly where I'm going with the
 4  question, but so the court reporter is
 5  able to get everything and the record is
 6  clear --
 7     A    That's fine.
 8     Q    -- wait to answer until I
 9  finish my question.  Thank you.
10          Going along with that, we have
11  a court reporter here and she'll be
12  recording your testimony, so it's
13  important that all of your answers are
14  verbal.  No uh-huh, no nods of the head,
15  yes or no answers, something concrete.
16          Do you understand that?
17     A    I understand.
18     Q    If you don't hear or understand
19  the question, please let me know and I'll
20  repeat it.
21          Do you understand?
22     A    I do.
23     Q    If I use a term you do not
24  understand, please tell me immediately
25  and I'll try to rephrase it.  Same goes
```

Page 126

1      S. Kloepfer
2  this reorganization.
3   Q   And posting a job description
4  doesn't fall into the auspices of
5  thinking about hiring?
6   A   It does, but you have to work
7  in an HR department to understand how
8  complicated it can be. But it is the
9  truth, that not having a director of HR,
10 slowed down the resolution of this matter
11 or the execution of this matter, plus
12 many of the other issues on Kloepfer
13 Exhibit 5 because I, as general counsel,
14 wanted to be sure that the HR component
15 of these decisions was fully in play,
16 which I cannot be sure until the new
17 director of HR showed up.
18  Q   And if this was a
19 reorganization that Mr. Aubrey now wanted
20 done ASAP and had been contemplating for
21 sometime and presumably would have wanted
22 it done during that time, you would
23 rather to have him wait throughout the
24 entirety of that time, until a new HR
25 director --

Page 127

1      S. Kloepfer
2   A   I didn't say that.
3   Q   Could you wait until I finish
4  my question.
5   A   I'll do that, but then you need
6  to ask more precise questions that don't
7  seek to put words in my mouth. I'll do
8  that, if you reciprocate.
9   Q   It's a question, you can say
10 yes or no and you need to let me finish
11 in order to get to the end of the
12 question.
13  A   Read back the question, will
14 you please?
15  Q   I'm not trying to put words in
16 your mouth.
17  A   Ma'am, could you read back the
18 question and I'll give a monosyllabic
19 answer to the question.
20  Q   I wasn't finished with the
21 question.
22  A   Can you try to make the
23 question fewer than 50 words, that would
24 be helpful.
25  Q   Would you rather have had

Page 128

1      S. Kloepfer
2  Mr. Aubrey wait throughout the entire
3  summer until an HR director was hired to
4  implement a plan that he wanted to
5  implement since that time?
6   A   No, it may well have been
7  Mr. Aubrey's preference as well, to have
8  a director of HR in place, to give him
9  comfort that this reorganization was done
10 properly.
11  Q   So it's possible that
12 Mr. Aubrey and yourself were not
13 comfortable with the people in HR, the
14 six or seven employees handling this
15 reorganization?
16  A   I didn't say that either. The
17 answer to that is no. What I am saying
18 is those things that could wait for the
19 new director of HR because the
20 responsible manager in this case,
21 Mr. Aubrey, was satisfied with it
22 waiting, wait. Now, if Mr. Aubrey came
23 to me to general counsel and said, Steve,
24 I don't care, this thing has to be done
25 in August or September, we would have

Page 129

1      S. Kloepfer
2  found a way to get it done in August or
3  September. He did not do that.
4      However, he knew, of course,
5  that the new director of HR was in place.
6  And now he wanted it done and we got it
7  done as quickly as we could. But the
8  fact that the new general -- the new
9  director of HR was in place, was a reason
10 that now it needed to get done
11 immediately because we didn't have the
12 reason anymore that we don't have a
13 director of HR.
14  Q   So it only became something to
15 be done ASAP, once Ms. Jablonsky was
16 hired?
17  A   No, I didn't say that either.
18 What I'm saying, Mr. Aubrey, knowing
19 there was a new director of HR in place,
20 wanted it done ASAP, which we did.
21  Q   Do you believe he wanted it
22 done ASAP because Ms. Jablonsky was
23 hired?
24  A   No, I believe he wanted it done
25 because he wants decisions implemented.

33 (Pages 126 - 129)

Page 138

1 S. Kloepfer
2 during the October 20th meeting?
3   A  Yes, and also it may have been
4 that Mr. Aubrey had mentioned that to me,
5 I just don't remember. But certainly Ms.
6 Jablonsky would have -- my knowledge of
7 when the reorg was contemplated, would
8 have come from Ms. Jablonsky or
9 Mr. Rizzuto or Mr. Aubrey. I just don't
10 remember.
11   Q  Did either Ms. Jablonsky or
12 Mr. Aubrey, whoever you first heard this
13 from, did they tell you what steps had
14 been taken since early August, up until
15 October 20th, if it was Ms. Jablonsky
16 that you learned it from?
