# Exhibit 27

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------x

ANTHONY BAFFO,

               Plaintiff,     Index No.

                                 10 Civ 1245

     -against-           (LDW)(ETB)

NEW YORK INSTITUTE OF TECHNOLOGY;

ROBERT RIZZUTO, in his official and

individual capacities; and LEONARD

AUBREY, in his official and individual

capacities,

               Defendants.

------------------------------------x

               March 16, 2011

               10:18 a.m.


        Videotaped deposition of LEONARD

AUBREY, held at the offices of Thompson Wigdor &

Gilly LLP, 85 Fifth Avenue, New York, New York,

pursuant to Notice, before Lynne D. Metz, a

Shorthand Reporter and Notary Public of the State

of New York.

Page 2

```
 1
 2   APPEARANCES:
 3
 4      THOMPSON WIGDOR & GILLY LLP
 5      Attorneys for Plaintiff
 6         85 Fifth Avenue
 7         New York, New York 10003
 8      BY:  GREGORY N. FILOSA, ESQ.,
 9         of Counsel
10
11      FULBRIGHT & JAWORSKI L.L.P.
12      Attorneys for Defendants
13         666 Fifth Avenue
14         New York, New York 10103
15      BY:  NEIL G. SPARBER, ESQ.,
16         of Counsel
17
18
19   ALSO PRESENT:
20      Anthony Baffo
21
22
23
24
25
```

Page 3

```
 1
 2      IT IS HEREBY STIPULATED, by and between the
 3   attorneys for the respective parties hereto, that:
 4   All rights provided by the C.P.L.R., and Part 221
 5   of the Uniform Rules for the Conduct of
 6   Depositions, including the right to object to any
 7   question, except as to form, or to move to strike
 8   any testimony at this examination is reserved; and
 9   in addition, the failure to object to any question
10   or to move to strike any testimony at this
11   examination shall not be a bar or waiver to make
12   such motion at, and is reserved to, the trial of
13   this action.
14
15   This deposition may be sworn to by the witness
16   being examined before a Notary Public other than
17   the Notary Public before whom this examination was
18   begun, but the failure to do so or to return the
19   original of this deposition to counsel, shall not
20   be deemed a waiver of the rights provided by Rule
21   3116 of the C.P.L.R. and shall be controlled
22   thereby.
23
24   The filing of the original of this deposition is
25   waived.
```

Page 4

```
 1
 2         THE VIDEOGRAPHER:  This is the video
 3   operator speaking, Robert Calvert of
 4   Veritext Reporting.  Today's date is March
 5   16, 2011.  The time on the video monitor is
 6   10:00 a.m.  We are here at the offices of
 7   Thompson Wigdor & Gilly located at 85 Fifth
 8   Avenue New York, New York to take the
 9   videotape deposition of Leonard Aubrey in
10   the matter of Anthony Baffo versus New York
11   Institute of Technology, Robert Rizzuto in
12   his official and individual capacity and
13   Leon Aubrey in his official and individual
14   capacity.
15         The venue of this case is United
16   States District Court for the Eastern
17   District of New York Index number is 10 Civ
18   1245(LDW)(ETB).
19         Will counsel please identify yourself
20   and state who you represent?
21         MR. FILOSA:  Gregory Filosa with
22   Thompson Wigdor & Gilly representing the
23   plaintiff Anthony Baffo.
24         MR. SPARBER:  Neil Sparber with the
25   firm of Fulbright & Jaworski representing
```

Page 5

```
 1   the defendants.
 2         THE VIDEOGRAPHER:  Will our court
 3   reporter please swear in the witness.
 4   L E O N A R D  A U B R E Y,
 5   called as a witness, having been first duly sworn
 6      by the Notary Public (Lynne D. Metz), was
 7      examined and testified as follows:
 8   EXAMINATION BY
 9   MR. FILOSA:
10      Q.  Good morning, Mr. Aubrey.  My name is
11   Greg Filosa.  As you know we represent Mr. Baffo
12   in a lawsuit that he has pending in Federal Court
13   in the Eastern District of New York.
14         We have asked you to come down here
15   today to provide testimony and to answer a number
16   of questions that we have related to that lawsuit.
17   I just wanted to go over some general instructions
18   before we get started.
19         For the record, could you please state
20   your full name?
21      A.  Leonard Anthony Aubrey.
22      Q.  And your date of birth?
23      A.  July 31, 1950.
24      Q.  And what is your current address?
```

