# Exhibit 28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------x

ANTHONY BAFFO,

Plaintiff, Index No.

10 Civ 1245

-against- (LDW)(ETB)

NEW YORK INSTITUTE OF TECHNOLOGY; ROBERT RIZZUTO, in his official and individual capacities; and LEONARD AUBREY, in his official and individual capacities,

Defendants.

-------------------------------------x

May 23, 2011

10:02 a.m.

Continued videotaped deposition of LEONARD AUBREY, held at the offices of Thompson Wigdor & Gilly LLP, 85 Fifth Avenue, New York, New York, pursuant to Notice, before Lynne D. Metz, a Shorthand Reporter and Notary Public of the State of New York.

Page 113

APPEARANCES:

THOMPSON WIGDOR & GILLY LLP
Attorneys for Plaintiff
85 Fifth Avenue
New York, New York 10003
BY: GREGORY N. FILOSA, ESQ.,
of Counsel

FULBRIGHT & JAWORSKI L.L.P.
Attorneys for Defendants
666 Fifth Avenue
New York, New York 10103
BY: NEIL G. SPARBER, ESQ.,
of Counsel

ALSO PRESENT:
Anthony Baffo

Page 114

THE VIDEOGRAPHER: We are on the record. Today's date is May 23, 2011. The time on the video monitor is 10:02 a.m. This is the beginning of tape number one 10:03:12 volume 2 of the continued videotaped deposition of Leonard Aubrey in the case of Anthony Baffo versus New York Institute of Technology, et al.

My name is Deverell Write. I 10:03:24 represent Veritext Reporting.

At this time will counsel please identify themselves.

MR. FILOSA: Gregory Filosa with Thompson Wigdor & Gilly for plaintiff 10:03:33 Anthony Baffo.

MR. SPARBER: Neil Sparber with the firm of Fulbright & Jaworski attorneys for the defendants.

LEONARD AUBREY,
called as a witness, having been first duly sworn by the Notary Public (Lynne D. Metz), was examined and testified as follows:

EXAMINATION BY
MR. FILOSA: 10:03:56

Page 115

L. Aubrey

Q. Mr. Aubrey, I wanted to pick up where I think we left off on day one of the deposition and the same instructions that I gave you at the outset of the first day of the deposition they 10:04:07 will apply to this deposition as well.

Do you recall those instructions?

A. Yes.

Q. And do you understand them?

A. Yes. 10:04:14

Q. And you recognize your testimony here, the court reporter just swore you in, so it is under oath just as it was during the first day of your deposition?

A. Yes. 10:04:26

Q. I was wondering if you could refresh my recollection as to -- we talked about some of the reasons for Mr. Baffo's termination back in October 2009.

Could you just summarize for me 10:04:38 exactly why Mr. Baffo's employment was terminated?

A. The single most important reason, the primary reasons were the performance, Anthony's performance.

Q. Was there any other -- go ahead. 10:04:52

Page 116

L. Aubrey

A. We were always trying to improve the financial performance of de Seversky and -- but the larger consideration was his performance.

Q. Was there any concern about the larger 10:05:03 financial economy at that time?

A. To a far lesser extent but no, it was primarily performance because if performance was better the performance of de Seversky would likely have been better. 10:05:24

Q. And how exactly did -- strike that.

What affect did the termination of Mr. Baffo's employment have on the performance of the de Seversky Center, to your understanding?

A. Over the longer run? 10:05:51

Q. Both short term and long term.

A. Well, I think it allowed us and helped us to do some things in changing the sort of the management structure of de Seversky at the time which ultimately improved the financial 10:06:05 performance of the organization.

Q. And would you characterize that as a long term effect?

A. Well, longer term than you know a few months. 10:06:18





0ad03150-f299-4c06-ada4-9dba127b981

L. Aubrey

Q. And this was the approach that was recommended by Mr. Rizzuto?

A. That I don't recall specifically. I am sure we had discussed it. 10:29:23

Q. It was his recommendation to move forward the week of October 19, 2009; right?

A. It was the result of our discussions that we go forward at that time, yes.

Q. But he says I would like to move 10:29:39 forward.

A. And I say as a followup to our discussion.

Q. That's not my question.

A. I am giving you the answer. You are 10:29:49 suggesting that he is recommending unilaterally that we move forward on the week of October 19th. I am saying he may well have, but it also was part of a discussion that we had had about the appropriate time to move forward. 10:30:07

Q. And all of this was in the context of all your prior discussions in moving forward the week of the 19th whether it was a recommendation.

