# Exhibit 29

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------x

ANTHONY BAFFO,

                Plaintiff,      Index No.

                                   10 Civ 1245

      -against-           (LDW)(ETB)

NEW YORK INSTITUTE OF TECHNOLOGY;

ROBERT RIZZUTO, in his official and

individual capacities; and LEONARD

AUBREY, in his official and individual

capacities,

                Defendants.

---------------------------------------x

                April 28, 2011

                9:14 a.m.

       Continued deposition of ROBERT RIZZUTO, held at the offices of Thompson Wigdor & Gilly LLP, 85 Fifth Avenue, New York, New York, pursuant to Notice, before Lynne D. Metz, a Shorthand Reporter and Notary Public of the State of New York.

Page 374

APPEARANCES:

THOMPSON WIGDOR & GILLY LLP
Attorneys for Plaintiff
    85 Fifth Avenue
    New York, New York 10003
BY: GREGORY N. FILOSA, ESQ.,
    of Counsel


FULBRIGHT & JAWORSKI L.L.P.
Attorneys for Defendants
    666 Fifth Avenue
    New York, New York 10103
BY: NEIL G. SPARBER, ESQ.,
    of Counsel


ALSO PRESENT:
    Anthony Baffo
    Bob Calvert - Videographer


09:13:08

Page 375

THE VIDEOGRAPHER: We are now on the record. I am Bob Calvert from Veritext New York Reporting. Today's date is April 28, 2011. The time on the video monitor is 9:14 09:13:21 a.m.

We are here at the offices of Thompson, Wigdor & Gilly located at 85 Fifth Avenue New York, New York to continue the videotape deposition of Robert Rizzuto in 09:13:35 the matter of Anthony Baffo versus New York Institute of Technology. The venue of this case is the United States District Court for the Eastern District of New York.

Will counsel please identify 09:13:49 themselves and say who they represent?

MR. FILOSA: Gregory Filosa with Thompson, Wigdor & Gilly representing plaintiff Anthony Baffo.

MR. SPARBER: Neil Sparber with 09:13:59 Fulbright & Jaworski, attorneys for the defendant.

THE VIDEOGRAPHER: Will our court reporter please swear in the witness?

ROBERT RIZZUTO,   09:14:06

Page 376

having been duly sworn, resumed the stand and testified further as follows:
EXAMINATION (Cont'd)
BY MR. FILOSA:   09:14:07
    Q. Now Mr. Rizzuto, this is the continuation of your first day of deposition, continuation from the first day of your deposition testimony and the first day was held on March 22, 2011.   09:14:33
    Did you prior to today, prior to coming back here today did you review a copy of your transcript of the first day of your deposition?
    A. No.   09:14:44
    Q. Did you -- is there anything you want to go back from your first day of deposition testimony to correct or clarify or anything like that?
    A. No.   09:14:54
    Q. So you are comfortable with the testimony that you gave on March 22, 2011?
    MR. SPARBER: Before we go, we had mentioned last time during the deposition there was one area that he did want to clear   09:15:03

Page 377

R. Rizzuto
up.
    MR. FILOSA: Did he clear it up?
    MR. SPARBER: No. We ended it knowing he was coming back for a second day. So the   09:15:14 question is up to you whether you want him to clarify now or wait until the end for me to ask the question. Whatever your preference.
    MR. FILOSA: I am not certain I am   09:15:24 going to ask the question, so why don't you --
    MR. SPARBER: No, I would ask the question if you didn't.
    Q. If you would like to clarify something   09:15:30 from the first day of your deposition testimony please do so. The floor is yours.
    A. Okay.
    MR. SPARBER: Do you recall what we had spoken about yesterday about the   09:15:38 clarification?
    THE WITNESS: Yes.
    MR. SPARBER: Would you please explain to Mr. Filosa since you remember how you would like to clarify?   09:15:46

2 (Pages 374 to 377)

