# Exhibit 30

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
ANTHONY BAFFO,
          Plaintiff,   Index No.
                       10 Civ 1245
   -against-     (LDW)(ETB)

NEW YORK INSTITUTE OF TECHNOLOGY;
ROBERT RIZZUTO, in his official and
individual capacities; and LEONARD
AUBREY, in his official and individual
capacities,
          Defendants.
------------------------------x

          February 25, 2011
          10:00 a.m.

     Deposition of CAROL JABLONSKY, held at the offices of Thompson Wigdor & Gilly LLP, 85 Fifth Avenue, New York, New York, pursuant to Notice, before Lynne D. Metz, a Shorthand Reporter and Notary Public of the State of New York.

VERITEXT REPORTING COMPANY
212-267-6868                    516-608-2400

---

Page 2

APPEARANCES:

   THOMPSON WIGDOR & GILLY LLP
   Attorneys for Plaintiff
      85 Fifth Avenue
      New York, New York 10003
   BY:  GREGORY N. FILOSA, ESQ.,
         and
       MATTHEW GORMAN, ESQ.,
         of Counsel

   FULBRIGHT & JAWORSKI L.L.P.
   Attorneys for Defendants
      666 Fifth Avenue
      New York, New York 10103
   BY:  NEIL G. SPARBER, ESQ.,
         of Counsel

ALSO PRESENT:
   Anthony Baffo

VERITEXT REPORTING COMPANY
212-267-6868                    516-608-2400

---

Page 3

    IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that: All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

    This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R. and shall be controlled thereby.

    The filing of the original of this deposition is waived.

VERITEXT REPORTING COMPANY
212-267-6868                    516-608-2400

---

Page 4

CAROL JABLONSKY, called as a witness, having been first duly sworn by the Notary Public (Lynne D. Metz), was examined and testified as follows:
EXAMINATION BY
MR. FILOSA:
   Q.   Good morning, Miss Jablonsky. My name is Gregory Filosa and I am an attorney with Thompson Wigdor & Gilly and we represent the plaintiff Anthony Baffo in a lawsuit that he's filed against New York Institute of Technology as well as Robert Rizzuto and Leonard Aubrey relating to the complainant with the New York Institute of Technology, and we called you here today to answer a number of questions we have related to the lawsuit.
       Could you please state your full name for the record?
   A.   Carol Jablonsky.
   Q.   Have you gone by any other names?
   A.   No.
   Q.   Are you married?
   A.   No.
   Q.   And your date of birth?

VERITEXT REPORTING COMPANY
212-267-6868                    516-608-2400

Page 61

C. Jablonsky

Q. The information that's contained on here, did you have a meeting with someone before this was presented to you or you discussed the same topics that are outlined on this?

A. I would have had a conversation with the general counsel regarding this and that information would have been shared with outside counsel.

Q. Was anyone else present for this conversation that you had with Mr. Kloepfer that preceded this affidavit?

A. I don't know when this was specifically created, but there was not one conversation to create this one document.

Q. But this was signed by you on November 12, 2009?

A. Yes.

Q. And do you know why this was provided to the New York State Division of Human Rights?

A. I would say it was in response to providing information for the complaint.

Q. And you reviewed this before you signed it?

A. Yes.

Page 62

C. Jablonsky

Q. Was everything contained in this affidavit true and accurate at the time you signed it?

A. Yes.

Q. And the information here is true and accurate as the information you are testifying to today?

A. Yes.

Q. And the information here you understood that it was important to make sure that the information in this affidavit was true and accurate; correct?

A. Yes.

Q. Because you were providing it to the New York State Division of Human Rights?

A. Yes.

Q. As part of their investigation of a complaint that Mr. Baffo had made; is that correct?

A. Yes.

Q. But when you reviewed this you don't recall making or suggesting any changes to the content of the affidavit?

A. No. I don't recall making any

Page 63

C. Jablonsky

changes.

MR. FILOSA: Let's take a short break.

(Recess taken.)

BY MR. FILOSA:

Q. Referring back to Jablonsky Exhibit 1, I want to direct your attention to the first paragraph. You indicate you began your employment with NYIT on Tuesday October 13, 2009?

Is that correct?

A. Yes.

Q. And skipping to the next sentence you say: On Friday October 16, 2009 at the request of Len Aubrey, NYIT's chief financial officer and treasurer, I met with Mr. Aubrey and with Robert Rizzuto, NYIT's Director of Dining Services, to discuss their areas of concern.

Do you see that?

A. Yes.

Q. And this meeting with Mr. Aubrey and Mr. Rizzuto on October 16, 2009, was this the first time you met with them?

A. Yes.

Q. And it says it was at the request of Len Aubrey.

Page 64

C. Jablonsky

Did Mr. Aubrey request that you meet with them? Did Mr. Aubrey request that you meet with him and Mr. Rizzuto?

A. What was happening during my first week is that I was to meet with all of the vice-presidents if possible. He chose that date and that time.

Q. So when you say at the request of Len Aubrey, you are referring just to the date and time of the meeting?

A. Yes, yes.

Q. Because you were scheduled to meet with him, he was the vice-president of NYIT?

A. Yes.

Q. And why were you meeting with all the vice-presidents?

A. As the new Director of Human Resources it was important to me to know the senior players at NYIT.

Q. And was this your idea or was it someone above you's idea to meet with all the VPs?

A. It was not my idea. It was set up for when I came in. Whose idea it was I don't know.

Q. As the Director of HR you report to

Page 65

```
 1                  C. Jablonsky
 2   Stephen Kloepfer?
 3       A.   Yes.
 4       Q.   And he is the general counsel?
 5       A.   Yes.
 6       Q.   Do you report to anyone else?
 7       A.   Not directly.
 8       Q.   Do you indirectly report to anyone?
 9       A.   Well, through Stephen up to Edward
10   Guiliano.
11       Q.   Who is Mr. Guiliano?
12       A.   He is the president of NYIT.
13       Q.   And the spelling of his last name is G
14   --
15       A.   G-U-I-L-I-A-N-O.
16       Q.   And you met with Mr. Aubrey and Mr.
17   Rizzuto on October 16, 2009 you indicated to
18   discuss their areas of concern.
19            What do you mean by that?
20       A.   The meeting was set up with each of
21   the vice-presidents as an introduction and to see
22   what was going on in their areas. What they might
23   ask of human resources.
24       Q.   And had Mr. Aubrey or Mr. Rizzuto
25   discussed any areas of concern that they might
```

Page 66

```
 1                  C. Jablonsky
 2   have before that meeting?
 3       A.   No.  That was my very first
 4   introduction to Mr. Aubrey and I didn't even know
 5   that Robert Rizzuto was going to be at that
 6   meeting.
 7       Q.   Was Mr. Rizzuto there for the whole
 8   meeting?
 9       A.   Yes, with me. It appears he had been
10   there beforehand.
11       Q.   So when you arrived at the meeting Mr.
12   Rizzuto and Mr. Aubrey were already together in
13   presumably Mr. Aubrey's office?
14       A.   Yes.
15       Q.   Do you know whether or not they had
16   been meeting before your meeting?
17       A.   I don't know, but he was not waiting
18   with me prior to the meeting. So he arrived
19   before me.
20       Q.   Where were you waiting prior to the
21   meeting?
22       A.   The way that office is set up is that
23   there is sort of a front office with his
24   administrative assistant and someone that works
25   for another area and then his office is over to
```