17   A  I did learn, I believe in that
18 meeting, that there had been a couple
19 steps taken, in terms of posting job
20 descriptions and posting new positions
21 that were part of the reorg, that I
22 learned on or about this time because the
23 reorg, I understood, involved not only
24 the elimination of Mr. Baffo's function
25 and position, but the hire of two

Page 139

1 S. Kloepfer
2 additional persons at lower salaries,
3 plus the assumption by Mr. Redlich and
4 Mr. Rizzuto of additional
5 responsibilities formerly held by Mr.
6 Baffo.
7   Q  So it was your impression that
8 the job descriptions in the two new
9 positions, these two new employees were
10 going to be hired only as part of the
11 reorganization?
12   A  That's not what I said.
13   Q  I'm asking if that was your
14 impression.
15   A  I didn't really have a settled
16 impression. I was asked on the basis of
17 Mr. Baffo's job performance and the
18 reasons for the reorg for my advice on
19 whether the reorg could be, you know, was
20 lawful under New York State, city and
21 federal law and I didn't need to know all
22 of the ancillary details.
23     The focus was really on Mr.
24 Baffo's job performance and on the
25 business reasons for the reorganization.

Page 140

1 S. Kloepfer
2 It wasn't my place, nor did I need to
3 know every job and title of who was going
4 to go where.
5   Q  That was my question, at that
6 time, did you have any understanding as
7 to whether or not those two new employees
8 were sought only as part of this
9 reorganization?
10   A  I didn't have an understanding,
11 nor would it have been material for me,
12 frankly.
13   Q  You mentioned that Ms.
14 Jablonsky -- you mentioned that you were,
15 on October 20th, correct me if I am
16 wrong, but during that October 20th
17 meeting, you were functioning to make
18 sure that the termination was legal under
19 state and federal laws; correct?
20   A  Once I learned that a job
21 function employee would be terminated, my
22 advice to my client managers was legal
23 advice, in my opinion.
24     However, not all of the
25 discussions I had with Ms. Jablonsky

Page 141

1 S. Kloepfer
2 between then and the 23rd of October,
3 were legal in nature. One of them being,
4 I'm sure you'll get into this, what would
5 be fair to Mr. Baffo now that we have
6 learned on or after the 23rd of October,
7 what would be fair in terms of a
8 severance offer, which I don't claim to
9 be legal advice, but much of the -- the
10 advice about whether the termination,
11 whether this reorg was a reorg or some
12 pretext for discrimination, that's a
13 legal question and I was acting in my
14 capacity as general counsel in advising
15 that.
16   Q  And is it your testimony that
17 that's why Ms. Jablonsky wanted to meet
18 with you on October 20th?
19   A  She would have known presumably
20 at that time, that having met with
21 Mr. Rizzuto and Mr. Aubrey about that a
22 termination was in the offering and being
23 the effective HR director she is, she
24 would have known that that would have an
25 implication for general counsel.

36 (Pages 138 - 141)

```
 1      S. Kloepfer
 2          The e-mail is dated
 3   October 23rd and it's from Carol
 4   Jablonsky to yourself?
 5   A   Yes.
 6   Q   Do you recall receiving this
 7   e-mail?
 8   A   Yes.
 9   Q   Now, earlier that day on the
10   23rd, did you speak with Ms. Jablonsky?
11   A   Yes.
12   Q   What was the subject of that
13   conversation?
14       MR. SPARBER: In accordance to
15   what I said earlier today and I
16   haven't objected to anything, I think
17   that it's NYIT's position that at
18   some point on October 23, 2009, that
19   Mr. Kloepfer's role changed and that
20   at some point on the morning of
21   October 23rd, Mr. Kloepfer, in my
22   words, put on his general counsel hat
23   and began to dispense legal advice
24   with respect to Mr. Baffo and the
25   situation.
```

Page 179

```
 1      S. Kloepfer
 2          And so to the extent you're
 3   asking for conversations between him
 4   and Ms. Jablonsky, I'm cautioning the
 5   witness not to answer with respect to
 6   any legal advice that he may have
 7   dispensed.
 8          I don't know what the answer to
 9   your question is because he could
10   have said, do you want to go to lunch
11   or something, which of course he can
12   answer, but I'm not sure of the
13   answer to your question. And I'm
14   cautioning the witness, if it calls
15   for dispensing of legal advice, I
16   would instruct him not to answer.
17   A   I'll do my best with those
18   guidelines. Ms. Jablonsky came up to see
19   me between 8:30 and 9:00 a.m. is my best
20   recollection, on Friday, October 23rd and
21   told me that Mr. Rizzuto had just that
22   morning told her that Mr. Baffo had just
23   that morning told Mr. Rizzuto that Mr.