2 (Pages 2 to 5)

Page 66

1  L. Aubrey
2  Q. With the ultimate goal to improve
3  financial performance?
4  A. Yes.
5  Q. Both by cutting expenses and by
6  getting better qualified people in the positions?
7  A. Yes.
8  Q. Both of those could improve financial
9  performance; correct?
10  A. Absolutely, yes.
11       MR. FILOSA: Let's take a break now.
12  Five to ten minutes.
13       THE VIDEOGRAPHER: This marks the end
14  of tape number one. We are going off the
15  record and the time is 11:26.
16       (Recess taken.)
17       THE VIDEOGRAPHER: This marks the
18  beginning of tape number two. We are back
19  on the record and the time is 11:41.
20  BY MR. FILOSA:
21  Q. Now Mr. Aubrey, we were just talking
22  about the 2008 reorganization at the de Seversky
23  Center and we talked a little bit earlier today
24  about a management change, reorganization, however
25  you want to refer to it, that occurred in 2009

Page 67

1  L. Aubrey
2  that resulted in the elimination of the general
3  manager position.
4       I wanted to direct your attention
5  towards the 2009 reorganization and ask you a few
6  questions about that.
7       Do you recall when you first discussed
8  this topic, the 2009 reorganization with anyone?
9  A. Well, maybe the best way to answer
10  that question is because it has longer story is
11  that when we hired Anthony, I don't remember when,
12  Robert and I felt number one, it was in a sense a
13  stretch because Anthony had not had sort of as I
14  recall, extensive background in the position that
15  we were filling; okay, and with the necessary
16  requisite breadth of manager responsibilities on
17  the one hand. On the other hand, he was very
18  enthusiastic, had had a prior association with the
19  university and was someone who is very personable
20  and who we believe could ultimately succeed, at
21  the time we believed could ultimately succeed in
22  that position.
23       Around the 2008, 2009 period, I can't
24  remember the exact date, Robert and I had had
25  periodic discussions about obviously the financial

Page 68

1  L. Aubrey
2  performance in general of de Seversky, but then
3  there were concerns around Anthony's performance
4  in particular. And Robert and I discussed
5  different things that we could do to try to help
6  him and perhaps including things like getting
7  training and so on, but there was an effort over
8  what I recall a fairly extended period to try and
9  improve his performance. Anthony was not a
10  particularly strong manager of people and
11  obviously, that's an important part of the job and
12  that I know was a concern that Robert had.
13       And so in an operation like that where
14  you oversee some low skilled, you know waiters and
15  so on and fairly -- like sometimes relative to pay
16  scales, modest pay and so on and high turnover,
17  you really have to be not just a good people
18  person but a good manager, and Anthony as it
19  turned out was not particularly strong there and
20  after some extended period of time didn't really
21  grow into that position.
22       So from my perspective that Anthony
23  was hired because we both hoped and expected that
24  he would grow into the position because he
25  demonstrated an enthusiasm for working at de