Ultimately the decision was made to move forward the week of the 19th; right? 10:30:26

L. Aubrey

A. Mm-hmm, yes.

Q. And that was before the dining room captain and the bartender captain positions had been filled? 10:30:32

A. That's correct. To the best of my recollection, right.

Q. Going on to the second paragraph here Mr. Rizzuto writes "I am forecasting flat revenues for fiscal 2010 and have designed a plan to create 10:30:47 three positions with the savings."

Do you see that?

A. Yes, I do.

Q. And did you agree with Mr. Rizzuto's forecasting of flat revenues for fiscal 2010? 10:30:58

A. Since it was so early and the discussions began early, it was a judgment on his part that that was the direction we were heading because as I recall, the revenues for '08 and '09 were fairly flat and what he may have been 10:31:23 suggesting there was it looks like we are heading in the same direction.

In other words, so there was evidence about where revenues had been heading. There was evidence and Robert was making a judgment that we 10:31:40

L. Aubrey

are proceeding along the same path.

Q. And do you know whether or not it was based on anything other than the revenue for fiscal year 2008 and fiscal year 2009? 10:31:54

A. He may have seen and I know he may have had some evidence as to where bookings were at that point in time and some thoughts about how that might go forward.

Q. Did you discuss that with him? 10:32:09

A. Probably briefly, but again this wasn't a sort of penultimate reason as to why we were making the decisions that we were making.

Q. What do you mean this wasn't the penultimate reason? 10:32:27

A. Right, meaning that as I have said earlier, that the financial performance or the projected -- I understood the financial performance had been recently. That was a fact okay, and we both wanted to improve that 10:32:46 situation. So therefore, reorganizing the management of de Seversky was an important element to improving that situation in either restructuring the management, removing Anthony which is part of that to me and to Robert was 10:33:07

L. Aubrey

critical to improving the financial performance ultimately.

Q. But going back to forecasting flat revenues, do you know whether or not -- did you 10:33:30 ever discuss with Mr. Rizzuto what his forecast was based on?

A. Probably a brief conversation on that specific topic.

Q. And he would have had access to 10:33:42 bookings that were planned for fiscal year 2010 that were already on the books at that point?

A. Yes, presumably.

Q. And he could have based his forecast on that? 10:33:59

A. Yes.

Q. Do you know whether or not he did?

A. No, I don't know that.

Q. Now at the time this was signed, did you do any independent reach or analysis into how 10:34:06 -- strike that.

At the time this was signed did you do any independent research or analysis into Mr. Rizzuto's forecast of flat revenue?

A. No, because it was almost irrelevant 10:34:23

0ad03150-f299-4c06-ada4-9dba127b981

Page 141

L. Aubrey

because what was important was actual performance in the prior two years which I was aware of and also of the performance of Anthony as GM.

Q. It doesn't say anything in here about 10:34:39 Mr. Baffo's performance as general manager, does it?

A. That's correct.

Q. So it only references forecasting of flat revenues; right? 10:34:51

A. In that sentence it does. The first paragraph as we discussed a couple of times implicitly references our conversations or explicitly references our conversations and implicitly the position of the general manager and 10:35:08 the performance of at that time the current general manager.

Q. So the only reference here to Mr. Baffo's performance you believe is implicit; right, is that your testimony? 10:35:23

A. My testimony says it is exactly what it says. Our discussions regarding the reorganization of the management staff which is elimination of the general manager position which is the subject of the memorandum. 10:35:37

Page 142

L. Aubrey

Q. But at no point does it reference the performance of the general manager position?

A. It doesn't explicitly mention the individual who's occupying the GM position at that 10:35:49 time. It does not say that.

Q. It doesn't mention his performance; right?

A. It does not say that, no. His performance reports do. 10:36:00

Q. And that was the subject of your -- the discussions that you testified that you had with Mr. Rizzuto, the subject of them that you say are explicitly referenced here was Mr. Baffo's performance as general manager of the de Seversky 10:36:22 Center?