Page 382

R. Rizzuto

we were both in the office at the time but I believe he asked if he could talk to me and at that point sure and sat down and we have a little table in the office itself and sat down and 09:21:09 Anthony proceeded to tell me about his diagnosis of HIV.
 Q. And was anyone else -- strike that.
    What time of day was this?
 A. I am not sure. 09:21:21
 Q. Was anyone else present in the office at that time?
 A. No.
 Q. What about in the surrounding offices, did you see anyone else that morning in the 09:21:30 offices?
 A. I don't believe so.
 Q. And what specifically did Mr. Baffo tell you?
 A. It was pretty brief. From what I 09:21:41 remember, I don't remember exact words, I am sure, but that he was diagnosed with HIV and I was you know okay and I was taken back, but then he proceeded to tell me how he thinks that he was diagnosed with it. 09:22:04

Page 383

R. Rizzuto

 Q. Did you ask him how he had contracted the HIV virus?
 A. I don't think I did, but I don't remember for sure. 09:22:13
 Q. Did you ask him anything else? Did you ask him anything during this meeting?
 A. I don't remember that I did. As I said it was pretty brief.
 Q. And how did the meeting end? 09:22:25
 A. I believe that I said to him is there anything -- if you need anything or if you need any time or whatever you need to do to take care of this take the time that you need to do so.
 Q. And this was all you were sitting at 09:22:39 the conference table in yours and Mr. Baffo's office?
 A. Yes.
 Q. Did Mr. Baffo say anything else other than what you testified to today? 09:22:53
 A. I don't remember that he did.
 Q. Did he do anything else?
 A. What do you mean by do?
 Q. Anything other than what you had testified to -- strike that. 09:23:04

Page 384

R. Rizzuto

 Q. Do you recall any other circumstances of your meeting with Mr. Baffo on that date?
 A. I don't.
 Q. What did you do immediately following 09:23:19 that meeting?
 A. I think I went to Carol Jablonsky's office because that was the day we were supposed to release the position. That's what I think that I did because that was supposed to happen later in 09:23:52 the morning. So this obviously had to be before that but I am not exactly sure the time we had the conversation.
 Q. When you say you went to Miss Jablonsky's office, you actually went to see her 09:24:07 in person?
 A. I think I did.
 Q. Where is her office -- strike that.
    Where was her office at the time in relation to your office? 09:24:14
 A. Probably a three minute drive.
 Q. A three minute drive.
    And did you drive or did you walk?
 A. More than likely I would have driven.
 Q. And it's still her offices on NYIT's 09:24:25

Page 385

R. Rizzuto

campuses?
 A. Yes.
 Q. And what did you do when you got to Miss Jablonsky's office? 09:24:36
 A. I believe that I had told her that Anthony and I had this discussion about his diagnosis and said to her you know this is I am sure a serious thing. What do you want to do and I believe she said to me that she needed to talk 09:24:59 to Steve about it.
 Q. And how long was your meeting with Miss Jablonsky?
 A. I am not sure.
 Q. Would you say it was more or less than 09:25:08 five minutes?
 A. I don't believe it was a long meeting, but I couldn't put a time frame on it.
 Q. What else did you discuss with Miss Jablonsky other than what you testified to today? 09:25:23
 A. I don't remember.
 Q. Was it shorter or longer than your meeting with Mr. Baffo which you've already described was brief?
 A. Really hard to remember. I don't 09:25:36

Case 2:10-cv-01245-LDW-ETB   Document 39-29   Filed 10/11/11   Page 5 of 10 PageID #: 681

Page 410

R. Rizzuto

August. Unfortunately, the way timing works at NYIT and we have had past situations where eliminations were happening and it took three or four months for it to happen. This had to happen. This was a plan that we -- and yes, it was my ultimate idea and decision to do that initially, but when it came up to the timing on this and the 23rd came around and the decision was made to go to do it on the Monday I had nothing to do with that decision nor would I have even tried then at that point to say no, I don't think we should do it because it had to happen.