Page 67

```
 1                  C. Jablonsky
 2   the side. So I was in that front area and when I
 3   walked into Len Aubrey's office the two of them
 4   were sitting at the conference table in his
 5   office.
 6       Q.   Were you waiting long for Mr. Aubrey?
 7       A.   No.
 8       Q.   But when you got there -- strike that.
 9            Did you wait for any period of time?
10       A.   Just long enough for the
11   administrative assistant to let him know that I
12   was there.
13       Q.   And then you went in and Mr. Rizzuto
14   and Mr. Aubrey were already there?
15       A.   Yes.
16       Q.   And you hadn't had any discussions
17   with Mr. Aubrey prior to that meeting?
18       A.   No.
19       Q.   And how long was the meeting with Mr.
20   Aubrey and Mr. Rizzuto?
21       A.   I don't recall specifically, but I
22   would say probably around 45 minutes.
23       Q.   What did you and Mr. Aubrey and Mr.
24   Rizzuto discuss during this meeting?
25       A.   The structure of his area. He is the
```

Page 68

```
 1                  C. Jablonsky
 2   chief financial officer and has a number of
 3   different groups underneath him, one of which is
 4   dining services with Robert Rizzuto and then they
 5   proceeded to explain to me that they were doing
 6   the reorganization.
 7       Q.   Now you say that they indicated that
 8   they were doing a reorganization.
 9            What specifically did they say about
10   the reorganization?
11       A.   They said that they had been working
12   on this reorganization for a while and that
13   because there was no human resources director in
14   the interim between when the former moved over to
15   the global side and my arrival, they were waiting
16   for me to arrive to discuss this action.
17       Q.   Now you say they said they were
18   working on this for a while.
19            Did they say anything other than that,
20   that they were working on this for a while? I am
21   trying to get an understanding as to what they
22   meant by they had been working on this for a
23   while, to the extent you know.
24       A.   I didn't get specific dates. They
25   spoke about some of the financial reasons for it
```

Page 69

C. Jablonsky

and that they were looking to hire some other people in place of Mr. Baffo.

Q. What were the financial reasons that they discussed?

A. They were not specific other than Robert Rizzuto felt that he could do better with a reorganization versus the current status.

Q. What do you mean by financial reasons?

A. NYIT is a not for profit and many of the areas don't focus on bottom line dollars and cents. Robert Rizzuto's areas truly do look at budget, finance, bottom numbers, gains, losses. So he was talking about his overall position financial.

Q. What did he say? How did this reorganization that they were planning play? How did it address these financial concerns that he had had?

A. They didn't share that --

Q. To the extent you know.

A. They didn't share that with me specifically. We didn't discuss any numbers.

Q. So what specifically did Mr. Rizzuto say about the reasons for the reorganization?

Page 70

C. Jablonsky

A. At that meeting Len Aubrey did most of the talking.

Q. What did Mr. Aubrey say about the need, the reasons for the reorganization?

A. Very generally, that it was financial in nature and that they were looking to reorganize to help the position.

Q. Do you recall him saying anything else?

A. Regarding what aspect?

Q. Regarding the reasons for the reorganization other than the financial nature and looking to reorganize to help the position.

A. No. I only remember financial.

Q. Did they discuss Mr. Baffo's performance during this meeting?

A. No.

Q. Did you discuss any other areas of concern for Mr. Aubrey or Mr. Rizzuto other than the reorganization of the de Seversky Center?

A. Nothing that I remember specifically because this conversation regarding the reorganization was the last topic of the meeting.

Q. What other topics were discussed at

Page 71

C. Jablonsky

the meeting?

A. As I said, at the meeting general organization structure and things like that. If anything else was mentioned it was not important.

Q. Did any of these other topics pertain to Mr. Rizzuto?

A. No.

Q. So he didn't need to be at the meeting for those other topics?

A. No.

Q. Did they say during this meeting when they began discussing this plan to reorganize the de Seversky Center?

A. Not specifically.

Q. Did either Mr. Aubrey or Mr. Rizzuto indicate whose plan it was?

A. No. Not at that time nothing was said regarding the genesis of this plan.

Q. But you had talked a little bit earlier that Mr. Rizzuto had indicated that he felt he could do better from a financial standpoint with the reorganization?

A. Right.

Q. So did you have any understanding as

Page 72

C. Jablonsky

to whether or not it was Mr. Rizzuto that had come up with a plan or Mr. Aubrey?

A. No. They spoke as a unit. They were both on the same page.

Q. And did they say how -- let me direct your attention to paragraph 3 on page 2.

A. Okay.

Q. You indicate: During this meeting they spoke about plans they have been developing to reorganize the management at the de Seversky Conference Center on NYIT's Old Westbury Long Island campus.

My question is: Did they discuss how management would be reorganized as part of this reorganization?

A. I remember they mentioned names, but because it was the third, fourth day I didn't have any context. I don't remember.

Q. Do you know whether or not their plans -- but you do remember they talked about eliminating Mr. Baffo's position?

A. Yes.

Q. Do you know what his position was at that time?

Page 73

C. Jablonsky

A. No. Not specifically. Just that it was a management position and it was being replaced by lower level positions.

Q. Do you know whether or not they had discussed eliminating any other positions other than Mr. Baffo's position?

A. Not with me at that time.

Q. So basically your understanding -- is it fair to say that your understanding of the plan was to eliminate Mr. Baffo's position and replace it with more than one or a number of other lower level positions?

A. That was the part that I was involved in.

Q. And what was your understanding at that meeting as to how that would improve de Seversky Center's financial position?

A. That was not part of the meeting.

Q. Did Mr. Rizzuto say anything about how eliminating this position would improve the de Seversky Center's financial position?

A. Not specifically to me, no.

Q. Now at the time were there any other layoffs or restructuring at NYIT?

---

Page 74

C. Jablonsky

A. Not at that time that I was aware of.

Q. Was there a restructuring or layoffs at another time that you are aware of?

A. I have been told that there was a restructuring. That was truly a layoff over the summer and it was university wide in a number of different areas.

Q. And do you know whether or not there was any layoffs or reduction in force at the de Seversky Center? And when you say the summer, you are talking about the summer of 2009?

A. Yes.

Q. Do you know whether or not there were any layoffs or reduction in force at the de Seversky Center in the summer of 2009?

A. No. I didn't see a list.

Q. When you say that was truly a layoff, what do you mean?

A. That the way it was explained to me is that they were eliminating positions.

Q. And that was university wide?

A. Yes.

Q. So the university had given some instruction to different departments and divisions

---

Page 75

C. Jablonsky

about eliminating positions or expenses from the budget?

A. That happened prior to me. I don't know.

Q. What was your understanding of that layoff process?

A. I did not get into the reasons for it from a human resources perspective. I just knew about it from a practice of what have we done in the past kind of thing.

Q. But you knew that was a university wide layoff?

A. Yes.

Q. But you don't know whether or not there was also a layoff at the de Seversky Center as part of that university wide layoff?

A. I don't know who was involved in that layoff. So no, I don't know.

Q. Now this restructuring that Mr. Rizzuto and Mr. Aubrey were talking about, that was not part of a university wide layoff?

A. No. That was an independent action as far as I am aware.

Q. So you are not aware of the

---

Page 76

C. Jablonsky

instruction from -- strike that.

Who did Mr. Aubrey report to?

A. He reports directly to the president Edward Guiliano.

Q. Are you aware of any instruction from Mr. Guiliano with respect to eliminating staff or budget in conjunction with this reorganization that Mr. Aubrey and Mr. Rizzuto were discussing?