24   Baffo was HIV positive.
25   Q   And did Ms. Jablonsky give you
```

Page 180

```
 1      S. Kloepfer
 2   any indication as to when Mr. Rizzuto had
 3   called her or spoken with her that
 4   morning?
 5   A   I don't remember. She may
 6   have, but my firm memory is that before
 7   Ms. Jablonsky came up, literally walked
 8   up to my office that morning, she had
 9   talked that morning with Mr. Rizzuto.
10   Q   And when she first came up to
11   your office between 8:30 and 9:00 a.m.
12   that morning, did she give you any
13   indication as to when Mr. Baffo had
14   spoken with Mr. Rizzuto earlier that
15   morning?
16   A   I was told by Ms. Jablonsky and
17   later by Mr. Rizzuto, that the morning of
18   Friday, October 23rd, Mr. Baffo had told
19   Mr. Rizzuto that Mr. Baffo was HIV
20   positive.
21   Q   And it's your recollection that
22   this would have occurred sometime before
23   8:30 on the 23rd?
24   A   I got to work between 8:30 and
25   9 typically. I don't know precisely when
```

Page 181

```
 1      S. Kloepfer
 2   Carol Jablonsky came to see me. I do
 3   know she was preparing -- the plan had
 4   been to announce this event to Mr. Baffo
 5   at 10:00 a.m. that morning and I don't
 6   know when she came to see me.
 7          But I believe it was between --
 8   8:30 and 9:30 on Friday morning,
 9   October 23rd is my best recollection and
10   therefore, she would have been told that
11   by Mr. Rizzuto before whenever she told
12   me. That's the best I can remember.
13   Q   And when she came up to your
14   office -- strike that.
15          What was the reason she gave
16   you for coming up to your office?
17   A   Because she had learned that
18   morning an entirely new piece of
19   information, namely, that Mr. Baffo was
20   claiming as of that morning, the 23rd of
21   October, that he was HIV positive and
22   that was a relevant piece of information
23   for the general counsel to know and also
24   both in my guise as general counsel and
25   as the supervisor of HR.
```

46 (Pages 178 - 181)

Page 182

S. Kloepfer

So that's a piece of information that I would have expected the director of HR to tell me immediately, especially since it was only received an hour before we were slated to eliminate the said employee, Mr. Baffo.

Q Did Ms. Jablonsky express to you that she believed it was a relevant piece of information for you to know?

A I don't recall, but it was clearly a relevant piece of information. She's an experienced Human Resources director. As you will know, HIV status is a disability under New York and other relevant law and that was -- it goes without saying that that piece of information, learned literally within an hour of terminating someone, is a relevant piece of information that should be and was shared with the general counsel.

Q And when she came up to your office that morning, was that the first time you had spoken with her that morning

Page 183

S. Kloepfer

when she came up?

A I believe it was, yes.

Q Did she have --

A She was either at deSeversky that morning or she was called early at her office from deSeversky by Mr. Rizzuto. But the reason she was up in my office, was Mr. Rizzuto's conversation with her about what Mr. Baffo had just told Mr. Rizzuto.

Q At that time she came up to your office, did she express to you any recommendation as to whether or not the termination should go forward that morning?

A I agreed with her from an HR perspective, that it would not be appropriate to institute a termination of employee an hour after being told by the employee that the employee was HIV positive. Neither one of us thought that that was humane, fair or appropriate.

Q I believe you answered my question, but just so I'm clear, when you

Page 184

S. Kloepfer

say "from an HR perspective," what do you mean?

A I mean from the decent operation of an organization, that it was not appropriate to go forward with the termination literally an hour after learning that the employee was infected with HIV virus. I believe that, she believed that and we agreed entirely on that.

Q When you say "from an HR perspective," you are differentiating from a legal perspective?

A Yes, I am. I'm talking about HR, the function of a Human Resources Department is to help create a happy and productive and fair workplace, that's what you want the HR folks to do and at which Carol Jablonsky is very good at. And this is not a legal consideration whatsoever. This is how do you treat people at the workplace, even if you have already determined for good and sufficient reasons that their jobs would

Page 185

S. Kloepfer

be eliminated or they would be terminated, that there is a certain standard of decency one lends to and aspires to perform and so it's in that sense that I mean HR.

Q And was this part of the conversation you had with Ms. Jablonsky that morning, this trying to do the fair and right thing regarding the termination?

A Yes, it's not been handed to me, but we -- I had approved an earlier severance package for Mr. Baffo, that was not as generous as the one that is attached to Kloepfer Exhibit 9.

The severance offer to Mr. Baffo that is attached to Kloepfer Exhibit 9, was enhanced because even though we were entirely comfortable with the legal and other reasons -- we were entirely comfortable with the lawfulness of our actions with respect to Mr. Baffo, we empathized with his plight and therefore, we offered him additional

47 (Pages 182 - 185)