Page 69

1  L. Aubrey
2  Seversky and working with the university and that
3  we were hoping that his skills would improve over
4  time and that didn't happen to the extent that we
5  had expected and to the extent that's required to
6  successfully execute or carry out the
7  responsibilities of the position.
8       Now I can't remember the exact dates,
9  but it was over a fairly extended period of time,
10  longer than six months, maybe longer than a year
11  in which these conversations were held.
12       So now, so all of that led up to along
13  with all the various other changes and the
14  necessity to improve performance in management led
15  to the decision of the restructuring,
16  reorganization, whatever term you want to use, at
17  the top management levels of de Seversky.
18  Q. So -- but at some point the decision
19  was made to eliminate the general manager
20  position; correct?
21  A. That's correct.
22  Q. And do you recall -- I mean you gave
23  kind of a narrative six month to a year answer
24  covering that time period.
25       I am wondering at what point it became

```
                    Page 70
 1          L. Aubrey
 2   -- the decision to eliminate the position became
 3   more crystalized as opposed to more nebulous as
 4   you characterized --
 5       A.   Yeah --
 6       Q.   -- and just let me finish my question,
 7   and I am wondering at what point in time it got to
 8   that point where there are specific conversations
 9   about eliminating the position not so much as what
10   can we do for training and things like that, but
11   eliminating the position?
12       A.   August, September of 2009.
13       Q.   And do you recall did this come up in
14   conversations with Mr. Rizzuto?
15       A.   Yes, it did.
16       Q.   Was anyone else a part of these
17   conversations?
18       A.   No, they weren't. Him and I had these
19   conversations directly and exclusively just of two
20   of us.
21       Q.   And what do you recall the specifics
22   of these conversations being?
23       A.   Well, obviously there was recognition
24   that Anthony had to leave and we had to
25   restructure the leadership of the organization.
```

```
                    Page 71
 1          L. Aubrey
 2   That was specific.
 3          Then the second major point was well
 4   how do we do it in a way that's cost effective,
 5   meaning that we can reallocate some resources to
 6   other parts of the organization and effectively
 7   manage, effectively manage the facility.
 8       Q.   So is it your testimony that the
 9   decision to eliminate the position was primarily
10   performance based?
11       A.   No, no, not primarily performance
12   based. It was -- I will say it as fairly as I
13   can, it was equally performance and financial.
14       Q.   But what you had talked about was
15   eliminating the position and in talking about that
16   you described a number of performance management
17   considerations and then what you said was the
18   decision then became how to do it in the most cost
19   effective way.
20          That seems to be where the financial
21   issues came into play; is that fair to say?
22       A.   No. As I have said many times during
23   the course of this testimony is the financial
24   performance of the organization was, is and always
25   was critical; okay and that the quality of the
```

```
                    Page 72
 1          L. Aubrey
 2   management and the leadership is immeasurably
 3   linked to the financial performance of the
 4   organization.
 5          So it is, especially in service
 6   organization you can't separate them as easily as
 7   you might in some other type of operation.
 8       Q.   Now you also talked about Mr. Baffo's
 9   work performance, management style, management
10   skills and things like that.
11          Now did you ever have the opportunity
12   to personally observe his work performance or were
13   you in the de Seversky Center at any point to
14   observe his work performance?
15       A.   Well, his work performance is
16   reflected in the quality of the service and so on
17   which around that time had a number of
18   deficiencies which were noted by others to me;
19   okay.
20       Q.   How were you defining quality of
21   service then?
22       A.   Well, about you know, the skills of
23   the wait staff for example, and the management of
24   the dining room to have things properly organized
25   and scheduled. This is principally from someone
```

```
                    Page 73
 1          L. Aubrey
 2   who is an observer who is not necessarily, I am
 3   not a restauranteur nor someone who is a catering
 4   expert, but someone thinking it from the
 5   perspective of a customer.
 6       Q.   And you said the quality of service
 7   was noted by others?
 8       A.   Mm-hmm.
 9       Q.   Who specifically had noted it to you?
10       A.   You know this is general
11   conversations. I can't go through the whole list.
12       Q.   Do you recall discussing it with
13   anyone other than Mr. Rizzuto?
14       A.   The quality of the service question?
15       Q.   You were talking about the quality of
16   the wait staff and things of that nature.
17       A.   Yes.
18       Q.   So that wasn't limited to just
19   conversations with Mr. Rizzuto?
20       A.   It was not.
21       Q.   And do you recall anyone else that you
22   discussed this with?
23       A.   No.
24       Q.   But your testimony is that you did
25   discuss it with others?
```

19 (Pages 70 to 73)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

Page 86

1 L. Aubrey
2 elimination of the general manager's position at
3 de Seversky.
4 Q. And it is dated October 16th -- strike
5 that.
6 It is signed by you; correct?
7 A. That's correct.
8 Q. And next to your signature is the
9 date -- what's the date next to your signature?
10 A. October 16, 2009.
11 Q. And the memorandum is dated October
12 16, 2008?
13 A. That's correct.
14 Q. Do you have any understanding as to
15 whether or not this was -- strike that.
16 Is the October 16, 2008 date a typo or
17 incorrect, is that your understanding?
18 A. No. It is not just my understanding.
19 It is incorrect.
20 Q. So was this the -- the decision to
21 eliminate the position, the general manager
22 position at the de Seversky Center was made in or
23 about October 16, 2009; is that fair to say?
24 A. Yes. It was made prior to then.
25 Sometime prior to the 16th obviously because we