A. That's correct. Yes.

Q. So despite -- strike that.

Going on to the last sentence Mr. Rizzuto says "I will assume the general manager's 10:36:43 responsibility -- strike that.

Mr. Rizzuto says "I will assume the general manager's responsibilities and delegate duties as needed."

Do you see that? 10:36:56

Page 143

L. Aubrey

A. Mm-hmm.

Q. Was that your understanding of how the reorganization would go into effect?

A. That was part as to how it would 10:37:04 unfold in the short term.

Q. And how was -- what was the other part how it would unfold in the long term?

A. He would be filling these positions and Eric would be taking on more general manager 10:37:19 duties and Robert would be taking on more of the responsibilities in the kitchen.

Q. So was it the plan that Mr. Rizzuto would take on the general manager's duties on a short term basis? 10:37:37

A. In the immediate term, yes.

Q. And he would delegate those duties as needed?

A. That's correct.

Q. But it doesn't mention anything here 10:37:44 about increasing Mr. Redlich's role, does it?

A. Not in this document other than with regard to the reorganization in the first paragraph that we had discussed.

Q. It doesn't mention Mr. Redlich being 10:37:59

Page 144

L. Aubrey

given increased responsibilities; right?

A. Explicitly in this memorandum, no.

Q. Again, that's something that was implicit? 10:38:10

A. It was something that was discussed over a period of time.

Q. And do you have any documents which would show that this was discussed during a period of time? 10:38:20

A. No, not to my recollection. They may exist.

Q. Did you do anything to search for these documents?

A. No, I don't recall seeing any 10:38:26 documents on that.

Q. My question was: Did you do anything to search for them though?

A. No, I didn't.

Q. Did anyone else do anything to search 10:38:32 for these documents which might show discussions between you and Mr. Rizzuto prior to the date of Exhibit 2?

A. I can't answer that question because I don't know what anyone else did. 10:38:43

Page 145

L. Aubrey

Q. So you don't know -- my question was: Do you know if anyone else searched for them? Simply yes or no.

A. No, I don't. 10:38:50

Q. Now once you signed off on this what's marked as Exhibit 2, is it fair to say this is when the decision was made and it was approved once you signed off on it?

A. Yes. 10:39:38

Q. And is that a requirement that you sign off on Mr. Rizzuto's recommendation in writing?

A. Yes. That's typically the way we have done it. 10:39:50

Q. What is then the next step?

A. Then he would work with the human resources department. He would effectively implement the decision along with human resources.

Q. And was there any -- did you ever 10:40:06 review any other -- strike that.

Do you know whether or not Mr. Rizzuto prepare any paperwork or anything in coordinating with human resources?

A. Other than the usual requirements 10:40:17

Page 146

L. Aubrey

working with human resources on a separation probably with HR and the general counsel about a separation agreement or something.

Q. What about any other types of 10:40:28 memorandum formalizing recommendation similar to this?

A. No. Not to my understanding, no.

Q. And just so the record is clear, when I say this I am referring to Exhibit 2. 10:40:39

So you didn't ask Mr. Rizzuto for a memo other than Exhibit 2 outlining his recommendation or anything like that?

A. No.

Q. And you didn't believe any other memo 10:40:56 or anything else was necessary; right?

A. No.

Q. Did you ask Mr. Rizzuto to provide you with anything else, any other supporting documents with this memo, with this Exhibit 2? 10:41:12

A. No, because as it states earlier we had gone through this. This memo was part of longer process discussing Anthony's performance and this was really the end point of a much longer discussion. 10:41:33

Page 147

L. Aubrey

So my involvement after signing this, my personal involvement was okay, work with HR and implement the decision and whatever paperwork and so on would be put into place and done by human 10:41:44 resources.

Q. So you didn't ask him for a long term business plan or anything like that?

A. No, no. That had been discussed as part of this termination. 10:42:02

Q. You also didn't ask him for a short term business plan, anything like that?

A. No, in writing, no.

Q. What about a revised budget?

A. No. 10:42:14

Q. Or a revised organizational chart?

A. No.

Q. Do you know whether or not Mr. Rizzuto prepared any of this for human resources?

A. No. 10:42:23

Q. Now you testified earlier today that you met with Mr. Rizzuto on or about October 16, 2009 to discuss this?

A. Mm-hmm.

Q. And nobody else was present for that 10:42:37

Page 148

L. Aubrey

meeting?