Q. Why did it have to happen? Strike that.
   Well, my first question is: Why did it have to happen? You said that twice in your prior answer.
A. Because I needed to make a business decision here. This was a business decision.
Q. But as far as the timing why did it have to happen then?
A. You are referring to the 26th?
Q. No, I am referring first to the 23rd. Why did the elimination of the general

Page 411

R. Rizzuto

manager position in your mind have to happen on the 23rd?
A. That just happened to be a date we chose because Mr. Aubrey finally signed the document on the 16th.
Q. And you wanted to eliminate the position as soon as possible?
A. I don't -- I wanted to start thinking about eliminating the position back in August. That was the plan to start to think about doing this, what was the plan going to be.
Q. But ultimately the position wasn't eliminated until the middle of October, October 16th is when Mr. Aubrey signed the memo eliminating the position; correct?
A. Yes.
Q. And then you wanted to complete the elimination of the position by the end of that week; right?
A. I wanted to complete the elimination of this position in September all being said.
Q. Do you have any documents that would show that you wanted to complete the elimination of the position, the general manager position in

Page 412

R. Rizzuto

September?
A. No.
Q. And you have looked for those documents; right?
A. I have.
Q. You thought there were some but you weren't able to find any; is that right?
A. That's correct.
Q. So there is no documents out there which show you wanted to eliminate the general manager position in September of 2009?
A. No.
Q. I guess I am still trying to get an answer to my question why the general manager position had to be eliminated during the week of October 16th.
A. The only way that I can answer that is my past experience is that just happened to be that particular week because when Mr. Aubrey sat down and signed the document.
Q. But you had testified at the first day of your deposition that what you wanted to do was eliminate the general manager position and use those funds to support other positions at NYIT;

Page 413

R. Rizzuto

right -- strike that, at the de Seversky Center; right?
A. Yes.
Q. And which two positions did you want to use the general manager salary to fund?
A. I wanted to bump Eric into an operations manager and bump his salary up a little bit and then create I believe at the time it was a captain's position. No. At the time it was the sales position, then a captain's position I believe.
Q. And had those positions been hired at the time the general manager position was eliminated?
A. The position I don't know timing exactly well, but the position for Eric moving into operations manager afterwards happened with the bump. The -- Eric then came to me and said to me I don't believe that we need a sales position. I think that we can use the money elsewhere as a bar captain I believe the conversation was. I think we have documentation on that.
Q. On the conversation?
A. No, on the paperwork for the bar

Page 414

```
 1           R. Rizzuto
 2   captain.
 3       Q.  But at the time the general manager
 4   position had been eliminated, those other
 5   positions and I am referring to the two other    09:57:53
 6   positions not Mr. Redlich's position, those two
 7   other positions hadn't yet been filled; right?
 8       A.  No.
 9       Q.  Had anyone been interviewed for those
10   positions?                                       09:58:05
11       A.  My recollection of that is that we
12   were, I think we were advertising for them, but I
13   don't remember exactly when we actually hired
14   people for the position.
15       Q.  Do you know whether or not anyone had    09:58:16
16   been offered any of those positions at the time
17   that Mr. Baffo's employment was eliminated on
18   October 26th?
19       A.  I don't remember.
20       Q.  So my question is: Why did the           09:58:29
21   general manager position have to be eliminated
22   before these other positions were filled or had
23   even been offered to anyone?
24       A.  Typically the policy of the college is
25   you can't open up a position. The paperwork gets 09:58:43
```

Page 415

```
 1           R. Rizzuto
 2   filled out after the prior position is vacant.
 3       Q.  But in this case the paperwork had
 4   already been filled out while the general manager
 5   position was still filled; right?               09:58:56
 6       A.  I don't remember.
 7       Q.  You don't remember when NYIT had
 8   started posting for the two positions that you had
 9   planned to fund with Mr. Baffo's salary?
10       A.  I am sure we have documentation on it,  09:59:07
11   but I believe I even had Anthony start to because
12   the plan was in motion, I had him starting to put
13   some advertising on one of the websites, but I
14   don't know -- I don't remember whether it was
15   actually connected to what NYIT usually uses. It 09:59:21
16   might have been Craig's List, but I don't know for
17   sure.
18       Q.  Would that have been inconsistent with
19   NYIT's general policies of eliminating the
20   position before filling out the paperwork for the 09:59:34
21   other positions?
22       A.  Yes.
23       Q.  Why did you deviate from NYIT's policy
24   in that case?
25       A.  I don't remember why.                   09:59:44
```