A. I am not aware of any.

Q. So you don't know if Mr. Rizzuto or Mr. Aubrey were asked to eliminate positions or reduce head count or cut expenses?

A. No, I don't know.

Q. Now going on to the second sentence in paragraph 3 you say: Part of the plan was to eliminate the general manager position then occupied by Anthony Baffo and divide most of the general manager duties between two existing positions (Robert Rizzuto, Director of Dining Services and Eric Redlich, Manager Catering Sales).

You indicate at the start of that that part of the plan was to eliminate his position. What other parts of this plan were discussed at

### Page 77

C. Jablonsky

this meeting?

A. Not with me. How that was to specifically play out I don't know. I know that -- that's the next sentence.

Q. But what I am trying to get an understanding of is: Are there other parts of the plan other than eliminating the general manager position?

A. Yes.

Q. What were those parts of the plan?

A. As far as I know it was the lower level employees who were going to be hired to fill in certain gaps.

Q. So the entire plan was to eliminate the general manager position and hire other lower level positions to fill in those gaps?

A. What I understood from that meeting was the general manager's position would be eliminated. Part of that work would go to other senior managers and part would go to lower level employees.

Q. Was there any discussion as to these new -- strike that.

These lower level positions, were they

### Page 78

C. Jablonsky

preexisting or were they new positions; was there any discussion of that?

A. Not specifically. No.

Q. Was there any discussion what the salary of these positions would be?

A. No.

Q. Any discussion of what the benefits of these positions would be?

A. No.

Q. Any discussion of whether or not there would be any increase in the senior positions that would take on additional duties as part of the elimination of the GM position?

A. When you say increase you mean financial?

Q. Yes.

A. Not that I am aware of.

Q. Anything non-financial that would increase as a result of that?

A. The amount of work that they needed to take on.

Q. But their compensation?

A. No.

Q. No, that wasn't part of the plan or

### Page 79

C. Jablonsky

no, there was no discussion at that meeting?

A. There was no discussion of that and as far as I am aware there was no plan for that.

Q. Now you go on in the next sentence to say: In anticipation of that action NYIT had already started recruiting for two lower level employees and you designated dining room captain and sales associate position. You say would round out the balance of the work that would need to be done following the elimination of the GM position. Do you see that?

A. Yes.

Q. And what do you mean when you say in anticipation of that action?

A. In anticipation of eliminating the general manager's position and sharing that. NYIT had started to already recruit for the lower level employees who were also part of this overall plan.

Q. So did you have any understanding as to whether or not -- strike that.

These positions were already being recruited for at the time?

A. That's what I learned afterwards. I hadn't started until October 13th, so I didn't

### Page 80

C. Jablonsky

know that at the time.

Q. Did Mr. Rizzuto or Mr. Aubrey say anything at this meeting about having already been recruiting for these positions?

A. It was maybe half a sentence because we were focused on the more senior parts of it.

Q. What do you mean when you say focused on the more senior parts of it?

A. The elimination of the general manager, the distribution of the duties with that reorganization.

Q. What do you mean when you say the distribution of the duties?

A. Between Robert Rizzuto and Eric.

Q. Eric Redlich?

A. Yes. I am sorry.

Q. Was there any discussion at this meeting about what duties would be assigned to -- strike that.

Was there any discussion at this meeting about what duties Mr. Rizzuto would take on as part of the elimination of the general manager position?

A. Not that I recall, but again, as it

Page 81

C. Jablonsky

was my first few days I wouldn't have understood necessarily a specific name or title at that point.

Q. Now you had said you subsequently learned that they had been -- strike that.

You said you had subsequently learned that NYIT had been recruiting for these two lower level positions prior to your employment and prior to your meeting with Mr. Rizzuto and Mr. Aubrey; is that correct?

A. Yes.

Q. And what did you learn about -- strike that.

What was your understanding of these positions and the recruitment that had gone on up to that point?

A. What I understood was that this overall plan had already been put into place and that they were looking to fill those lower level positions.

Q. What had been done to put this overall plan into place?

A. It was prior to my joining. I don't know.

Page 82

C. Jablonsky

Q. But what did you subsequently learn had been done to put this into place prior to your joining or the meeting?

A. What I know is that they were looking to hire these positions. Specifically how that was done I don't know.

Q. But are you aware of anything that was done other than starting to recruit for these two positions?

A. No.

Q. What was your understanding as to what when these positions had I guess -- strike that.

What is the process if someone at NYIT, if a department wants to hire a new employee, is there a procedure they have to go through?

A. There is nothing a hundred percent set in stone. Different areas of the university do it differently. So there is no one procedure in place for that.

Q. Do you have any understanding of what the procedure is in place for the de Seversky Center?

A. Not at all levels of the organization.

Page 83

C. Jablonsky

HR is involved in the more senior levels of the organization.

Q. But in order to recruit for a position, does HR need to -- strike that.

If the de Seversky Center wanted to recruit for a position, do they need to obtain approval from HR or anyone else within the organization?

A. There is no hard and fast policy on that. HR is available to help, but when it comes down to certain positions, especially the lower level positions, HR may or may not be involved.

Q. Do you know whether HR was involved, I understand this is prior to your time, but do you know whether HR was involved in recruiting for these two lower level positions, the dining room captain position and the sales associate position?

A. No, I don't.

Q. Did you do anything to look into what, whether or not HR had any involvement in recruiting for these two positions?

A. No.

Q. You indicate that NYIT had already started recruiting for two lower level employees.

Page 84

C. Jablonsky

What was your understanding of what NYIT had done to start recruiting?

A. I had been told they had started to recruit and I know that ads had been placed asking for candidates, but I didn't go further than that.

Q. And who told you that; who told you that they had begun recruiting?

A. That was Robert and Len.

Q. And was that in that meeting with them on the 19th of October?

A. I don't recall if it was at that meeting.

Q. Strike that, I apologize. That was the 16th of October.

A. The dates, I don't recall if it was at that meeting or at a subsequent time.

Q. But at some point either Len Aubrey or Robert Rizzuto told you that they already had been recruiting for those two positions?

A. Yes.

Q. Did you ever look up the recruitment -- strike that.

There is something, a form or procedure that NYIT uses that's known as an RA?

Page 89

C. Jablonsky

Q. Do you know did they indicate whether or not -- strike that.

Were there any approvals that would be required in order to put into place a reorganization?

A. I didn't know what the policies of NYIT was on that Friday.

Q. Have you subsequently learned whether or not any approvals were required for a reorganization either within the de Seversky Center or just generally within NYIT?

A. I learned what NYIT's practices are regarding that.

Q. What are NYIT's practices regarding that?

A. The general way these things happen is that within the business unit a decision is made regarding structure, organization, number of positions. That type of thing. The vice-president of that area needs to approve that plan. At that point it comes to human resources and we put the documentation together in meeting that approval and any supporting documentation they may wish to provide. Show that to the

Page 90

C. Jablonsky

general counsel. General counsel would either ask questions or agree and then HR would implement taking whatever actions are necessary whether it's termination of employment, something called a COS, change of status, to move someone into a different position, a different location. That type of thing.

Q. So generally it starts though with the business unit and the vice-president of the business unit approving it?

A. Yes.

Q. You indicated you subsequently learned what the practice was.

When did you learn? Do you recall when you learned what the practice was for the reorganization at NYIT?