Page 87

1 L. Aubrey
2 had had discussions.
3 Q. But it wasn't effective until you
4 signed off on this; correct?
5 A. Yes. We had an agreement on what
6 action to take, yes.
7 Q. And at what point -- you said the
8 decision was made prior to this.
9 When was the decision made?
10 A. I don't know. It was obviously made
11 sometime prior.
12 Q. Do you know how soon prior to this?
13 A. As I indicated earlier, we had been
14 having conversations about this since late August
15 or so, since sometime in August.
16 Q. I understand that's your testimony.
17 But my question is: When was the
18 decision made? You had conversations about things
19 and a decision is not necessarily made. What I am
20 trying to understand is when the decision was made
21 to eliminate the position. At some point in time
22 there has got to be a decision being made.
23 Is it on this date October 16, 2009
24 when you signed it or is it your testimony that
25 the decision was made prior to that?

Page 88

1 L. Aubrey
2 A. The decision was made prior to that.
3 Q. And when -- and how soon or how long
4 prior to you signing this was the decision made?
5 A. I don't recall.
6 Q. Do you know if it was days?
7 A. I don't recall. It would be unfair of
8 me to even speculate now.
9 Q. Do you know if it was weeks?
10 A. It could have been, but I don't know.
11 Q. And do you know who drafted this?
12 A. Robert.
13 Q. He drafted this and provided it to you
14 for your signature?
15 A. That's correct.
16 Q. Did you ask him to put something in
17 writing for you to sign?
18 A. As a general procedure he would do so.
19 Whether I asked him for this or not I don't
20 precisely remember.
21 Q. And I just wanted to go through the
22 memo real quick. The first line says: "As a
23 followup to our discussion with regards to
24 reorganization of the management staff at the de
25 Seversky Center."

Page 89

1 L. Aubrey
2 That's a reference to those
3 discussions you've already talked about at length?
4 A. Yes.
5 Q. And then it goes on: "I would like to
6 move forward and eliminate the position during the
7 week of October 19, 2009."
8 Do you see that?
9 A. Yes, I do.
10 Q. Do you have any understanding as to
11 what Mr. Rizzuto means by the phrase moving
12 forward?
13 A. That means to eliminate the position
14 and terminate Anthony.
15 Q. So this is when the -- is this when
16 the decision was actually made? I am trying to
17 understand if the decision was already made, why
18 would he say move forward and eliminate the
19 position?
20 A. I don't understand your question.
21 Q. I mean it appears here he uses the
22 language move forward. So it is being elevated at
23 some point from where it was prior to this to the
24 point that it is with this with you signing off on
25 this.

Page 90

L. Aubrey

So the decision hadn't been approved prior to you signing off on this; is that correct?

A. In a formal way that's correct. It may have been agreed to, not may have, it was agreed to prior to then, but as I said earlier, I can't recall precisely when.

Q. Now was there any discussion about the timing of eliminating the position?

A. I am sure there was. The week of the 19th obviously, that was the -- that was -- that was -- whether it occurred on Monday or a Thursday is something that would have to be fit into the schedules and the particulars of the situation.

Q. What I am wondering though is whether or not there was any reason that it was the week of the 19th that the decision was made -- strike that.

What I am wondering is why the week of the 19th was selected for eliminating the position from a timing standpoint?

A. I can't think of anything that would be compelling other than that we had reached the point and were prepared to implement that in this particular action.

Page 91

L. Aubrey

Presumably the 16th was a Friday and we had closed -- you know that closed the decision and then implementing those decisions is really within the province of Robert and the head of HR and everything that has to be done that's necessary to implement such a decision.

Q. So there really wasn't any rhyme or reason as to why the 19th was selected other than it was after the formal decision had been made to eliminate the position?

A. Well, once we make the decision you want to do it reasonably promptly.

Q. Nut other than that, there was no other reason that came in that you had discussed about the timing of it, just the decision had been made, it was formally signed off on on the 16th and the decision was made to move forward promptly?

A. Mm-hmm.

Q. Now going on to the second paragraph Mr. Rizzuto indicates -- and I assume when he says I, that's a reference to Mr. Rizzuto?

A. Yes, it is.

Q. And that's not referring to you?

Page 92

L. Aubrey

A. That's correct.

Q. So it says: "I am forecasting flat revenues for fiscal 2010 and I have designed a plan to create three positions with the savings."

Do you see that?

A. That's correct.

Q. Did you agree with Mr. Rizzuto's forecasting flat revenues for fiscal 2010?

A. Well, since we start on September 1 the fiscal year, this is relatively early in the fiscal year and of course Robert books ahead. So he has, you know a closer eye on what's happening since he knows what his bookings are going forward.