A. To the best of my recollection, I don't know. HR may have been present at some point, but I don't know. 10:42:45

Q. When Mr. Rizzuto provided this to you though, do you know whether or not HR was present?

A. I don't recall, no.

Q. And at some point did you and Mr. Rizzuto meet with Carol Jablonsky? 10:42:56

A. I don't recall. I believe so, but again I don't recall in this whole process.

MR. FILOSA: Please mark this as 3.

(Aubrey Exhibit 3, a four-page document Bates stamped D 07307 through D 10:44:03 07310, marked for identification, as of this date.)

Q. Now you have been shown a document that's been marked as Aubrey Exhibit 3. It is a four-page document Bates stamped D 07307 through D 10:44:02 07310. Please review it and let me know when you are ready and just so you know my questions are only going to relate to the first page. You are free to review it if you like.

A. Okay. 10:44:43

L. Aubrey

Q. And if you look at the numbers for October 2008 and 2009; do you see them?

A. Yes, I do.

Q. You see that the numbers for October 12:04:47 2009 are higher than October 2008?

A. That's correct.

Q. And this is -- this time you didn't say modestly?

A. That's right. No, that's a sizeable 12:04:57 increase.

Q. For October 2009 the revenue had gone up a 146,000; right?

A. Yes, it did.

Q. So for September and October 2009 the 12:05:06 de Seversky Center generated $175,000 in additional revenue from the prior year?

A. That's correct.

Q. Now did you review these documents as part of the plan to reorganize the de Seversky 12:05:31 Center?

A. No, we did not because once again performance was what was really important. Anthony's performance.

Q. But if you see at the time that you 12:05:43

L. Aubrey

made the decision in October 2009, you were in the middle of the month that at the end you had been up a $175,000 from the prior year just attributable to two months; right? 12:05:56

A. Well, you are basing -- you are presuming everything was based on the economics which it was not. I know we are spending a lot of time on this and I appreciate it, but this is much bigger the issue with Anthony's performance than 12:06:08 is what we are looking at right here.

So I certainly concede with the numbers. If I sat when Robert and I were talking in September because remember the process with Anthony began in August. It did not begin in 12:06:25 September. The discussions began in August, to the best of my recollection. So in October was the end of the process of someone's performance in management of the operation and because we had, what I would characterize as, a modest increase in 12:06:45 September, that doesn't make the case better or worse. It is just okay, this is where we are and now is the time to take the action that we believe from a management point of view is a necessary action. Which we took. 12:07:04

L. Aubrey

So I obviously am not going to argue with the numbers here because the numbers are the numbers, but those were not the basis of the decision. 12:07:15

Q. And again just to reiterate, you don't have any documents which show that you discussed this reorganization with Mr. Rizzuto in August of 2009?

A. No, I don't, no. We -- what is clear 12:07:27 is that this went on for a long time.

Q. And what is -- you say that's clear?

A. What is clear, excuse me, to me is that this decision to terminate Anthony was not one that was taken lightly in part because I think 12:07:43 people in spite of his performance liked Anthony and wanted to help him succeed. So we did discuss it at some length about his -- you know what can we do to help him and how can we try to improve things. But we simply reached the point at the 12:08:05 end which was October that it was time to take an action.

Now quite frankly, if it was a month later and I saw these numbers for October of 2009 it wouldn't have made a difference because this 12:08:21

L. Aubrey

was a discussion around his performance and his ability to manage the operation which was not good. And this only includes revenue not expenses. So this is not a profit and loss 12:08:43 statement.

Q. I recognize that. Unfortunately, this is what has been produced to us.

A. Well, I am just telling you it is not a fair equation from that perspective. 12:08:57

Q. But it doesn't change the fact that revenue was up $175,000 from these two months from 2009 versus the prior year?

A. I can't argue with that however misleading this may be. 12:09:17

Q. Now do you recall what happened next? We talked earlier today about you met with Mr. Kloepfer on October 21st of 2009.

Do you recall what the next step in the process was for this reorganization? 12:10:21

A. No. Other than related to Anthony's termination?

Q. Yes.

A. Or -- well, presumably Steve drafted a form of a settlement agreement or a release and so 12:10:37

0ad03150-f299-4c06-ada4-9dba127b981