Page 416

```
 1           R. Rizzuto
 2       Q.  But in your mind the elimination of
 3   the general manager position had to occur during
 4   the week of the 16th; right?
 5       A.  If Mr. Aubrey had filled the paperwork  10:00:01
 6   out and signed it on the 24th of October, then it
 7   would have happened right after that. Again, I
 8   have to tell you that it's a matter of sometimes
 9   we just have to wait for these signatures to
10   happen and the process to go through.           10:00:14
11       Q.  But in this case Mr. Aubrey didn't
12   sign, didn't sign the authorization to eliminate
13   the position until October 16th; right?
14       A.  Yes, that's the date.
15       Q.  And as soon as he signed that you       10:00:26
16   wanted to eliminate the position what week; right?
17       A.  Yes.
18           MR. FILOSA: Could we mark this as
19       Rizzuto Exhibit 20.
20           (Rizzuto Exhibit 20, a two-page         10:01:00
21       document Bates stamped D 03417 to 3418,
22       marked for identification, as of this date.)
23       Q.  Now you have been shown a document
24   that's been marked as Rizzuto Exhibit 20. It is a
25   two-page document Bates stamped D 03417 to 3418. 10:02:04
```

Page 417

```
 1           R. Rizzuto
 2   Please review it and let me know when you are
 3   ready.
 4       A.  Yes, I am ready.
 5       Q.  And this is an e-mail chain between     10:02:33
 6   you and Mr. Redlich; right?
 7       A.  Yes.
 8       Q.  Do you recall this e-mail chain?
 9       A.  No.
10       Q.  But directing your attention to the     10:02:39
11   third e-mail from the top, it is an e-mail from
12   you to Mr. Redlich dated October 23, 2009 at 9:37
13   a.m.?
14       A.  Yes.
15       Q.  Do you see that? And in that -- the     10:02:52
16   first line of your e-mail you say: Okay FIY, the
17   thing I spoke to you about is not happening right
18   away or today at all.
19           Is that a reference to the meeting
20   with Mr. Baffo about eliminating his position?  10:03:08
21       A.  I imagine it is, yes.
22       Q.  Do you know whether or not this is
23   before or after your meeting with Miss Jablonsky?
24       A.  I would imagine it was after the
25   meeting from the way this is written.           10:03:24
```

12 (Pages 414 to 417)

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

Page 422

R. Rizzuto

this, but -- and I can't say that this is connected to a termination. We started discussing Anthony's performance again, back in the summertime and the thought in my mind what I wanted to do and why and you know, I would imagine that this was one of the case in point.

Q. Now when you are referring to you just -- strike that.

When you say we had been discussing going back to the summertime, are you referring to you and Mr. Redlich or you and Mr. Aubrey?

A. This particular instance would be Mr. Redlich.

Q. So your testimony is that going back to the summer of 2009 you had been discussing Mr. Baffo's performance with Mr. Redlich; right?

A. He was discussing it with I and I was discussing it with him because he had his own frustrations with it. Yes, the answer is yes.

Q. And in these conversations, was there any discussion about Mr. Redlich taking on the general manager position or the general manager duties, however you want to characterize it?

A. In all honesty I can't remember a

Page 423

R. Rizzuto

conversation to say that Eric I might have said to him this is the plan. I could tell you honestly though there was no plan to fill the general manager position because I was doing the duties of it anyway. The plan ultimately was to move some bodies around and give a little bit more duties to Eric.

Q. And do you recall when those conversations started? I am not talking about his performance, but talking about him taking on additional duties. Strike that.

Do you recall when these conversations occurred and when I talk about these conversations I am referring not to conversations about Mr. Baffo's performance but about Mr. Redlich taking on additional duties?

A. In the summertime whether it be the end of July or beginning of August.

Q. But you don't have any documents that would show you were discussing with Mr. Redlich him taking on additional duties?

A. I do not.

Q. Are you aware of any documents that might not be in your possession which would show

Page 424

R. Rizzuto

you were discussing this with Mr. Redlich?

A. I am not, no.

Q. And in this -- from this e-mail though it seems to be you would have discussed with him -- strike that.

In this e-mail it appears you had discussions with him about either Mr. Baffo's performance or the elimination of the general manager position; is that fair to say?

A. It is fair to say that some conversation regarding his performance has happened.

Q. Because you wouldn't just send an e-mail saying case in point without there being some preliminary discussion about that?