A. Sometime after the meeting with Len on Friday and before the meeting with Robert on Monday.

Q. And did you have any understanding at that meeting with Mr. Aubrey and Mr. Rizzuto whether or not Mr. Aubrey had already approved the reorganization from -- I guess he was the vice-president of the business unit; right?

Page 91

C. Jablonsky

A. Yes.

Q. Do you know whether he approved the reorganization on his end?

A. He spoke about it as a done deal. So without formally saying the words I approve this reorganization, he was the one presenting it to me for implementation.

Q. And did you have an understanding as to -- was your expectation he approved it prior to that meeting, I mean prior to the October 16th meeting?

A. When you say my expectation?

Q. Your understanding, the way he was talking about it and it was presented to you as a done deal and already had been approved, did you get the sense that it was something that he had approved days or weeks prior to the meeting or was it something that had been done just on the day of the meeting?

A. The conversations were all past tense. It sounded like this had been decided a while ago.

Q. Now going on paragraph 4 you indicate: That you met with Robert Rizzuto on Monday October 19th in order to get details of the planned

Page 92

C. Jablonsky

action, a memo outlining the changes and new organization charts.

Do you see that?

A. Yes.

Q. Now whose idea was it to meet with Mr. Rizzuto on October 19th?

A. It was my idea at the Friday meeting that I needed to gather information and then get back in touch because I couldn't answer questions about implementation because I didn't know NYIT's policies, practices.

Q. And at this meeting did you -- strike that.

Prior to this meeting on Monday October 19th did you discuss with Mr. Rizzuto -- you say get details of the planned action, a memo outlining changes in the new organization charts.

Did you ask him to provide those at that meeting?

A. No. That is what was discussed at the meeting.

Q. That was what was discussed at the October 19th meeting?

A. Yes.

VERITEXT REPORTING COMPANY
212-267-6868    516-608-2400

Page 93

C. Jablonsky

Q. Did Mr. Rizzuto provide you with a memo outlining the changes or new organizational charts prior to the October 19th meeting?
A. No. I hadn't asked for them.
Q. Did you ask for them at that meeting?
A. Yes.
Q. Why did you ask for these, the memo and the organizational charts at the meeting?
A. Because I found out that was the documentation NYIT would like to have before implementing this action.
Q. Do you know whether or not those documents had been prepared prior to that meeting?
A. I don't know firsthand.
Q. Is it your understanding that he provided these to you after that meeting?
A. Yes.
Q. Do you know when your meeting with Mr. Rizzuto was on the 19th?
A. I don't recall what time of day.
Q. Do you know where the meeting was?
A. My office.
MR. FILOSA: Let's mark this as Jablonsky Exhibit 2 please.

Page 94

C. Jablonsky

(Jablonsky Exhibit 2, information regarding a meeting Bates stamped D03273, marked for identification, as of this date.)
Q. Please look at what is Jablonsky Exhibit 2.
A. I did.
Q. Do you recognize this?
A. Yes.
Q. What is it?
A. It's information regarding a memo, a meeting that I set up from my calendar.
Q. Is that the October 19th meeting with Mr. Rizzuto?
A. Yes.
Q. And does it indicate what time it was?
A. Yes, it does.
Q. What time is it?
A. 2:30.
Q. Did you meet with Mr. Rizzuto on more than one occasion that day the 19th?
A. I don't recall.
Q. So is it your understanding that the meeting occurred at 2:30 on the 19th?
A. Yes.

Page 95

C. Jablonsky

MR. FILOSA: Please mark this as Jablonsky Exhibit 3.
(Jablonsky Exhibit 3, a two-page document Bates stamped D 03307 through 08, marked for identification, as of this date.)
Q. The court reporter is showing you what has been marked as Jablonsky Exhibit number 3. It is a two-page document Bates stamped D 03307 to through 08.
A. Yes.
Q. Have you seen this document before? Strike that.
This is an e-mail with an attachment; is that fair to say?
A. Yes.
Q. And it is an e-mail from Robert Rizzuto to you dated October 19, 2009?
A. Yes.
Q. Sent at 7:48 in the morning?
A. Yes.
Q. Do you recall receiving this e-mail?
A. Not specifically.
Q. There is an organizational chart attached that is headed Food Services Staffing

Page 96

C. Jablonsky

Chart.
Do you recognize that?
A. I have seen it before.
Q. This doesn't pertain to the de Seversky Center or does it?
A. No.
Q. So the food services staffing is a separate -- strike that.
So food services is a separate department or division within NYIT?
A. Yes. As I described before, Robert has the de Seversky Center and then knows cafeterias, the food services in the student buildings that report up to him as well.
Q. This is related to the non de Seversky part that Mr. Rizzuto is responsible for?
A. Correct.
Q. Do you have any idea why he sent it to you on October 19th?
A. I don't specifically recall, but it would help me understand the structure underneath Len Aubrey and his most senior people.
MR. FILOSA: Please mark this as Jablonsky Exhibit 4.

## Page 97

C. Jablonsky

(Jablonsky Exhibit 4, a two-page document Bates stamped D 03305 through 06, marked for identification, as of this date.)

Q. Now you have been shown a document that's been marked as Jablonsky Exhibit 4. It is a two-page document Bates stamped D 03305 through 06. Please review it and let me know when you are ready.

A. Okay.

Q. This is like Jablonsky 3. It is an e-mail with an attachment that was sent to you by Mr. Rizzuto; is that correct?

A. Yes.

Q. And it indicates it was sent on Monday October 19, 2009 at 2:11 p.m.?

A. Yes.

Q. And it attaches an organizational chart for the de Seversky Center?

A. Yes.

Q. Was it your understanding this was the organizational chart before or after the reorganization?

A. I don't think I knew at the time necessarily what he meant it to be.

## Page 98

C. Jablonsky

Q. And your meeting with him was at 2:30?

A. Yes.

Q. So he sent this in advance of that meeting.

Did you discuss this at the meeting?

A. Not specifically, no.

Q. Do you know why -- strike that.

If you look at page 2 of the exhibit, the organizational chart, at the top is Anthony Baffo, general manager?

A. Yes.

Q. So would this be fair to say it was before the reorganization?

A. Yes.

Q. Because if it was after he wouldn't be at the top of the organizational chart?

A. Correct.

Q. And did you have any understanding as to whether or not Mr. Rizzuto had drafted an organizational chart for the restructure or reorganized de Seversky Center prior to your meeting?

A. No. That would have been discussed at the meeting.

## Page 99

C. Jablonsky

Q. Were you surprised that one hadn't been drafted prior to your meeting?

A. I didn't know whether one had or had not.

Q. But the fact that -- strike that.

One wasn't drafted though prior to the meeting?

A. I don't know that.

Q. If Mr. Rizzuto hadn't drafted an organizational chart prior to that meeting, would you have been surprised?

A. Could you ask the question again?

Q. If Mr. Rizzuto had not drafted any reorganizational chart for the de Seversky Center prior to your October 19th meeting, would you have been surprised by that?

A. I can't say it would have surprised or not surprised me.

Q. If this was a done deal already, would you have expected a new organizational chart would have been drafted prior to the deal being done?

A. No. Based on what I have seen at NYIT, organization charts are not maintained or maintained well.

## Page 100

C. Jablonsky

Q. Turning back to Jablonsky Exhibit 1, it indicates at paragraph 4 that you met with Mr. Rizzuto on October 19, 2009?

A. Yes.

Q. What did you discuss at this meeting with him?

A. I asked him for anything and everything he may have in connection with this so I could gather the information, present it to the general counsel.