This is around the period of course coming out of the difficult years that we had, you know since during the course of the recession. So very much during that period from the university as a whole, we were all very concerned about the economics, everything ranging from we didn't know how many students would come back to school because parents and so on lost employment. So this is in the general context of the university and him seeing a falloff or potential falloff on

Page 93

L. Aubrey

what are many times discretionary expenditures.

I am sure we had that conversation, but you know it was at best at that point in the fiscal year it was an estimate.

Q. My question though is whether or not you agreed with his forecast of flat revenue for 2010?

A. Yes, at that point I did.

Q. And what was that based on?

A. Just what I described about his bookings situation. What he saw happening in the environment in general and what I saw happening in the environment in general around our general business.

Q. Did you do any independent research though into bookings that the de Seversky Center had for the remainder of 2009 and into 2010?

A. No, I did not.

Q. So your understanding of the forecasting of flat revenues was based on what Mr. Rizzuto had told you?

A. That's correct.

Q. And he told you that he was forecasting flat revenues and he cited all these

24 (Pages 90 to 93)

Page 106

```
 1        L. Aubrey
 2   overseeing the two people who were put in the sous
 3   chefs role; okay. Those folks at some point prior
 4   to this were given increased responsibilities and
 5   Robert was overseeing their performance as well.
 6        Q.  And prior to this, had Mr. Baffo as
 7   general manager supervised the kitchen staff as
 8   you refer to them?
 9        A.  Yes. I can't remember now. I believe
10   the dining room food staff, the dining kitchen
11   staff reported to him but I don't remember that
12   exactly. Anthony is sitting next to you. He can
13   answer that.
14        Q.  I apologize, but I am going to be
15   asking you the questions today. I won't be asking
16   any questions of Mr. Baffo.
17        A.  Right.
18        Q.  Now in conjunction with this
19   memorandum that Mr. Rizzuto provided, did he
20   provide any other paperwork, any business plan or
21   budget or revised work chart?
22        A.  No.
23        Q.  Did you ask him for anything?
24        A.  No.
25        Q.  Would you expect that he would have
```

Page 107

```
 1        L. Aubrey
 2   provided any of that like he did for the 2008
 3   reorganization?
 4        A.  No.
 5        Q.  And why not?
 6        A.  Because this has been a discussion
 7   that had been going on for a very long time as I
 8   referred to earlier; okay. This was the
 9   consummation -- I am sorry, completion of a
10   discussion that had gone on for a very long time
11   and we both believed quite strongly that this was
12   the right thing to do.
13        Q.  So you didn't ask him to put together
14   any business plan or organizational chart or
15   anything like that?
16        A.  No, I did not.
17        MR. FILOSA: Before I get into
18   anything else this might be an appropriate
19   time. We have passed 12:30 which is when
20   you had to go. So if it's okay with you we
21   will conclude the deposition for today and
22   reconvene at a date and time that we agree
23   upon later.
24        (Continued on the next page.)
25
```

Page 108

```
 1        L. Aubrey
 2        MR. SPARBER: That's great.
 3        THE VIDEOGRAPHER: This marks the end
 4   of tape number 2. We are going off the
 5   record and the time is 12:34.
 6        (Time Noted: 12:34 p.m.)
 7
 8
 9
10            LEONARD AUBREY
11
12   Subscribed and sworn to before me
13   this     day of      , 2011.
14
15
16   (Notary Public)     My Commission Expires:
```

Page 109

```
 1
 2            CERTIFICATE
 3   STATE OF NEW YORK  )
                        : ss.
 4   COUNTY OF NEW YORK )
 5        I, LYNNE D. METZ, a Shorthand Reporter
 6   and a Notary Public within and for the State of
 7   New York, do hereby certify that the foregoing
 8   deposition of LEONARD AUBREY was taken before me
 9   on the 16th day of March, 2011;
10        That the said witness was duly sworn
11   before the commencement of his testimony; that the
12   said testimony was taken stenographically by me
13   and then transcribed.
14        I further certify that I am not
15   related by blood or marriage to any of the parties
16   to this action or interested directly or
17   indirectly in the matter in controversy; nor am I
18   in the employ of any of the counsel in this
19   action.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 24th day of March, 2011.
22
23
24            LYNNE D. METZ
25
```