A. Absolutely not.

Q. And this is dated October 20, 2009; right?

A. Yes, it is.

Q. Now at any time after you learned about Mr. Baffo's HIV status, was there any discussion about not eliminating the position but transferring him to another position?

A. I believe that Carol Jablonsky posed

Page 425

R. Rizzuto

that question to me and if there was any kind of a lateral move it would probably have to be in a supervisory position which I would not have agreed upon because that's where Anthony had his challenges in a supervisory position.

Q. And do you know when Miss Jablonsky posed this question?

A. I don't.

Q. Was it in your first meeting with her on October 23, 2009?

A. I have no recollection of when that would have taken place that conversation.

Q. But you do recall that she posed that question to you?

A. I think she did.

Q. What was your response to that question from her?

A. Now I am trying to -- this is where the confusion comes in for me. As I said to you, I think the conversation happened. What I am trying to decipher is whether this is a normal question that she asks if we are going to eliminate a position that's a normal question. Do you have another -- I am trying to figure out for

14 (Pages 422 to 425)

Page 494

1  R. Rizzuto
2  part of the leader on a daily basis.
3      Do you see that?
4  A. I do.
5  Q. Is that narrative that Mr. Redlich   11:48:28
6  needed to work on?
7  A. As far as coming to work on time, no.
8  Dressing the part of the leader on a daily basis,
9  I believe he could have dressed better.
10 Q. And that's the same concern you talked   11:48:45
11 about on day one of your deposition with respect
12 to Mr. Baffo?
13 A. It is.
14 Q. Where you took him to Joseph A. Bank
15 and bought him some suits?   11:48:53
16 A. Yes.
17 Q. Did you do the same with Mr. Redlich?
18 A. I did not.
19 Q. Now these other goals here listed on
20 pages 1 and 2 of this exhibit, are these areas   11:49:11
21 that Mr. Redlich needed to work on?
22 A. They could have been areas that he
23 needed to work on or they could have been goals
24 that have not yet even been or recently spoken of.
25 Q. But there is a lot listed here; right?   11:49:31

Page 495

1  R. Rizzuto
2  A. Yes, there are.
3  Q. So there is a lot of things he needs
4  to work on or new goals that you were setting for
5  him?   11:49:40
6  A. Yes.
7  Q. And as a result you rated him
8  developing/needs improvement for this year?
9  A. Yes.
10 Q. And you haven't changed his rating;   11:49:51
11 right?
12 A. Pardon me?
13 Q. You haven't changed his rating; right?
14 A. No.
15 Q. It is still rated developing/needs   11:49:57
16 improvement?
17 A. Yes.
18 Q. You haven't changed it to fully
19 proficient or anything like that?
20 A. No.   11:50:05
21 Q. Now just going back to we talked a
22 little bit today as well as during the first day
23 of your deposition about how the funds had been
24 used for Mr. Baffo's salary were used following
25 the elimination of that position. And I think you   11:50:47

Page 496

1  R. Rizzuto
2  indicated three ways in which they were used; to
3  increase Mr. Redlich's salary, to fund a dining
4  room manager position and ultimately to hire a
5  bartender captain position; is that correct?   11:51:06
6  A. Yes.
7  Q. And were these two other positions
8  ultimately filled?
9  A. The bar captain was filled and the
10 dining room manager was captain, yes.   11:51:17
11 Q. What was captain, dining room?
12 A. It was dining room captain not
13 manager.
14 Q. And who was hired for that position?
15 A. I think it was Brian Davis.   11:51:33
16     Are you talking about the captain or
17 the bartender, the bartender captain? I am sorry,
18 the server captain or the bartender captain?
19 Q. Why don't we stick with dining room
20 captain or manager. I actually think it was the   11:51:48
21 dining room manager position, but I will defer to
22 you on that one or the bartender captain position.
23 Those are the two positions we are talking about.
24     Was the dining room captain or manager
25 position filled?   11:52:03