Q. And did he indicate what he had, what existed at that time?

A. Not that I remember outlining specific documents, no.

Q. So did you ask him to provide anything?

A. I asked him to provide whatever he had. I don't remember the specific words, but I would have asked him if he had Len Aubrey's approval because as I said, coming from a business unit that has to be done before HR would get involved.

Q. And did he say whether or not he had Len Aubrey's approval -- strike that.

Case 2:10-cv-01245-LDW-ETB   Document 39-30   Filed 10/11/11   Page 12 of 20 PageID #: 698

Page 101

C. Jablonsky

Q. Did you ask him to prepare a memo outlining the changes?
A. I had asked him for that information.
Q. Do you know whether or not a memo had been prepared prior to your meeting?
A. I don't know when it was prepared.
Q. Did you ask him to prepare one?
A. I asked him for the information. I didn't specifically give him the format that it needed to be presented in.
Q. When you said you asked him for the information, did you ask him to put it in writing?
A. Yes.
Q. Did you have any understanding as to whether or not he had put all the information in a writing prior to your meeting?
A. I don't know.
Q. But he didn't indicate that he had, did he?
A. Not that I remember. I remember trying to gather information and asking for information. I don't recall at that meeting specifics of what was, wasn't new.
Q. You go on to say in the second

Page 102

C. Jablonsky

sentence of paragraph 4: I reviewed these materials and made some changes for presentation to NYIT's general counsel Stephen Kloepfer.
A. Mm-hmm.
Q. Do you see that?
A. Yes.
Q. When you say you reviewed these materials, did Mr. Rizzuto provide with you these materials at the meeting?
A. Not at the meeting.
Q. He provided them after the meeting?
A. Correct.
Q. What did he provide you?
A. I don't recall all the specifics, but it would have been the approval from Len. It would have been some information regarding the reorganization and based on going backwards it was the organization charts.
Q. So that would have been the approval from Len, a memo outlining the reorganization?
A. Yes.
Q. As well as a reorganizational chart?
A. Yes.
Q. You indicated that you made some

Page 103

C. Jablonsky

suggested changes.
Q. Did you make the changes or did you just suggest them and Mr. Rizzuto to make?
A. I would suggest them to Mr. Rizzuto.
Q. What changes did you suggest?
A. I don't remember specifically, but Robert is not the best writer. I am sure there were misspellings. I am sure there were clauses instead of sentences. That type of thing. So it would have been to just put it in a structure that I would feel comfortable presenting to the general counsel.
Q. Do you recall suggesting any substantive changes to the content of the memo outlining the reasons for the reorganization?
A. No.
Q. And what about the org chart, did you suggest any changes to the org chart?
A. No.
Q. You go on to say: I received the updated materials on Tuesday, October 20, 2009 and forwarded the information to Mr. Kloepfer. Do you see that?
A. Yes.

Page 104

C. Jablonsky

Q. Do you recall how you received the updated materials?
A. No.
MR. FILOSA: Please mark this as Jablonsky Exhibit 5.
(Jablonsky Exhibit 5, a three-page document Bates stamp D 03302 through 04, marked for identification, as of this date.)
Q. Miss Jablonsky, you have been showed a document marked as Jablonsky Exhibit 5. It is a three-page document Bates stamp D 03302 through 04. Please review it and let me know when you are ready.
A. Okay.
Q. Now the first page of this document is an e-mail attaching a two-page document; is that correct?
A. Yes.
Q. This is the e-mail from Mr. Rizzuto sent on October 20, 2009 at 12:25 p.m.; is that correct?
A. Yes.
Q. And in the e-mail on top Mr. Rizzuto says: Carol, attached is the memo that you

Page 105

C. Jablonsky

requested. Please let me know if it is informatory enough to move forward.

Now Mr. Rizzuto said attached is the memo that you requested. Do you recall whether or not you requested Mr. Rizzuto to provide a memorandum?

A. I don't recall, no.

Q. Do you know whether or not he drafted this previously or had drafted it in the 20 hours since your meeting the day before?

A. I don't know.

Q. Mr. Rizzuto appears to indicate that you requested that he provide this information. Did you tell him what information was needed?

A. I don't recall. I don't recall what I would have asked for.

Q. Do you recall giving him any other guidance as to what information was required or what was necessary?

A. I don't recall specifically having that conversation, but I would have asked for information regarding the reason for the reorganization, what the reorganization was. That

Page 106

C. Jablonsky

would have been what I would have asked for, but I don't remember a specific conversation.

Q. Now turning to page 2 of the memo.

A. Mm-hmm.

Q. Mr. Rizzuto is -- this memo is addressed to you; correct?

A. Yes.

Q. Did Mr. Rizzuto need your approval in order to move forward with the reorganization?

A. He needed to go through human resources, but that simply is a conduit to get into the general counsel. So it is a required step, but I wouldn't call it an approval.

Q. I am trying to get an understanding why he addressed the memo to you as opposed to general counsel.

A. Because I would be the one presenting it to the general counsel as an action.

Q. Now turning to the first line of the memo it states: With continued uncertainty regarding the economy.

Do you know what Mr. Rizzuto meant when he said by continued uncertainty regarding the economy?

Page 107

C. Jablonsky

A. I don't know specifically what he meant.

Q. Do you know did you ever discuss with him what affect any uncertainty regarding the economy could have on the de Seversky Center?

A. No. I would not have gotten into the financials with him. That would have been a decision, a discussion within his business unit and that's why we need to have the vice-president's approval on anything before we would get involved.

Q. My question though is: He didn't discuss with you what affect any uncertainty regarding the economy would have on the de Seversky Center?

A. No.

Q. And you never asked him what he meant by that?

A. No.

Q. Turning to the second sentence Mr. Rizzuto indicates: It is my feeling that we will continue to feel pressure through fiscal 2010. Did you have any understanding as to what Mr. Rizzuto meant by that?

Page 108

C. Jablonsky

A. No.

Q. Did he ever explain to you what he meant by that we will continue to feel pressure through fiscal 2010?

A. No.

Q. Did you ever ask him what he meant by that?

A. No.

Q. Did you have any understanding as to whether or not revenue at the de Seversky Center was up or down compared to the prior year?

A. No.

Q. Did Mr. Rizzuto ever discuss whether or not revenue was up or down compared to the prior year?

A. Discussed, no.

Q. Was it your understanding that he was concerned that revenue would go down as a result of this economic uncertainty?

A. I know he is concerned with his bottom line, but other than that I don't have any specifics.

Q. And the goal of this reorganization was to cut some expenses to effect the bottom

Page 109

```
 1                C. Jablonsky
 2   line; is that a fair statement?
 3        A.   That I don't know.
 4        Q.   Did Mr. Rizzuto ever express to you or
 5   discuss with you whether or not that was one of
 6   the goals of the reorganization was to cut the
 7   expenses?
 8        A.   No.
 9        Q.   Turning to the last sentence of this
10   paragraph it indicates:  That the following
11   recommendations with regards to consolidations;
12   will provide us with favorable profit margins even
13   with lower revenue numbers for fiscal 2010/2011.
14             Do you see that?
15        A.   Yes.
16        Q.   Did you have any understanding as to
17   how the recommendations which would follow would
18   affect the de Seversky Center's profit margins?
19        A.   No.
20        Q.   Did Mr. Rizzuto ever explain how these
21   recommendations would affect the de Seversky
22   Center's profit margins?
23        A.   No.
24        Q.   Do you know whether or not these
25   changes would have resulted in lower costs to the
```