Page 497

1  R. Rizzuto
2  A. Yes.
3  Q. And do you know who filled that?
4  A. I think it was Brian Davis.
5  Q. Do you know when he was hired?   11:52:11
6  A. I don't.
7  Q. Is there someone named Roger?
8  A. Echuarie, E-C-H-U-A-R-I-E.
9  Q. And do you know when Mr. Echuarie was
10 hired?   11:52:27
11 A. No, but maybe that was the position
12 that we hired.
13 Q. Do you know what his position is?
14 A. Dining room manager.
15 Q. And do you know when he was hired?   11:52:36
16 A. I don't know the date, no.
17 Q. Do you know what his salary was?
18 A. I think it was in the range of 38 to
19 41 maybe. Not positive.
20 Q. And the funding for that position came   11:52:55
21 from the elimination of the general manager
22 position?
23 A. I think it did.
24 Q. That was your plan; right?
25 A. Yes.   11:53:07

32 (Pages 494 to 497)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

Page 502

R. Rizzuto
2  Q. It seems like you are recalling
3  something?
4  A. Yes.
5  Q. What is it you are recalling?  11:57:52
6  A. Has something to do with the financial
7  part of that. I think it was a pool. I don't
8  know whether they did that last year or not.
9  There was one year they gave us a pool of dollars
10 that we had to allocate the different fully  11:58:03
11 proficient, proficient. I vaguely remember that,
12 but I couldn't explain it to you if I tried.
13 Q. My question though is if they give you
14 any recommendations on the distribution of highly
15 accomplished, fully proficient ratings for your  11:58:25
16 workforce?
17 A. Are you -- I just want to clarify.
18 Are you asking me do they give you
19 amounts that you are allowed to give in those
20 individual areas?  11:58:40
21 Q. No, that they recommend.
22 A. I don't know if that's what that
23 criteria was about because I haven't used it.
24 There was one year and it might have been a couple
25 of years ago and we had a different director of  11:58:52

Page 503

R. Rizzuto
2  human resources, so I don't know.
3  MR. FILOSA: Please mark this.
4  (Rizzuto Exhibit 28, a two-page
5  document Bates stamped D 03264 through 3265,  12:00:04
6  marked for identification, as of this date.)
7  Q. Now you have been shown a document
8  that's been marked Rizzuto Exhibit 28. It is a
9  two-page document Bates stamped D 03264 through
10 3265. Please review it and let me know when you  12:00:09
11 are ready.
12 A. Okay.
13 Q. And do you recall receiving this
14 document?
15 A. I do.  12:00:16
16 Q. And what is it?
17 A. It is a guideline criteria for the PDP
18 evaluation program.
19 Q. And it includes -- it references the
20 different performance assessment categories; do  12:00:31
21 you see that?
22 A. It does.
23 Q. And it gives you some explanation as
24 to when these categories should be used?
25 A. It does.  12:00:39

Page 504

R. Rizzuto
2  Q. And it also gives you a recommend
3  distribution for each category; right?
4  A. Yes, it does.
5  Q. And it indicates for highly  12:00:46
6  accomplished the recommended distribution is 15
7  percent of the workforce; do you see that?
8  A. Yes.
9  Q. Is that something that you follow at
10 the de Seversky Center?  12:00:53
11 A. No.
12 Q. Why not?
13 A. I use this tool specifically with an
14 individual on what their performance is or not.
15 Q. And this also indicates that the de  12:01:06
16 Seversky Center, NYIT for fully proficient
17 recommends a distribution of 70 percent of the
18 workforce?
19 A. Yes.
20 Q. And you also don't follow that either?  12:01:20
21 A. No.
22 Q. Why not?
23 A. As I said, I wouldn't be filling out
24 these evaluations wouldn't be true to what they
25 are if I fill them out and said okay, I need to  12:01:36

Page 505

R. Rizzuto
2  take 70 percent of my workforce and give them a
3  fully proficient if that person wasn't fully
4  proficient.
5  Q. So you didn't believe that -- strike  12:01:46
6  that.
7  Do you have any idea in the last
8  performance in the last fiscal year how many
9  employees received a fully proficient rating?
10 A. In my department?  12:02:00
11 Q. At the de Seversky Center.
12 A. I do not, but it wasn't many.
13 Q. That's probably well short of 70
14 percent?
15 A. Very well short.  12:02:12
16 Q. Do you not believe that the de
17 Seversky Center's doing a good job in the service
18 it provides or the performance?
19 A. No. That's not the part of it. It is
20 that for me an employee has to do their position.  12:02:23
21 They need to perform within their expectation that
22 they were given and can be rated on that. How
23 they are performing to their expectation.
24 College doesn't use an expectation
25 system. I use expectation system. I don't know  12:02:46