VERITEXT REPORTING COMPANY
212-267-6868                                516-608-2400

Page 110

```
 1                C. Jablonsky
 2   de Seversky Center?
 3        A.   No.
 4        Q.   Did you ever discuss, did Mr. Rizzuto
 5   ever discuss with you whether or not these changes
 6   would result in lower cost?
 7        A.   No.
 8        Q.   Is it your understanding that --
 9   strike that.
10             Do you have any understanding as to
11   whether or not if these changes didn't lower
12   costs, how it could affect the profit margins at
13   the de Seversky Center?
14        A.   Human resources is not involved in
15   that part.  So no, I don't understand.
16        Q.   Who would have been involved in that
17   part of it?
18        A.   Len Aubrey.
19        Q.   Did you ever question whether or not
20   these recommendations would meet those goals?
21        A.   No.
22        Q.   From your position, was it a function
23   of HR to ask any of those questions?
24        A.   No.
25        Q.   HR's function was simply to act as a
```

VERITEXT REPORTING COMPANY
212-267-6868                                516-608-2400

Page 111

```
 1                C. Jablonsky
 2   conduit from the vice-president of the business
 3   unit to the general counsel; is that fair to say?
 4        A.   Yes.
 5        Q.   And why was the general counsel's
 6   approval needed for any reorganization?
 7        A.   NYIT's practice is that the general
 8   counsel is made aware of any termination of
 9   employment.
10        Q.   But what about if a reorganization
11   doesn't involve a termination of employment, would
12   the general counsel need to be involved?
13        A.   No.
14        Q.   So only when a reorganization includes
15   a termination is the general counsel involved?
16        A.   That the general counsel must be
17   involved.  As the director of HR I had made it a
18   practice to give him an FYI when other things are
19   going on, but there would be no need for an
20   approval.
21        Q.   Do you have any understanding as to
22   why the general counsel's approval was needed for
23   any termination?
24        A.   No.  NYIT's practice.
25        Q.   Do you agree with that practice?
```

VERITEXT REPORTING COMPANY
212-267-6868                                516-608-2400

Page 112

```
 1                C. Jablonsky
 2        A.   I never thought about it.
 3        Q.   So going through to the next paragraph
 4   it indicates:  My recommendation is to eliminate
 5   the general manager's position and segregate these
 6   responsibilities.
 7             Is that consistent with your
 8   understanding of what Mr. Rizzuto's recommendation
 9   was at that time?
10        A.   The use of the word segregate I am not
11   sure I understand.  My understanding was to
12   eliminate the general manager's position and have
13   other people pick up those parts.
14        Q.   And did Mr. Rizzuto explain why he was
15   selecting to eliminate the general manager's
16   position versus another position?
17        A.   No.
18        Q.   Did you ask why the GM position versus
19   another position?
20        A.   No.
21        Q.   Do you know if Mr. Rizzuto considered
22   eliminating other positions other than the general
23   manager position?
24        A.   I don't know.
25        Q.   Now going through the next paragraph,
```

VERITEXT REPORTING COMPANY
212-267-6868                                516-608-2400

Page 121

C. Jablonsky

1  revise the memorandum?
2      A.   I don't recall, but there is more
3  information in the second one than the first.
4      Q.   Did you ask that he provide more
5  information?
6      A.   I don't recall, but I would have to
7  assume.
8      Q.   Now if you could turn to page 2, I
9  just want to compare Jablonsky 6 and 5. If you
10 compare page 2 of each you will see -- looking at
11 the second paragraph, you will see the second
12 paragraph has some additional information there?
13     A.   Yes.
14     Q.   And specifically whereas Jablonsky 5
15 just says: My recommendation is to eliminate the
16 general manager's position and segregate these
17 responsibilities.
18          Jablonsky Exhibit 6 says: My
19 recommendation is to eliminate the general
20 manager's position currently held by Anthony
21 Baffo; and then goes on.
22          Did you recommend -- strike that. Did
23 you ask Mr. Rizzuto to make this change?
24     A.   I don't recall, but I would assume so.

Page 122

C. Jablonsky

1      Q.   And then the sentence goes on: And
2  use the funds to create the dining room captain/
3  sales associate position.
4           Did you ask Mr. Rizzuto to include
5  that information in the memo?
6      A.   I don't recall, but I assume so.
7      Q.   Do you know why you would have asked
8  him to include that information?
9      A.   If I asked specifically it would have
10 been to give more information, more specific
11 information about his plan.
12     Q.   At the meeting of the Friday before
13 had Mr. Rizzuto and Mr. Aubrey discussed using the
14 funds from eliminating the GM position to create
15 the dining room captain and sales associate
16 position?
17     A.   Not that I remember. I was not
18 focused on the funding aspects on it, of it.
19     Q.   But it was clear to you they made the
20 decision to eliminate the general manager
21 position?
22     A.   Yes. That position was no longer
23 going to be part of the structure.
24     Q.   And then in -- do you recall turning

Page 123

C. Jablonsky

1  now to the meeting on the 19th, do you recall
2  discussing with Mr. Rizzuto whether or not the
3  money that was saved from eliminating the general
4  manager position would be used for these specific
5  functions, the dining room captain and the sales
6  associate position?
7      A.   The 19th is Monday?
8      Q.   Yes.
9      A.   I don't recall, but human resources
10 does not get involved with the funding of these
11 actions. Our finance budget function would.
12     Q.   I understand that. My question is
13 whether or not you discussed not where the money
14 would come from or approving the funding, but just
15 using that money to fund these positions or assign
16 some of those duties to these positions.
17          Was there any discussions about these
18 specific job positions?
19     A.   We didn't discuss money.
20     Q.   What I am trying to understand is when
21 there was first a discussion about creating these
22 specific positions, the dining room captain and
23 the sales associate position, whether it was
24 discussed first at the October -- the Friday,

Page 124

C. Jablonsky

1  October 16th meeting or the Monday, October 19th
2  meeting.
3      A.   Again, I am sorry because I was new
4  that week. Whether or not somebody used a
5  specific title during that meeting or -- I came
6  away with the general concept I can't say what
7  specific titles or even names may have been used
8  at that point.
9      Q.   Now there is another two sentences
10 that are added in there which state: Also, I
11 would like to give our sales manager Eric Redlich
12 responsibility of overseeing the daily operations
13 of the de Seversky Center. I can fund all three
14 of these positions through the elimination of the
15 general manager position.
16          Do you have any understanding as to
17 why this information was added to the memo?
18     A.   No. It would be a further explanation
19 of the action.
20     Q.   And did you have any understanding as
21 to whether or not Mr. Rizzuto would be able to
22 fund all three -- strike that. The sentence says:
23 I can fund all three of these positions through
24 the elimination of the general manager position.

C. Jablonsky

AFTERNOON SESSION.
(1:36 p.m.)
CAROL JABLONSKY,
    having been previously sworn, resumed the
    stand and testified further as follows:
EXAMINATION (Cont'd)
BY MR. FILOSA:

Q. Miss Jablonsky, before the break we had been talking about, I think your meeting with Mr. Rizzuto from Monday, October 19, 2009. In the meeting with Mr. Rizzuto you discussed again the reorganization of the de Seversky Center and the decision to eliminate the general manager position.

In that meeting did you discuss with Mr. Rizzuto again the reasons for the reorganization, the financial reasons that underlie his request or recommendation for the reorganization?