Page 506

1 R. Rizzuto
2 that they are using this anymore to be honest with
3 you. I don't remember seeing this last year. I
4 know Carol didn't also did not agree with the way
5 this was set up and there was a lot of problems  12:03:01
6 with the system and that was one thing that she
7 had vowed to try and change. I haven't gotten any
8 information so far I don't believe on this for
9 this year yet.
10 Q. And this was put out in June of 2009  12:03:14
11 though; right?
12 A. June 15, 2009, yeah.
13 Q. And this is for use in the 2009 fiscal
14 year performance reviews?
15 A. Yes.  12:03:25
16 Q. And when did Miss Jablonsky vow to
17 change this?
18 A. One of the things is when she started
19 her job that she became a human resources
20 director.  12:03:37
21 Q. And she communicated this to you?
22 A. Yes.
23 Q. When was that?
24 A. Probably after the first year she --
25 probably after the first year she had experienced  12:03:45

Page 507

1 R. Rizzuto
2 this system.
3 Q. So that would have been after the 2010
4 fiscal year?
5 A. Yes.  12:03:56
6 MR. FILOSA: Mark these as 29 and 30
7 please.
8 (Rizzuto Exhibit 29, a three-page
9 document Bates stamped D 08630 through D
10 08632, marked for identification, as of this  12:05:40
11 date.)
12 (Rizzuto Exhibit 30, a three-page
13 document Bates stamped D 08627 through D
14 08629, marked for identification, as of this
15 date.)  12:05:24
16 Q. Now Mr. Rizzuto, you have been shown
17 two documents. The first marked Rizzuto Exhibit
18 29. The second marked Rizzuto Exhibit 30.
19 Rizzuto Exhibit 29 is a three-page
20 document Bates stamped D 08630 through D 08632.  12:05:34
21 Rizzuto 30 is a three-page document
22 Bates stamped D 08627 through D 08629. Please
23 review these and let me know when you are ready.
24 A. Ready.
25 Q. And do you recognize what these are?  12:05:55

Page 508

1 R. Rizzuto
2 A. Yes.
3 Q. What are they?
4 A. They are printouts or read outs of the
5 hand-scanned system at the de Seversky Mansion.  12:06:03
6 Q. And if you look at the first one the
7 first one is for you?
8 A. Yes.
9 Q. And the one marked Rizzuto Exhibit 30
10 is for Mr. Baffo?  12:06:14
11 A. Yes.
12 Q. And if you could turn to -- well,
13 strike that.
14 What these reflect is the time that
15 you swipe in and out of work on a particular day  12:06:29
16 for a particular time period; right?
17 A. Yes.
18 Q. And if you look at the top of Rizzuto
19 29 you see it is the time period for September 1,
20 2009 through October 31, 2009?  12:06:41
21 A. Yes.
22 Q. And that's the same for Mr. Baffo
23 which is marked Rizzuto Exhibit 30?
24 A. Yes.
25 Q. If I could just direct your attention  12:06:50

Page 509

1 R. Rizzuto
2 to page 2 of Exhibit 29 which is yours, it shows
3 -- and I am directing you to the entry for Friday
4 October 2, 2009.
5 Do you see that?  12:07:03
6 A. Yes.
7 Q. It indicates that you swiped in at
8 5:18 a.m. and swiped out at 5:37 p.m.?
9 A. Yes.
10 Q. Do you believe that to be accurate?  12:07:11
11 A. Yes.
12 Q. And it says that you worked 12 hours
13 and 19 minutes that day?
14 A. Yes.
15 Q. Were you in the office the entire time  12:07:19
16 that day?
17 A. I have no idea.
18 Q. Well, how does it typically work? You
19 swipe in and swipe out?
20 A. The swiper is in the office itself.  12:07:29
21 So you will come in and you will swipe in and at
22 the end of the day when leaving we will swipe out.
23 Q. So it doesn't -- strike that.
24 How many other -- are you typically
25 outside of the office on any given day?  12:07:46