A. No. My meeting with him would have focused on the HR aspects. It would just be me getting the approval from Stephen creating the documents, me getting the communication.

Q. So you weren't necessarily concerned

C. Jablonsky

at that point about the reasons for the organization or you didn't discuss the reasons at that meeting?

A. No. It was just I received approval from the vice-president. That part of it is finished.

Q. So Mr. Baffo's performance as general manager wasn't discussed during this meeting, was it?

A. No.

Q. Following your meeting with Mr. Rizzuto on the 19th, and we went through some of the documents that were exchanged on the 20th, you then met with Mr. Kloepfer; correct?

A. Yes.

Q. And that was on -- do you recall that was on October 20, 2009?

A. I don't recall specifically. I think so, but I don't recall specifically.

Q. Going back to the affidavit that we have been going through Jablonsky 1, at the end of paragraph 4 you indicated that you received the updated materials on Tuesday October 20, 2009 and forwarded the information to Mr. Kloepfer?

C. Jablonsky

A. Yes.

Q. Do you know whether or not you forwarded it to him the same day you received it or whether or not it was some point after?

A. I don't recall.

Q. But going on to paragraph 5 you indicate you received approval from Mr. Kloepfer and had Corina Hendea -- this is the Associate Director of HR that we talked about a little earlier today; correct?

A. Yes.

Q. And you had her prepare the standard severance agreement that NYIT presents to an employee whose position is being eliminated through reorganization.

Do you see that?

A. Yes, I see that.

Q. So you received approval from Mr. Kloepfer.

When did you receive this approval from him?

A. I don't recall which day it was.

Q. How did you receive this approval from him?

C. Jablonsky

A. I don't recall, but I think it was via e-mail.

Q. Did he sign any memorandum or document approving the reorganization?

A. Not to my knowledge.

Q. But do you recall receiving the e-mail from him indicating his approval of the reorganization?

A. I remember getting approval. I think it was via e-mail, but I do remember having approval before taking the next steps.

Q. Did you discuss the reorganization with Mr. Kloepfer in person at some point?

A. Yes.

Q. Did you discuss it with him at that meeting? In your prior e-mails you indicated it was scheduled for 3 o'clock that day.

A. I don't know if it was at that meeting or subsequent.

Q. But you remember discussing with him in person?

A. Yes.

Q. And what did you explain to him about the reorganization?

---

Page 141

C. Jablonsky

A. Just the general overview that it was a reorganization. That Len Aubrey had already approved the plan and that there was one position that we needed to create a severance agreement for.

MR. SPARBER: Before we go to the next question, I just repeat what I said before which is we do believe that conversations with Mr. Kloepfer that are not privileged and confidential that Miss Jablonsky will testify with respect to those, but I do reserve the right at various times if there is something that deems to be confidential to object at that time.

MR. FILOSA: That's fine. It is not our position that Miss Jablonsky in talking about these conversations somehow waived the privilege. I will leave it to you to distinguish what you believe to be a privileged conversation and what is not.

I may continue asking my questions under the assumption -- I am just going to keep going with the questions. If at any point you are concerned about privilege,

---

Page 142

C. Jablonsky

please let me know.

MR. SPARBER: I will.

MR. FILOSA: My intent is not to get to privileged communications, but in a situation like this I am just going to continue to ask the questions until you tell me I am at a privileged point.

MR. SPARBER: Okay.

MR. FILOSA: So is there a question pending?

(Record read.)

Q. Did Mr. Kloepfer have any questions about the reorganization?

A. I don't recall. He would have clarified anything he didn't understand, but I don't recall specific questions.

Q. Do you remember anything, any part of your discussion with Mr. Kloepfer other than what you had testified to that you summarized in your summary of the reorganization?

A. No. I don't remember there being any issues or concerns raised. It was merely transmitting the information to him and him then responding.

---

Page 143

C. Jablonsky

Q. And do you recall what his response was?

A. He approved the action.

Q. Do you recall if it was in this meeting or if it was some point thereafter?

A. I don't recall. Chances are it was verbal during the meeting and then followed up by an e-mail.

Q. Is that something that would be required, some type of written approval under the general NYIT practices?

A. Yes, but it could be as simple as an okay. A memo is presented or e-mail is presented this is what it was, you know. Unless you object this is what we are going to do and then you get an okay back. That's an approval.

Q. You indicate in your affidavit that you had Corina Hendea prepare the standard severance agreement that NYIT presents to an employee whose position is being eliminated through reorganization.

Do you know where Miss Hendea got the standard severance agreement?

A. No. I don't whether she had it -- I

---

Page 144

C. Jablonsky

don't know how she had it saved.

Q. And do you know who -- did you determine that the severance agreement was necessary?

A. No, but it is standard operating procedure in a situation like this. With prior employers I would have used one and I would have assumed that there would have been one to use, but I didn't make the specific decision in this specific case to use a severance agreement.

Q. Did anyone, did Mr. Aubrey ask or mention a severance agreement at any point during your discussions about the reorganization?

A. Not that I recall. There may have been a general conversation about this is a severance type of situation, but that's as far as it would have gone.

Q. Do you know whether or not you discussed with Mr. Rizzuto any need for a severance agreement as part of this reorganization and elimination of Mr. Baffo's job?

A. Again, I think it would have been that very general conversation because the presumption is that a situation like this would need one.

Page 157

C. Jablonsky

identification, as of this date.)

Q. You have been shown a document marked as Jablonsky Exhibit 10. It is a one-page document Bates stamped D 08408. Please review it and let me know when you are ready.

A. Okay.

Q. Have you ever seen this document before?

A. Yes.

Q. Do you know what it is?

A. Yes. It is the talking points that I prepared.

Q. So you drafted this?

A. Yes, based on Robert's words.

Q. And did you provide this to Mr. Rizzuto?

A. Yes.

Q. How did you give it to him?

A. I don't recall.

Q. You don't know if you printed it and handed it to him or e-mailed it to him?

A. I don't know.

Q. Did you find this in the documents when you were searching your computer?

Page 158

C. Jablonsky

A. I don't remember if I found it or if it was found on the electronic gathering of the documents.

Q. So is it fair to say, that this is a combination of your words and Mr. Rizzuto's words or would you characterize it more as you simply wrote down what he said?

A. I wrote down what he said and tried to put it in complete sentences and order of thought to lead up to my part.

Q. So the substance of all this is, was all provided to you by Mr. Rizzuto?

A. Yes.

Q. You just cleaned it up and put it in -- formatted it?

A. Yes.

Q. Looking at the second sentence, the first paragraph it says: As you know we have been under a lot of economic pressure lately and we need to look at ways to make this operation more cost effective.

Are those Mr. Rizzuto's words?

A. Yes.

Q. And --

Page 159

C. Jablonsky

A. Just not necessarily that exact word in that exact -- you know what I mean. It is his thought.

Q. In sum and substance those are his words?

A. Yes.

Q. Now did he explain to you what he meant by, in sum and substance, we have been under a lot of economic pressure lately?

A. No.

Q. Did you ask him whether or not the de Seversky Center had been under a lot of economic pressure lately?

A. No.

Q. So he said that there was and you accepted that as true?

A. Yes.

Q. And it goes on: We need to look at ways to make this operation more cost effective.

Did you have any understanding as to what Mr. Rizzuto meant when he said in sum and substance that?

A. No.

Q. Did you ask him what he meant by that?

Page 160

C. Jablonsky

A. No.

Q. Did you have any understanding as to whether or not the reorganization would make the de Seversky Center more cost effective?

A. No.

Q. Did you ask how the reorganization could make the de Seversky Center more cost effective?

A. No.

Q. Did Mr. Rizzuto ever explain how the reorganization would make the de Seversky Center more cost effective?

A. No.

Q. Now you go on to say: Len and I have been looking at the structure for quite a while now and decided that a reorganization is needed to help accomplish our goals. We put some part of the plans into effect already, but unfortunately part of this plan includes elimination, your position of general manager.

Do you see that?

A. Yes, I do.

Q. And when it says Len and I, that is referring to Mr. Aubrey and Mr. Rizzuto?

Page 161

```
1            C. Jablonsky
2     A.    Yes.
3     Q.    Now do you have any understanding as
4  to what Mr. Rizzuto meant in sum and substance
5  that they have been looking at the structure for
6  quite a while?
7     A.    Not specifically. Just referring to
8  those other positions that he had mentioned prior
9  that they were recruiting for.
10    Q.    Do you know for how long they had been
11 thinking about it?
12    A.    No.
13    Q.    And Mr. Rizzuto didn't say how long he
14 had been thinking about it?
15    A.    Not specifically.
16    Q.    And when you say or -- sorry.
17          When you write based on Mr. Rizzuto's
18 words we have put some parts of this plan into
19 effect already, do you know what that is a
20 reference to?
21    A.    My understanding of it is that it is
22 those two positions that had already started to be
23 recruited for.
24    Q.    That's the dining room captain
25 position and the sales associate position that we
```

Page 162

```
1            C. Jablonsky
2  talked about that were in your affidavit?
3     A.    I don't know for sure if those were
4  the two that were recruited for.
5     Q.    And then it goes on: Considering the
6  economic climate and pressures, we are able to
7  offer you an enhanced severance to help you with
8  this transition.
9           Are those Mr. Rizzuto's words in sum
10 and substance or something you added?
11    A.    That would be something that Robert
12 Rizzuto was aware of that we were going to use the
13 package that had been used that prior summer. So
14 the word enhanced severance would not have been a
15 word that would have come out of his mouth without
16 hearing it from us.
17    Q.    But did you ever discuss with Mr.
18 Rizzuto whether an enhanced severance was
19 necessary or appropriate?
20    A.    I would have told him that that's what
21 was going to be done in this situation.
22    Q.    Do you know when you were scheduled to
23 meet with Mr. Baffo on the morning of Friday the
24 23rd?
25    A.    Not specifically. I know it was in
```

Page 163

```
1            C. Jablonsky
2  the morning, but I don't remember the time.
3     Q.    And did you ever meet with Mr. Baffo
4  that morning?
5     A.    No.
6     Q.    Why not?
7     A.    I got a phone call from Robert Rizzuto
8  telling me that he had had a conversation with
9  Anthony and that Anthony told him that he was HIV
10 positive.
11    Q.    And what specifically did Mr. Rizzuto
12 say?
13    A.    I don't remember the specific words
14 that was -- just the gist of it that he had come
15 in that morning and given him that information.
16    Q.    Did that concern you in any way?
17    A.    It gave me pause to think about should
18 it affect it, could it affect it? What do we do
19 now? Do we go ahead with the plan as stated?
20    Q.    What affect would Mr. Baffo's HIV
21 status have on the plan?
22    A.    Not necessarily the status. Just that
23 there was now new information into the situation
24 that I had not heard before.
25    Q.    Now did Mr. Rizzuto tell you -- strike
```

Page 164

```
1            C. Jablonsky
2  that.
3          Do you know when that phone call was?
4     A.    It was before the meeting. I am not
5  sure specifically, but it was definitely prior
6  to -- de Seversky is at a different part of the
7  campus. I had not yet left my office for the trip
8  to de Seversky.
9     Q.    How long is the trip from your office
10 to de Seversky?
11    A.    It's only five minutes, but it is
12 still get in the car and go over there.
13 Considering I just started, I didn't know where I
14 was going and it's like go through a parking lot,
15 down a hill. So I probably would have left myself
16 ten.
17    Q.    And do you know when the meeting was
18 scheduled for?
19    A.    It was in the morning. I can't tell
20 you if it was 8:30, 9:30, 10.
21    Q.    And did Mr. Rizzuto say what Mr. Baffo
22 had told him?
23    A.    As I said, he said that Anthony had
24 come in and told him that he was HIV positive. I
25 don't remember the specific words to it, but that
```

VERITEXT REPORTING COMPANY
212-267-6868                516-608-2400

Page 165

C. Jablonsky

was the gist of the conversation.

Q. And did you say anything in response to Mr. Rizzuto?

A. I said okay. Hold off. Let me talk to Steve Kloepfer.

Q. Why did you tell him to hold off?

A. Because this was a new piece of information we didn't have before.

Q. What affect would that new piece of information have that would have made you hold off?

A. I wasn't sure which is why I wanted to talk to Steve who was the general counsel about whether or not this would change anything.

Q. Now did Mr. Rizzuto say whether or not he had discussed Mr. Baffo's HIV status prior to that day?

A. Not during that conversation, no. Not at that point.

Q. Did he say anything else about what Mr. Baffo had told him in this first phone conversation? Did Mr. Rizzuto say anything else about what Mr. Baffo had told him?

A. No. That was a very quick

Page 166

C. Jablonsky

conversation.

Q. What did you do after you spoke to Mr. Rizzuto?

A. Tried to contact Steve Kloepfer.

Q. Why did you want to contact Mr. Kloepfer?

A. Because I wasn't sure if and how this would change what NYIT was going to do going forward.

Q. And did you ultimately contact Mr. Kloepfer?

A. Yes.

Q. And do you know when you spoke with him -- strike that.

Did you speak with him?

A. Yes.

Q. Do you know when you spoke with him?

A. Not the specific time of day, no.

Q. Do you know whether it was that day?

A. Yes. It was that morning, but I don't know what time.

Q. Do you know if you spoke to him in person or over the phone?

A. In person.

Page 167

C. Jablonsky

Q. What did you discuss with Mr. Kloepfer?

MR. SPARBER: Okay. I am now interposing an objection. For the record, I think that at this point in time, just generally speaking, Mr. Kloepfer's job has sort of changed; his business hat to his legal hat. He is now dispensing legal advice rather than business advice and I would caution you not to at the moment do it and not I am directing the witness at this point not to answer that question.

Q. Are you going to follow your attorney's instruction and not answer the question?

A. Yes.

Q. Would you be able to answer this question had your attorney not instructed you not to answer it?

A. What do you mean by be able?

Q. Do you recall what you discussed with Mr. Kloepfer?

A. In general.

Q. So if your attorney had not instructed

Page 168

C. Jablonsky

you not to answer the question you would be able to provide some type of substantive answer to my question?

A. I would be able to.

Q. That's all I was asking. It is a procedural thing.

A. Mm-hmm.

Q. So ultimately you met with Mr. Kloepfer; correct?

A. Yes.

Q. And what did you do following your meeting with Mr. Kloepfer?

A. I don't know if this --

MR. SPARBER: You can answer if it doesn't involve actually what you and Mr. Kloepfer talked about. He is asking you what you did after that. So you might very well be able to answer the question.

A. Based on that conversation I created a new agreement, new cover letter.

Q. And what did this new agreement and new cover letter provide for?

A. Enhanced benefits, enhanced severance.

Q. Over and above what was on the October